# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

BRAVETTE JOHNSON and
CURTIS WILLIAMS,

        Plaintiffs,

v.

CITY OF RICHMOND, VIRGINIA,

Serve:

        Allen L. Jackson, City Attorney
        Office of the City Attorney
        City of Richmond, Virginia
        900 E. Broad St., Suite 400
        Richmond, VA  23219
        (City of Richmond)

JASON NORTON,

Serve at:

        2715 Bowles Lane
        Glen Allen, VA 23060
        (Henrico County)

BRYAN T. NORWOOD,

Serve at:

        3650 South Glebe Road
        Unit 254
        Arlington, VA 22202
        (Arlington County)

CHRISTOPHER GLEASON,
CHARLES SIPPLE,
ROGER RUSSELL,
MICHAEL ALSTON,
BRIAN CORRIGAN,
MARTIN HARRISON, and
WILLIAM BLACKWELL,

Case:  __3:17CV553__

**JURY TRIAL DEMANDED**

Serve the foregoing at:

Richmond Police Department
200 West Grace Street
Richmond, Virginia 23220
(City of Richmond)

Defendants.

## COMPLAINT

COME NOW Plaintiffs Bravette Johnson and Curtis Williams, by counsel, and move this Court for judgment against Defendants City of Richmond, Virginia; Jason Norton; Bryan T. Norwood; Christopher Gleason; Charles Sipple; Roger Russell; Michael Alston; Brian Corrigan; Martin Harrison; and William Blackwell, stating as follows:

## I.     INTRODUCTION

1.     On March 11, 2010, Detective Jason Norton, an Officer with the Richmond Police Department, executed a search warrant on 33__ D___ Avenue in Richmond, Virginia.  While in the house, Officer Norton arrested Bravette Johnson.  Mr. Johnson did not know it at that time, but his arrest was only possible because of fraud committed by Officer Norton, and permitted by other officers and the Police Department itself.  Johnson thus should not have spent a single day in jail.  Instead, he sat in his cell, separated from his family and friends, and, indeed, his entire *life,* for approximately two years.  Even after his release, Johnson was subjected to supervised probation and further judicial proceedings that significantly infringed on his liberty.

2.     Bravette Johnson was not the only victim of Norton's lies and the Richmond Police Department's gross failures.  Curtis Williams suffered a similar fate—being unconstitutionally detained for approximately two years and subjected to post-release infringements on his liberty. In addition to the Plaintiffs in this suit, a separate lawsuit currently

before this Court details the unconstitutional detentions of five other persons based on similar conduct. *See Ensley et al. v. City of Richmond et al.*, Case: 3:17-cv-00024-MHL.

3.      Every single day that Plaintiffs spent in prison was in violation of the United States Constitution and Virginia law. This Complaint seeks to vindicate the rights of Messrs. Johnson and Williams by holding the City of Richmond, Jason Norton, then Police Chief Norwood, and the other Defendants, Norton supervisors, accountable for their extraordinary misconduct.

## II.      <u>JURISDICTION</u>

4.      This Court has jurisdiction over the federal law claims in this case pursuant to 28 U.S.C. § 1331 because the Plaintiffs claim a right to relief arising under federal law.  In particular, the Plaintiffs aver that their unjustified arrests violated the United States Constitution.

5.      This Court has jurisdiction over the state law claims in this case pursuant to 28 U.S.C. § 1367 because the state law claims arise out of the same transactions or occurrences comprising the federal law claims.

## III.      <u>VENUE</u>

6.      Venue is proper pursuant to 28 U.S.C. § 1391(b), because a substantial part of the acts and omissions giving rise to Plaintiffs' claims occurred in the Eastern District of Virginia.

7.      Assignment to the Richmond Division of the Eastern District of Virginia is proper pursuant to Eastern District of Virginia Local Rules 3(B)(4) and 3(C), because a substantial part of the acts and omissions giving rise to Plaintiffs' claims occurred in the Richmond Division.

## IV.      <u>PARTIES</u>

8.      Plaintiff Bravette Johnson is a citizen of the Commonwealth of Virginia residing in Henrico County, Virginia.

9.     Plaintiff Curtis Williams is a citizen of the Commonwealth of Virginia residing in Henrico County, Virginia.

10.     Defendant Jason Norton was, at all relevant times, an officer in the Richmond Police Department.  He is sued in his individual capacity.

11.     Defendant City of Richmond is, and at all relevant times, was, a city within the Commonwealth of Virginia.  The City of Richmond operates the Richmond Police Department (sometimes referred to herein as "RPD").  Final decision making for the City of Richmond's policies concerning police operations, however, has been delegated to its Chief of Police, who, during the relevant period, was Defendant Bryan T. Norwood.[1]

12.     Defendant Bryan T. Norwood was, at all relevant times, the Chief of Police of the Richmond Police Department and was responsible for supervising Jason Norton.  Defendant Norwood served as Chief of Police from 2008 through 2013.  He is sued in his individual capacity.

13.     Defendant Christopher Gleason was, at all relevant times, an officer in the Richmond Police Department responsible for supervising Jason Norton.  From 2009 through approximately June 2012, Defendant Gleason served as Norton's Direct Supervisor.  Upon information and belief, Defendant Gleason has continued to work for RPD through the date of this filing.  He is sued in his individual capacity.

---

[1]     The Richmond Police Chief has final control over police policies, training, discipline, and the day-to-day operations of the Department. The City Code grants the Chief of Police "general management and control of the department of police." Richmond City Code § 2-272. The City Code further provides that the Chief of Police shall: assign all members to their respective posts, shifts, details and duties; make rules and regulations concerning the operation of the Department, the conduct and training of the officers; and determine the penalties to be imposed for infractions of such rules.  The City Code further provides that the Chief of Police shall be responsible for the efficiency, discipline and good conduct of the Department. *Id.*

14.     Defendant Charles Sipple was, at all relevant times, an officer in the Richmond Police Department responsible for supervising Jason Norton.  Defendant Sipple served as Norton's Intermediate Supervisor in or before 2008 through, upon information and belief, April 2011.  He is sued in his individual capacity.

15.     Defendant Roger Russell was, at all relevant times, an officer in the Richmond Police Department responsible for supervising Jason Norton.  From July 2007 through April 2011, Defendant Russell served as the Head of the RPD's Special Investigations Division.  According to his LinkedIn page, from "April 2011 – present (5 years 10 months)," Defendant Russell has served as "Officer in Charge" of the RPD's Internal Affairs Division.  Upon information and belief, Defendant Russell has continued to work for RPD through the date of this filing.  He is sued in his individual capacity.

16.     Defendant Michael Alston was, at all relevant times, an officer in the Richmond Police Department responsible for supervising Jason Norton.  In 2012 and 2013, Defendant Alston served as Norton's Direct Supervisor.  Upon information and belief, Defendant Alston has continued to work for RPD through the date of this filing.  He is sued in his individual capacity.

17.     Defendant Brian Corrigan was, at all relevant times, an officer in the Richmond Police Department responsible for supervising Jason Norton.  In 2012 and 2013, Defendant Corrigan served as Norton's Intermediate Supervisor.  Upon information and belief, Defendant Corrigan has continued to work for RPD through the date of this filing.  He is sued in his individual capacity.

18.     Defendant Martin Harrison was, at all relevant times, an officer in the Richmond Police Department responsible for supervising Jason Norton.  In or about 2011 through at least

March 2013, Defendant Harrison served as the Head of the RPD's Special Investigations Division. The RPD website indicates that Defendant Harrison currently leads the Department's Internal Affairs Division. Upon information and belief, Defendant Harrison has continued to work for RPD through the date of this filing. He is sued in his individual capacity.

19.      Defendant William Blackwell was, at all relevant times, an officer in the Richmond Police Department responsible for supervising Jason Norton. From in or about 2009 through 2011, Defendant Blackwell oversaw the RPD's confidential informant program. Upon information and belief, Defendant Blackwell has continued to work for RPD through the date of this filing. He is sued in his individual capacity.

20.      All of the individual Defendants are persons, who, during the relevant period, were acting within the course and scope of their employment/agency with the Richmond Police Department, and under color of state law pursuant to 42 U.S.C. § 1983.

21.      Defendants Norwood, Gleason, Sipple, Russell, Alston, Corrigan, Harrison, and Blackwell will, for ease of reference, be referred to collectively as the "Supervisory Defendants."

## V.      FACTS

### A.  Jason Norton's Troubled Tenure as a Richmond Police Officer

22.      Jason Norton joined the Richmond Police Department in 2004 and over time earned a reputation as a sloppy, dishonest, and corrupt officer. Indeed, Norton's problems were so well known—and so serious—that, within the Department, it had been a "joke for years that Norton was dirty." "Dirty," in the field of law enforcement, indicates that an officer is corrupt— that he is flouting the law rather than obeying it.

23.      By mid-2012, Norton's "dirtiness" was so evident that the Federal Bureau of Investigation (FBI) began investigating him. What the FBI found is a shocking record of

misconduct. Although this case chiefly concerns Norton's fraudulent arrests of the Plaintiffs, his misconduct apart from these events evidences his propensity to lie and break the law—a fact that supports the City of Richmond and the Supervisory Defendants' liability in this case.

### 1. Norton's Unlawful Seizures of Money

24.     One of Norton's most common frauds concerned the seizure of money during an arrest.  Over and over again, Norton would stop a car, search the car, and discover money and perhaps other contraband.  He would seize the money as though it were evidence of a crime, but *would not* arrest the occupants of car, issue a citation, or even, contrary to department policy, provide a receipt to the occupants confirming that he took the money.  The failure to provide a receipt is crucially important, because it allows Norton to deny that he ever took the money.  If he had issued receipts, those who had their money taken could have shown up at the police station demanding their money back and administrators would then have turned to Norton asking for the money.  By not issuing receipts, therefore, Norton was laying the groundwork for a scheme to unlawfully keep the money.

25.     An example of this behavior is recorded in a statement made to the FBI by "C. R."  According to C.R., "in 2008 or 2009," Norton pulled C.R. and "T. T." over in a North Richmond parking lot.  T. T. was driving, but he did not have a valid driver's license.  Norton searched the car and "took $5,000 cash" which was "in a plastic bag in the car."  According to C.R., "[T. T.] was scared and thought he would get locked up."  But instead, "NORTON let [T. T.] and [C. R.] go without giving them a citation or receipt."

26.     "R. A.," a resident of North Richmond, had the same experience in November 2008 and then again in 2009.  According to an FBI interview, Norton pulled R. A. over in November 2008 while R. A. was driving a Dodge Charger on Barton Avenue in Richmond.

"While searching for drugs, NORTON found and took $3,500 from the arm rest of the Dodge

Charger.  NORTON did not give [R. A.] a receipt for the money and continued to regularly pull

[R. A.] over."  The same thing happened to R. A. in 2009 when he was eating food in his car.

"[R. A.] had spit out a piece of plastic packaging for his utensils.  NORTON took the plastic and

placed it inside an evidence bag stating that it was packaging for drugs.  NORTON took $1,000

to $1,500 from [R. A.] . . .  NORTON did not provide [R. A.] with any paper or receipts after

NORTON took the money."

   27.  Another Richmond resident, "M. S.," encountered this conduct not twice, but

three times.  The first time was in November 2008.  M. S. was hanging out with several friends

on H_____ ____ Street when, according to FBI records, Norton pulled up and had everybody

line up.  Norton then called a canine to smell the lineup for drugs.  "NORTON stated that the

canine hit on [M. S.] and two of the others.  [M. S.] didn't observe the canine react to him or the

others and doubted NORTON's statement that the dog 'hit.'" Norton nonetheless called for a

police transport vehicle.  While waiting for the vehicle, Norton searched [M. S.]'s car and found

"a black duffel bag, a weed scale and empty zip lock bags."  A bit later, Norton noticed a bulge

in [M. S.]'s pocket and asked him what it was:

> [M. S.] stated that there was money in his pocket.  NORTON asked how much [money]
> to which [M. S.] replied $1,500 or $1,700.  NORTON told [M. S.] not to worry about it
> and 'my kids are going to have a good Christmas off you.'
>
> NORTON told [M. S.], let me tell you how I work.  See that guy with the glasses right
> there—that's DEA—I can take this money, give it to him, call your probation officer, and
> have your probation revoked.  NORTON then provided the alternative that [M. S.] could
> get on NORTON's team.  [M. S.] responded something to the effect of fuck that money
> and was released from the paddy wagon.
> . . .

NORTON took the $1,700, which had been folded in half in [M. S.]' pocket, but did not take the duffel bag, scale or anything else. NORTON[2] admitted that the $1,700 were proceeds from marijuana that was previously stored in the duffel bag. NORTON did not give [M. S.] any receipt, report or court date but did provide [M. S.] with a Richmond City card that had a phone number on it. [M. S.] threw the card away.

28.    M. S.'s second run in with Norton was in "April or May of 2009." M. S. was in his mother's car when Norton pulled him over, saying that "he hadn't seen this vehicle in his neighborhood and he had to find out who was driving." Norton asked M. S. to get out of the car, patted him down, and found "approximately $1,100 or $1,200 cash in [M. S.]'s pocket. NORTON took the money and stated that he would go in early tonight." At that point, another police officer arrived.

NORTON told [M. S.] that he would go talk to the officer and let the officer know that he had already spoken with [M. S.]. [M. S.] got into [his mother's car] and drove off. [M. S.] remembered being mad but felt like NORTON's taking money from [M. S.] would be a routine thing. Although [M. S.] was upset he figured that periodically giving money to NORTON would be a cost of business. No arrests or court hearings came from this incident.

29.    This same conduct repeated itself for the third time on September 13, 2011. Norton accosted M. S. while he was in his car, searched it and found contraband. M. S. was placed in handcuffs and he expected to be formally arrested. Instead, Norton's partner, Bruce Gochenour (who arrived shortly after Norton):

provided [M. S. with] a phone number on a sheet of paper or card board and told [M. S.] that he was providing a number so [M. S.] could call, work with GOCHENOUR and NORTON, and they would go from there. GOCHENOUR then took the hand cuffs off [M. S.] and let him go. NORTON told [M. S.] that they don't have snitches . . . [but rather] an all-star team of business partners. [M. S.] threw the piece of paper with the number on it out his window. That day, NORTON and GOCHENOUR seized drugs and $5,000 from [M. S.]'s vehicle but did not arrest [M. S.] or provide a receipt or ticket.

---

[2]    Although FBI records state that "Norton" admitted that the money was the result of marijuana sales, it seems likely that this is a typographical error. More likely it was M. S., not Norton, who admitted this.

M. S. was so confused about this experience that he sought the advice of an attorney.  Soon after

this, Norton and Gochenour met with M. S.  At the meeting:

> NORTON told [M. S.], this is how it goes – every month we pick the place, you make the
> drop and we pick it up.  [M. S.] understood this to mean that NORTON and
> GOCHENOUR wanted [M. S.] to deliver them money monthly in exchange for their not
> going after [M. S.]' drug dealing.  [M. S.] assumed they were willing to make this offer
> because [M. S.] hadn't gone to the cops about their prior encounters.

30.     A final example of Norton's misconduct concerns "M. T."  On January 6, 2012,

according to an FBI interview:

> M. T. was driving . . . when NORTON followed him approximately 15 blocks.
> NORTON stopped [M. T.] . . . for the tint on this [sic] windows, but then said don't
> worry about it because he smelled marijuana.  Norton found a tobacco grinder with
> marijuana residue and a cup with a false bottom containing less than a gram of heroin.
> [M. T.] also had approximately $1,300 in his pants.  . . .
>
> NORTON seized the grinder, cup, heroin, $1,300 and a GPS and vacation photographs
> that were inside the vehicle.  NORTON gave [M. T.] a summons with his phone number
> on it but no receipt.  [M. T.] showed up for court on the date of the summons only to find
> that he was not on the docket.  [M. T.] asked about his case and there was no record of a
> summons or pending court date.

31.     Norton's behavior was not secret.  In FBI interviews, his police officer colleagues

reported that "lots of rumors about Norton went around," including "rumors and stories . . .

regarding missing money."  In interviews with residents of Highland Park in North Richmond,

residents reported that they "heard 'on the street' that Norton takes money," that Norton was a

"crooked cop," and that some people had to "pay a tax to Norton."

32.     Indeed, the Richmond Police Department was aware of it as well.  On March 25,

2011, Norton received a formal reprimand for an incident in February 2009 in which Norton

seized marijuana and cocaine, but failed to make an arrest or charge.  Norton claimed that his

decision not to arrest the individual related to an "attempt[] to use the individual as an

informant." This explanation was unavailing, however, because "the individual was not

registered as an informant." Thus, Norton's reprimand was based on his "fail[ure] to follow proper arrest procedures & procedures using an informant." As detailed later in this Complaint, Norton's intentional lies regarding informants would play a crucial role in his unlawful arrest of the Plaintiffs in this case.

**2. Norton's Dishonesty**

33. Aside from his repeated unlawful seizure of cash from suspects, Norton had problems with his own colleagues. Over time, they had come to regard Norton as "flying too fast and too loose," "shaky," or, more grimly, "a sinking ship." One significant part of this problem was Norton's dishonesty.

34. First, and perhaps most relevant to the claims in this Complaint, Norton was formally reprimanded on March 25, 2011 for his work with confidential informants in July 2010. RPD officials discovered that official Department records of Norton's work with informants contained two alarming problems. First, some official records contained signatures that were purportedly made by the same person, but did not look consistent. This suggested that at least one of the signatures must have been a forgery—with Norton being the most likely forger. Second, other records contained signatures of persons who were not listed as an informant in the case. This suggested that the informants Norton was telling the court about in his warrant applications were not his actual informants. Norton's dishonest schemes in his handling of informants will be discussed in much greater detail later in this Complaint.

35. Another example of Norton's dishonesty relates to a missed court date in July 2012. A police officer's failure to make a court date is quite problematic because it may result in a defendant escaping the charges against him. What made this incident especially concerning, however, was not the missed appearance, but rather Norton's excuse. Instead of just admitting to

his mistake, Norton made up a story about his son having a dental appointment. But Norton couldn't keep his story straight. When interviewed by another detective about the incident, Norton "repeatedly provided details related to that appointment in conflict with statements that Norton had just made." Norton's suspicious responses necessitated a second interview where Norton finally admitted that "he had used [the] dental appointment as an excuse for missing court b/c he was afraid he would get in trouble."

36. On another occasion in November 2012, Norton lied about his work in the field. During a meeting, several officers discussed "options to catch targets located in a specific area of the City." Norton said in the meeting that he had already "knocked on doors and went looking for targets at their addresses." In response to this, Norton's supervisor stated that "this is a team and that would mean that you went out by yourself and did this"—an apparent violation of policy. The supervisor asked Norton who went with him, and, instead of admitting the truth, Norton named an officer. Later, that officer was asked if "he went with Norton and the officer stated no."

37. A month later in December 2012, Norton missed a scheduled training in Martinsville, Virginia. RPD officers had planned to leave from police headquarters at 3:30 a.m. so that they could arrive in Martinsville in time for the training. Norton never showed up. At 3:45 a.m., having heard nothing from Norton, the officers left. At 6:30 a.m., Norton called and said, "the power went off," thus preventing his alarm from waking him up. Norton's supervisor was concerned that Norton missed the meeting, but much more concerned about Norton's unlikely "power went off" excuse. The supervisor's suspicions were apparently correct, for Norton later made a written statement in which he backed off his "power went off" excuse. In his statement, he said that he "forgot to switch the alarm button over to the actual alarm."

38.     In February 2013, Norton missed another court date.  With a court date scheduled for a Wednesday, Norton emailed his supervisor (apparently on a Tuesday) saying that "I have court today at 10 and Friday at 9:30.  I also need the day Wed. as I am flying to Boston to be with my best friend and his family as he has very invasive surgery. It [sic] was diagnosed with numerous kinds of cancer.  I will be flying back Thursday morning at 0615 hours."  Then, on Wednesday, Norton sent an email falsely stating, "[j]ust wanted to remind you that I am in Boston today and if anyone wants to say a prayer for my buddy Brendan it would be greatly appreciated." Then, on Thursday in the morning, Norton wrote again, "[h]ey just wanted to let you know that I landed safely and a [sic] soon as I get off the plane and get to my car I will be in. Didn't have to check a bag.  See you soon."   As it turned out, however, Norton never went to Boston and was "observed in the Shockoe Bottom area" on Wednesday afternoon.  When asked for proof that he went to Boston, Norton came clean and admitted that he had lied.  His excuse was that he "had a lot of things that have personally been going on in my life over the past year and have had a hard time dealing with them."

39.     In March 2013, Norton was caught in more misconduct that he tried to hide from by lying.  In this instance, Norton was spotted drunk at 2:00 a.m. with his service weapon in Shockoe Bottom, a bar district in downtown Richmond.  When he got into his car, started it, and turned on his headlights, an officer approached him and asked him if he had been drinking. Norton said "no," but when the officer asked Norton to step out of the car, he could see Norton's bloodshot eyes, that Norton was weaving back and forth, and noticed a "strong odor of alcohol on breath."  Norton was taken back to the station where his weapon was taken from him while he sobered up.  While at the station, Norton tried to explain his behavior.  He admitted drinking "3 beers and 2 red bull vodkas" that night, but stated that he was "not going to drive the car" (even

though he had started the car and turned on the headlights).  In the end, however, Norton knew he had made a big mistake and needed to protect his career.  He told his supervisor that night that "he wouldn't mess up anymore and swore on his kids he wouldn't if his supervisor would not report the incident."  A couple days later, Norton wrote a statement concerning the incident that, according to his supervisor, "left several things out." Notably, in his statement, Norton stated that he drank "2 red bull vodkas and 4 beers" not "3 beers and 2 red bull vodkas" as he had reported the night of the incident.

40.     Norton's willingness to lie is evidenced not just in his formal interactions with his supervisors, but also in his informal interactions with his colleagues.  For example, one of Norton's colleagues told the FBI that Norton told lots of "stories."  One of the stories that the co-worker remembered was a "30 minute dissertation" Norton gave about how he "pitched on the baseball team at East Carolina University" and played against "the University of Richmond." All of this was apparently false—and it appears that his colleagues knew it.

### 3.  Stepping Across the Thin Blue Line

41.     Seizing money from suspects (but then letting them go free) and lying to his supervisors, were only some of Norton's problems as an officer.  Another issue concerned his efforts on *behalf of the very individuals he was charged with arresting*.

42.     One shocking example of this occurred in April 2010. At that time, several FBI agents were surveilling a residence as part of a Task Force known as "RAVE" (Richmond Area Violent Enterprise).  The Task Force, which was staffed with RPD and federal officers, was specifically focused on uncovering criminal activity by "Gang A," a gang in Richmond.

43.     While surveilling the residence, the FBI agents observed R. A.—a person known to them—dealing cocaine base.  Knowing that R. A. was one of Norton's informants, one of the

FBI agents contacted Norton using a cell phone to "notif[y] [him] of the situation involving his Informant."

44.    After attempting several times to reach Norton, the agent eventually made contact and told him of their plans.  According to the Task Force files, Norton responded with "something to the extent of 'Let me take care of it'" and then hung up. Little did the agents realize at the time, but Norton's effort to "take care of it" was to tip off R. A.  According to a later interview of R. A., Norton called R. A. after hanging up with the FBI agent and "let [R. A.] know that he was hit"—meaning that he was about to be arrested.

45.    Norton's warning to R. A., however, was not enough.  Before R.A. could get away, another Task Force member, RPD Officer Errol Fernandez, arrested him. Soon after the arrest, Norton called the agents back asking whether R. A. had been arrested.  When agents informed Norton that the arrest was already "in process," Norton asked if the cocaine could be seized and R. A. released and perhaps indicted later.  The FBI agent rejected this suggestion, where upon Norton hung up the phone to call Fernandez.

46.    Soon thereafter, Norton called the agent back again.  After some discussion, the FBI agent told Norton that arresting R. A. was the best choice at the moment.  According to the official report, the agent told "Norton this a couple of times with no response. Detective Norton then hangs up the phone shortly thereafter."

47.    Moments later, the FBI agents spotted R. A. "walking freely down the street without being detained by the patrol officer."  When asked, Officer Fernandez said he "did not know why." R. A. was quickly re-arrested.  During the arrest, R. A. "stated several times in custody 'why me?'" and then "My man Norton said things are cool."

48.     The events surrounding R. A.'s arrest were so disconcerting to the FBI agents that they wrote out several different reports of what happened. Indeed, one report was specifically focused on Norton's strange behavior, titled "DETECTIVE NORTON REPORT TO [FBI AGENT] RE [R. A.]." The report became part of the Task Force files, which, as noted above, was a joint effort between the FBI and the RPD. Thus, by at least April 2010, RPD supervisors were on notice that Norton had an inappropriate relationship with R. A.—the type of relationship that Norton wanted to hide and protect. This is important, because, as shown later in this Complaint, R. A. was not just any informant. He was an informant crucially involved in Norton's fraudulent scheme that led to the unconstitutional arrest and imprisonment of numerous persons.

49.     The evening of R. A.'s arrest is notable for yet another reason. That night, FBI agents were surveilling a residence associated with the activities of "Gang A." In other surveillance of the gang's activities, officials overheard Norton's name. Importantly, the gang members were not discussing threats *from* Norton, but rather discussing whether Norton would *help* them by "supplying or looking after the guys in the gang." This is concerning on its own, but is even worse given that, according to FBI files, "NORTON sat on the arrest warrant of a Bloods gang member for a couple of months without entering it into the computer or executing the arrest. Richmond Police Detective SPRINKLE found the warrant in NORTON's desk and arrested the subject." It is not known whether Norton's attempt to prevent R. A.'s arrest was related to any connection he had with Gang A. Nonetheless, RPD supervisors would have known about both events and must have been, or should have been, deeply concerned.

50.     Gang A was not the only gang with which Norton had connections. Another Richmond gang, "Gang B," was under investigation by the RPD for a variety of criminal

activities.  While this investigation was in process, Norton became friends (both online and apparently in person) with "J. B."  J. B. would later be arrested for attacking a member of a rival motorcycle gang and breaking his eye socket.  J. B. was no bit player in the gang either; when officers searched his house, they discovered drugs and more than a dozen firearms.

## B. Norton's Misconduct Involving Confidential Informants

51.     Aside from the dishonesty and corruption described above, Norton also engaged in extensive misconduct in his use of confidential informants.  To understand this misconduct, it is first necessary to understand how police use informants to detect crime and how the RPD in particular manages its informants.

### 1. Warrants and RPD's Confidential Informant Practices

52.     The United States Constitution protects all persons in the United States from unjustified searches and seizures.  In the circumstances relevant to this case, a search or seizure is justified if it is based on a valid warrant issued by a court.  Courts may issue warrants only upon a finding that there is "probable cause" to believe that a crime is occurring or has occurred. Thus, if a police officer wants to search or seize something, he must first prove to a court that there is probable cause to believe that a crime is occurring or has occurred.

53.     Officers may prove probable cause to a court in different ways.  For instance, if an officer observes suspicious activity in the vicinity of a particular house and wishes to search that house, the officer may establish probable cause by reporting to the court his own observations. Sometimes, however, the officer has not personally observed suspicious activity, but only heard from others that such activity has occurred.  Where an officer hears about suspicious activity second-hand, the court must make sure that the second-hand reports are

nonetheless trustworthy. If police officers could perform a search or seizure based merely on gossip, our constitutional rights would not amount to much.

54.     To guard against searches and seizures based on mere gossip, the Constitution requires the person providing the second-hand report—often called an "informant"—to be reliable. If a reliable informant supplies the police officer with information about a crime, a court may issue a search warrant even though the police officer does not have personal knowledge of the crime. In contrast, if the informant is not reliable, the court may not issue the warrant.

55.     Because reliability is essential to establishing probable cause in cases where a police officer does not have personal knowledge of a crime, applications for a warrant will often contain statements intended to establish the reliability of the informant—sometimes called the informant's "resume." For example, to establish reliability, an officer might state that he has known the informant for 15 months, that the informant is experienced in the drug trade, and that the informant has previously provided reliable information to the police, etc. Of course, if an officer lies about an informant's resume, the informant's reliability has never actually been established and the resulting warrant is invalid. If a warrant is invalid, then so, too, is any resulting arrest and period of detention—even if it lasts for years. As we shall see, that is exactly what happened in this case.

56.     Before Norton's lies and the invalid warrants in this case are discussed, however, it is important to address another matter: RPD's handling of confidential informants. A confidential informant is someone who provides tips to police officers about recent or ongoing crimes, but whose identity is known only to the police. Police officers often agree to keep an informant's identity secret because, if the identity were known to the public, the informant would

be at risk of retaliation for helping the police.  Thus, by promising informants confidentiality, the police are able to gather more information from the public.

57.     To preserve an informant's confidentiality, the RPD assigns each informant a "CI number," *e.g.,* "CI #123."  ("CI" stands for "Confidential Informant.")  When referring to the informant in a document, officers refer only to the informant by his CI number.   Thus, if the document were to become public, no one could discern the true identity of the informant.  A separate file—called the "master file"—contains a record of each informant's CI # and name.

58.     An informant will sometimes share information with the police without any expectation of personal gain, but, more frequently, the informant seeks a benefit for his services.  For example, if the police arrest somebody for a crime, that person might obtain a reduction in his charges (or avoid charges altogether) if he is willing to provide information to the police that will lead to the detection of an important crime.  If an informant has not already been implicated in a crime, however, then the reduction or avoidance of charges would be of no interest to the informant.  In these cases, police departments often offer cash payments to informants for providing useful information.

59.     The RPD maintains a supply of cash to pay informants.  If an officer believes that an informant has information that would be useful in solving a crime, the officer may negotiate a fee with the informant and then, using RPD cash, pay the informant.  In Richmond, fees tend to range from approximately $100 to $500.

60.     Obviously, if a police department is handing out hundreds of dollars of cash to police officers who then pay it to informants, it is important to maintain close control over when and how the money is distributed.  In the Richmond Police Department, these controls take the

form of a "Report of Expenditure of Special Investigative Funds." Within the Department, this report is more commonly known as an "N-10 form."

61.     The RPD's N-10 form requires officers who work with informants to provide the CI number of the informant being paid, as well as the amount of money paid to the informant. The N-10 form also requires that: (1) the informant himself acknowledge receipt of the funds by signing his name and (2) a witness verify that the informant did, in fact, receive the funds and sign his name on the form. The witness's verification is indicated by the witness's own signature on the N-10 form.

62.     In addition to these requirements, the N-10 form requires the officer working with the informant to sign his or her own name and declare that "the information [contained in the N-10 form] is true and accurate."

63.      In sum, officers who desire to execute a search or seizure must, in circumstances relevant to this case, first obtain a warrant from a court. To obtain a warrant, the officer must demonstrate to the court that there is probable cause to believe that a crime is occurring or has occurred. When an officer does not have personal knowledge of criminal activity, he or she may seek a warrant based on information provided by an informant—but only if the informant is *reliable.* If the informant is not reliable, or the officer has misrepresented the informant's identity, any resulting warrant is invalid. Informants who provide information to RPD officers may be paid for their services, but only after an N-10 form has been completed. The N-10 form contains the informant's CI number, the informant's signature, a witness's signature, and the officer's own signature.

## 2. Jason Norton's Fraudulent Warrant Scheme

64.     Jason Norton had a reputation in the RPD for "producing"—i.e., for making lots of drug arrests.  Norton's reputation, however, was not well earned.  His reputation was based on a pack of lies.

65.     Norton's lies involved his use of confidential informants. To obtain a court warrant, Norton routinely told courts that his knowledge of criminal activity derived from an informant.  Norton knew, of course, that a warrant could only issue if he could establish the informant's reliability. Norton was apparently so eager to make arrests, and so unconcerned with people's rights, that he frequently lied when establishing his informants' reliability.

66.     Norton's lies were of two types.  In some warrant applications, he attempted to establish the *same informant's reliability using entirely different sets of facts,* while in other warrant applications, he attempted to establish *different informants' reliability using the exact same set of facts*.  The *Richmond Times-Dispatch*, in its coverage of Norton's misconduct, described the problem thus: Norton's warrant applications had "differing résumés . . . for the same informant and identical résumés . . . for purportedly different informants."

67.     The inconsistencies were not isolated.  For example, Norton relied on the same informant in seven different warrant applications.  If the informant is the same, the facts establishing the informant's reliability should also be the same or nearly the same.  But the facts supporting the same informant—at least according to Norton's statements—were "wholly inconsistent." As Assistant Commonwealth Attorney Patrick Dorgan explained, "Generally speaking, this guy's résumé on the seven search warrants should be consistent. But you lay them out across the table and they're wholly inconsistent."

68.     In other instances, Norton did not give different "résumés" for the same informant; he gave "the exact same résumé for two completely different individuals." As Dorgan explained during his investigation into Norton's scheme, "[y]ou put them side by side and it's exactly the same, to a T." It is simply inconceivable that different informants would have the exact same indicia of reliability. As one of Norton's colleagues put it, incredulously, "'[w]hat are the chances it's the exact same?'"

69.     In sum, Norton repeatedly lied in his applications for search warrants. His lies concerned the identity and/or reliability of the confidential informants he offered to the court as evidence of probable cause. In some cases, Norton provided different résumés for the same informant, and in other instances, he provided the same résumé for different informants. In either case, Norton was lying about identify or reliability of his informants. As a result, warrants based on his lies were completely invalid, as were the arrests and detentions of the Plaintiffs in this case: Bravette Johnson and Curtis Williams.

### C.   Jason Norton's Fraudulent Arrest of Bravette Johnson

70.     On March 11, 2010, state and federal officers arrested Bravette Johnson at 33__ D____ Avenue in Richmond, Virginia. Johnson did not know it at the time, but his arrest was the result of blatant lies by Jason Norton and thus completely unconstitutional.

71.     Earlier that day, Norton applied for and obtained a warrant to search 33__ D____ Avenue. To establish probable cause justifying the warrant, Norton stated in his warrant application that a confidential informant told him of illegal activity at that location. Norton further, and as required by the Constitution, attempted to establish his informant's reliability by stating as follows:

> The confidential informant mentioned in this affidavit is considered reliable to this affiant based on information they have provided this affiant for the past 14 months. The

confidential informant has provided this affiant with information regarding criminal activity that has been proven through independent police investigation. This confidential informant has provided this affiant information that led to the arrest of two (2) individuals wanted on outstanding warrants in the City of Richmond. The confidential informant has given information that has led to the arrest of thirteen (13) individuals that were involved in the illegal drug trade. The confidential informant has provided this affiant with information that has led to the obtaining of three search warrants. The search warrants have led to the arrest of five individuals and the seizure of illegal narcotics. Those arrests have gained convictions in Federal and State Courts. The confidential informant has made several controlled narcotic purchases. Finally, the confidential informant has recognized individuals known to this affiant that sell illegal narcotics. The confidential informant has used cocaine and heroin in the past and is familiar with the way cocaine and heroin is packaged for street-level distribution. In addition, the confidential informant is familiar with the methods used by those who distribute street-level drugs.

72.     Norton attributed the information about alleged criminal activity at 33__ D___

Avenue to "CI #924," who, according to RPD records, is J. C.   The N-10 form associated with

Johnson's arrest appears to contain J. C.'s signature, but when FBI agents asked J. C. if the

signature was his, he replied, "that's fuckin' crazy," and stated that the signature was not his.

73.     Another suspicious aspect of the N-10 form is the witness's verification of the

payment.  The witness line on the N-10 form is completely blank.  Thus, it appears that the RPD

provided Norton money to pay an informant, but, contrary to policy, did not apparently attempt

to witness the payment.  Indeed, there is reason to think that Norton was not making any

payment. When the FBI asked one of Norton's fellow officers whether Norton might keep a

payment instead of passing it on to an informant, the officer replied, "I totally believe that could

happen."

74.     Another discomfiting aspect of the N-10 form is the presence of Defendant

Sipple's signature.  Although Sipple was charged with signing the form, his role was to verify

that the form had been properly completed.  Yet, in this case, Sipple signed the form despite a

glaring omission—a witness signature.  Defendant Sipple's willingness to sign an incomplete N-

10 form shows his own disregard for the integrity of RPD's confidential informant program, as well as his failure to supervise Norton himself.

75.      Beyond these problems lies the additional problem that large portions of CI #924's resume in the warrant application for 33__ D_____ Avenue were identical to the resume of at least one other informant. The chart below compares the resume for CI #924, as stated by Norton on March 11, 2010, with the resume for CI #757, as stated by Norton on March 30, 2010. Different informants should have different resumes, but as the chart below shows, Norton provided almost the exact identical resume for both informants.  The only difference (the length of the relationship) is underlined and bolded.

| Norton's description of CI #924's reliability on March 11, 2010 | Norton's description of CI #757's reliability on March 30, 2010 |
|---|---|
| The confidential informant mentioned in this affidavit is considered reliable to this affiant based on information they have provided this affiant for the past **14 months**. | The confidential informant mentioned in this affidavit is considered reliable to this affiant based on information they have provided this affiant for the past **two years**. |
| The confidential informant has provided this affiant with information regarding criminal activity that has been proven through independent police investigation. | The confidential informant has provided this affiant with information regarding criminal activity that has been proven through independent police investigation. |
| This confidential informant has provided this affiant information that led to the arrest of two (2) individuals wanted on outstanding warrants in the City of Richmond. | This confidential informant has provided this affiant information that led to the arrest of two (2) individuals wanted on outstanding warrants in the City of Richmond. |
| The confidential informant has given information that has led to the arrest of thirteen (13) individuals that were involved in the illegal drug trade. | The confidential informant has given information that has led to the arrest of thirteen (13) individuals that were involved in the illegal drug trade. |
| The confidential informant has provided this affiant with information that has led to the obtaining of three search warrants. | The confidential informant has provided this affiant with information that has led to the obtaining of three search warrants. |
| The search warrants have led to the arrest of five individuals and the seizure of illegal narcotics. | The search warrants have led to the arrest of five individuals and the seizure of illegal narcotics. |

| | |
|---|---|
| Those arrests have gained convictions in Federal and State Courts. | Those arrests have gained convictions in Federal and State Courts. |
| The confidential informant has made several controlled narcotic purchases. | The confidential informant has made several controlled narcotic purchases. |
| Finally, the confidential informant has recognized individuals known to this affiant that sell illegal narcotics. | Finally, the confidential informant has recognized individuals known to this affiant that sell illegal narcotics. |
| The confidential informant has used cocaine and heroin in the past and is familiar with the way cocaine and heroin is packaged for street-level distribution. | The confidential informant has used cocaine and heroin in the past and is familiar with the way cocaine and heroin is packaged for street-level distribution. |
| In addition, the confidential informant is familiar with the methods used by those who distribute street-level drugs. | In addition, the confidential informant is familiar with the methods used by those who distribute street-level drugs. |

76.     The similarities between the two resumes listed above obviously cast enormous doubt on the identity and reliability of CI #924.  Just as troublesome, however, is that Norton used the **exact same resume** in December 2009, about three months earlier.

| Norton's description of CI #924's reliability on March 11, 2010 | Norton's description of an unknown CI's reliability on December 3, 2009 |
|---|---|
| The confidential informant mentioned in this affidavit is considered reliable to this affiant based on information they have provided this affiant for the past 14 months. | The confidential informant mentioned in this affidavit is considered reliable to this affiant based on information they have provided this affiant for the past 14 months. |
| The confidential informant has provided this affiant with information regarding criminal activity that has been proven through independent police investigation. | The confidential informant has provided this affiant with information regarding criminal activity that has been proven through independent police investigation. |
| This confidential informant has provided this affiant information that led to the arrest of two (2) individuals wanted on outstanding warrants in the City of Richmond. | This confidential informant has provided this affiant information that led to the arrest of two (2) individuals wanted on outstanding warrants in the City of Richmond. |
| The confidential informant has given information that has led to the arrest of thirteen (13) individuals that were involved in the illegal drug trade. | The confidential informant has given information that has led to the arrest of thirteen (13) individuals that were involved in the illegal drug trade. |

| | |
|---|---|
| The confidential informant has provided this affiant with information that has led to the obtaining of three search warrants. | The confidential informant has provided this affiant with information that has led to the obtaining of three search warrants. |
| The search warrants have led to the arrest of five individuals and the seizure of illegal narcotics. | The search warrants have led to the arrest of five individuals and the seizure of illegal narcotics. |
| Those arrests have gained convictions in Federal and State Courts. | Those arrests have gained convictions in Federal and State Courts. |
| The confidential informant has made several controlled narcotic purchases. | The confidential informant has made several controlled narcotic purchases. |
| Finally, the confidential informant has recognized individuals known to this affiant that sell illegal narcotics. | Finally, the confidential informant has recognized individuals known to this affiant that sell illegal narcotics. |
| The confidential informant has used cocaine and heroin in the past and is familiar with the way cocaine and heroin is packaged for street-level distribution. | The confidential informant has used cocaine and heroin in the past and is familiar with the way cocaine and heroin is packaged for street-level distribution. |
| In addition, the confidential informant is familiar with the methods used by those who distribute street-level drugs. | In addition, the confidential informant is familiar with the methods used by those who distribute street-level drugs. |

77.     Given these resumes, there can be little doubt that Norton was fabricating the resumes for the confidential informant involved in the search of 33__ D____ Avenue.  It is worth noting briefly why Norton would prefer to make an arrest using a confidential informant rather than based on his own personal knowledge.  The benefit of using a confidential informant (or purporting to use a confidential informant) is that Norton could seek money from the RPD to pay the informant.  Thus, a police officer with an appetite for personal financial gain would always prefer to attribute his knowledge of illegal activity to an informant.  If the informant is real, the officer can at least split the money with the informant, and if the informant is fake, the officer can keep the entire payment.  As noted earlier in this Complaint, Norton has a long history of using his job for personal financial gain.

78.     Knowing nothing about all these misrepresentations, the judge granted Norton's request for a search warrant of 33__ D_____ Avenue. While executing the warrant, officers allegedly discovered contraband and arrested Bravette Johnson, who was a social guest at the residence during the search.  Johnson was a frequent guest at the residence and often spent the night there.  But for his arrest, he would have spent the relevant night in the residence; he had spent the previous night there as well, and had recently returned from errands and picking up dinner when police arrived.  Johnson maintained property at the residence, often arrived and entered without invitation, contributed to the expenses arising from the residence, had permission from the resident to enter and to use the premises when the resident was not there, and had permission from the resident to invite and admit others to the residence.  Johnson's expectation of privacy in this setting was indeed affirmed when the Commonwealth sought the vacation of Johnson's convictions arising from this event.  If Johnson had no expectation of privacy, the Commonwealth surely would not have concluded that his conviction was unlawful.

79.     Criminal proceedings were soon instituted against Johnson in Virginia state court. During the course of these proceedings, Norton never admitted his lies.  Had he done so, or had any of the Supervisory Defendants acted properly to intervene, the case against Johnson would have immediately fallen apart.  Indeed, once Norton's lies were discovered by persons outside of RPD, that is exactly what happened.

80.     Having no knowledge that his constitutional rights had been violated, and facing significant jail time, Johnson pled guilty on August 17, 2010.  Johnson would never have pled guilty had he known of Norton's lies.  Johnson was sentenced to 15 years in jail, with 13 years suspended, and an undetermined period of supervised probation.

81.     Johnson served his sentence and was released in November 2011.  Even after his release, however, Johnson continued to suffer from Norton's misconduct.  For the first 90 days after his release, Johnson was required to report to his probation officer 1-2 times per week for drug screens.  Then, after the 90-day period of weekly screenings was over, Johnson was placed on regular probation for a year.  This required him to submit his urine and a written report to his probation officer once a month.

82.     Even after this period of 15 months, Johnson continued to suffer harm from Norton's misconduct.  In 2012, Johnson was arrested and charged with possession with the intent to distribute a controlled substance.  This was the same charge Johnson faced when arrested by Norton, and when he was sentenced on that charge, the court sentenced him to serve two years in jail because it was his second offense.  The 2012 charges against Johnson were thus deemed to be his third offense, *which carried a mandatory minimum 10-year sentence*.  Upon his arrest, Johnson was denied bail and sat in jail for approximately three months.  The Commonwealth's Attorney eventually *nolle prossed* the charges against Johnson, allowing him to be released.  Yet, soon after his release, the Commonwealth's Attorney repeatedly filed actions against Johnson for allegedly violating the terms of his probation arising from the conviction based on Norton's misconduct.  These actions resulted in repeated arrests, and, on at least one occasion, Johnson was forced to pay $1,000 to a bondsman to obtain his release.  Of course, had Norton not engaged in such misconduct, Johnson would not have been on probation and thus vulnerable to such actions by the Commonwealth's Attorney.

83.     Even though the Commonwealth originally nolle prossed the charges against Johnson arising from his 2012 arrest, it ultimately did indict him sometime later in 2012 for that same alleged conduct.  Facing a minimum of 10 years in prison, Johnson accepted an offer to

plead guilty in exchange for a recommendation of 4 years imprisonment. Crucial to Johnson in making this decision was that he expected his mother to pass away from a long-term illness in the coming years. If he only served 4 years, there was a good chance he could be with her when she died, but if he served a 10-year sentence, he would almost certainly be in jail during her decline and death. (Sadly, Johnson's mother passed away while he was serving his 4-year sentence.)

84.     Johnson entered his plea in August 2014. While in jail serving his 4-year sentence, Johnson heard about Norton's misconduct and wrote to Richmond Commonwealth's Attorney Michael Herring. During discussions arising from this letter, the Commonwealth represented to Johnson that, had his 2012 charges been treated as a *second* offense instead of his *third* offense, he most likely would have received 18 to 24 months. This makes sense because, when sentenced on what the Commonwealth believed was his second offense (the charges arising from Norton's misconduct), Johnson was, in fact, sentenced to serve 2 years in jail.

85.     In response to Norton's misconduct, prosecutors took the uncommon step on July 6, 2015 of asking the court to vacate Johnson's conviction arising from Norton's misconduct. In a motion to vacate, the Commonwealth's Attorney for Richmond, Michael Herring, stated that "there is clear and convincing evidence that a fraud occurred in [Johnson's] case. As such, the Commonwealth moves that JOHNSON's 2010 convictions be vacated." Richmond Circuit Court Judge B.W. Snukals granted this request on August 27, 2015, holding that "the written motion, submitted exhibit and proffer of facts establishes by clear and convincing evidence that extrinsic fraud did occur and that such fraud renders [Johnson's] convictions void." With regard to his conviction arising from his 2012 arrest, that conviction was thereafter amended to constitute a second offense, and Johnson was released for time served. The court's order

provided some relief for Johnson, but it obviously failed to give him back the time he spent in jail or any compensation for the limitations on his liberty imposed by his term of probation or the circumstances flowing therefrom.

### D. Jason Norton's Fraudulent Arrest of Curtis Williams

86.     At 7:00 p.m. on the evening of July 7, 2009, Curtis Williams found himself detained in the 3000 block of Barton Avenue in Richmond, Virginia.  Among the officers detaining him was Jason Norton.  It is unclear at this point what information justified the detention, but it is clear that Norton quickly sought a warrant to search Williams' person.  Norton thus drafted an application for a search warrant, complete with an extensive affidavit explaining his purported basis for probable cause, including his own experience, and the reliability of the informant who supposedly pointed the finger at Williams.  The warrant issued at 7:37 p.m., which means that Norton was able to complete his entire application and have a magistrate grant the application in a ***mere 37 minutes***.  Of course, having been on the scene about 7:00 p.m., there would be little way to draft a warrant application without playing "fast and loose" with the details—which is how one of Norton's colleagues described Norton's practices with informants.

87.     In his application for a warrant, Norton did not identify his informant by name, number, or any other designation.  But he did include the informant's resume, which was as follows:

> The confidential informant mentioned in this affidavit is considered reliable to this affiant based on information they have provided to this affiant. The confidential informant has been deemed reliable to this affiant for over two months.  The confidential informant has provided this affiant with information that has been proven through independent police investigation. This confidential informant has provided this affiant with information regarding the location of illegal drugs that has led to the seizure of those drugs. The confidential informant has also provided this affiant with information regarding the location of firearms that were recovered and seized by this affiant.  The confidential informant has provided this affiant with information that led to the arrest of six (6) individuals wanted on outstanding warrants in the City of Richmond. The confidential

informant has provided information that has led to the obtaining of search warrants for ten individuals. Those search warrants have led to the seizure of illegal narcotics and arrests of all ten individuals. The confidential informant has given information that has led to the obtaining of search warrants for fourteen dwellings. Those search warrants have led to the seizure of illegal narcotics and firearms. The arrests that have been made as a result of the warrants have gained convictions in Richmond General District, Richmond Circuit, and Federal Courts. The confidential informant has purchased and distributed illegal narcotics in the past. The confidential informant can identify the way that illegal narcotics are packaged. The confidential informant has provided information that has led to the arrest in two homicide cases.

88.     On its face, this resume seems wholly implausible. According to Norton, in a mere two months, the informant apparently provided information leading to: (1) the arrest of six individuals on outstanding warrants, (2) the search and arrest of 10 individuals, (3) the search of 14 dwellings, and (4) an arrest in two homicide cases. Moreover, the judicial system was apparently so expedient that the search warrants of the 14 dwellings had, in a mere two months, already led to "convictions in Richmond General District, Richmond Circuit, and Federal Courts." As anyone in the criminal justice field knows, this is an almost facially unbelievable resume. Few, if any, informants have been that productive in such a short period of time.

89.     Even aside from its facial unbelievability, there are other reasons to doubt the resume Norton offered to the magistrate. As the chart below shows, Norton's resume for his informant on July 7, 2009 was nearly identical to resumes he offered to the court on at least *four other occasions during 2009*, including resumes for different informants. The differences between the resumes are bolded and underlined.

| Norton's description of an unknown informant's reliability on July 7, 2009 | Norton's description of CI #757's reliability on March 13, 2009 | Norton's description of an unknown informant's reliability on August 21, 2009 | Norton's description of CI #933's reliability on Sept. 11, 2009 | Norton's description of an unknown informant's reliability on Sept. 18, 2009 |
|---|---|---|---|---|
| The confidential informant mentioned in this affidavit is considered reliable to this affiant based on information they have provided this affiant. The confidential informant has been deemed reliable to this affiant for over two months. | The confidential informant mentioned in this affidavit is considered reliable to this affiant based on information they have provided this affiant. The confidential informant has been deemed reliable to this affiant for over two months. | The confidential informant mentioned in this affidavit is considered reliable to this affiant based on information they have provided this affiant. The confidential informant has been deemed reliable to this affiant for over two months. | The confidential informant mentioned in this affidavit is considered reliable to this affiant based on information they have provided this affiant. The confidential informant has been deemed reliable to this affiant for over **two years**. | The confidential informant mentioned in this affidavit is considered reliable to this affiant based on information they have provided this affiant. The confidential informant has been deemed reliable to this affiant for over **two years**. |
| The confidential informant has provided this affiant with information that has been proven through independent police investigation. | The confidential informant has provided this affiant with information that has been proven through independent police investigation. | The confidential informant has provided this affiant with information that has been proven through independent police investigation. | The confidential informant has provided this affiant with information that has been proven through independent police investigation. | The confidential informant has provided this affiant with information that has been proven through independent police investigation. |
| This confidential informant has provided this affiant with information regarding the location of illegal drugs that has led to the seizure of those drugs. | This confidential informant has provided this affiant with information regarding the location of illegal drugs that has led to the seizure of those drugs. | This confidential informant has provided this affiant with information regarding the location of illegal drugs that has led to the seizure of those drugs. | This confidential informant has provided this affiant with information regarding the location of illegal drugs that has led to the seizure of those drugs. | This confidential informant has provided this affiant with information regarding the location of illegal drugs that has led to the seizure of those drugs. |

| | | | | |
|---|---|---|---|---|
| The confidential informant has also provided this affiant with information regarding the location of firearms that were recovered and seized by this affiant. | The confidential informant has also provided this affiant with information regarding the location of firearms that were recovered and seized by this affiant. | The confidential informant has also provided this affiant with information regarding the location of firearms that were recovered and seized by this affiant. | The confidential informant has also provided this affiant with information regarding the location of firearms that were recovered and seized by this affiant. | The confidential informant has also provided this affiant with information regarding the location of firearms that were recovered and seized by this affiant. |
| The confidential informant has provided this affiant with information that led to the arrest of six (6) individuals wanted on outstanding warrants in the City of Richmond. | The confidential informant has provided this affiant with information that led to the arrest of six (6) individuals wanted on outstanding warrants in the City of Richmond. | The confidential informant has provided this affiant with information that led to the arrest of six (6) individuals wanted on outstanding warrants in the City of Richmond. | The confidential informant has provided this affiant with information that led to the arrest of six (6) individuals wanted on outstanding warrants in the City of Richmond. | The confidential informant has provided this affiant with information that led to the arrest of six (6) individuals wanted on outstanding warrants in the City of Richmond. |
| The confidential informant has provided information that has led to the obtaining of search warrants for ten individuals. Those search warrants have led to the seizure of illegal narcotics and arrests of all ten individuals. | The confidential informant has provided information that has led to the obtaining of search warrants for ten individuals. Those search warrants have led to the seizure of illegal narcotics and arrests of all ten individuals. | The confidential informant has provided information that has led to the obtaining of search warrants for ten individuals. Those search warrants have led to the seizure of illegal narcotics and arrests of all ten individuals. | The confidential informant has provided information that has led to the obtaining of search warrants for ten individuals. Those search warrants have led to the seizure of illegal narcotics and arrests of all ten individuals. | The confidential informant has provided information that has led to the obtaining of search warrants for ten individuals. Those search warrants have led to the seizure of illegal narcotics and arrests of all ten individuals. |
| The confidential informant has given information that has led to the | The confidential informant has given information that has led to the | The confidential informant has given information that has led to the | The confidential informant has given information that has led to the | The confidential informant has given information that has led to the |

| | | | | |
|---|---|---|---|---|
| obtaining of search warrants for fourteen dwellings. Those search warrants have led to the seizure of illegal narcotics and firearms. | obtaining of search warrants for fourteen dwellings. Those search warrants have led to the seizure of illegal narcotics and firearms. | obtaining of search warrants for fourteen dwellings. Those search warrants have led to the seizure of illegal narcotics and firearms. | obtaining of search warrants for fourteen dwellings. Those search warrants have led to the seizure of illegal narcotics and firearms. | obtaining of search warrants for fourteen dwellings. Those search warrants have led to the seizure of illegal narcotics and firearms. |
| The arrests that have been made as a result of the warrants have gained convictions in Richmond General District, Richmond Circuit, and Federal Courts. | The arrests that have been made as a result of the warrants have gained convictions in Richmond General District, Richmond Circuit, and Federal Courts. | The arrests that have been made as a result of the warrants have gained convictions in Richmond General District, Richmond Circuit, and Federal Courts. | The arrests that have been made as a result of the warrants have gained convictions in Richmond General District, Richmond Circuit, and Federal Courts. | The arrests that have been made as a result of the warrants have gained convictions in Richmond General District, Richmond Circuit, and Federal Courts. |
| The confidential informant has purchased and distributed illegal narcotics in the past. The confidential informant can identify the way that illegal narcotics are packaged. | The confidential informant has purchased and distributed illegal narcotics in the past. The confidential informant can identify the way that illegal narcotics are packaged. | The confidential informant has purchased and distributed illegal narcotics in the past. The confidential informant can identify the way that illegal narcotics are packaged. | The confidential informant has purchased and distributed illegal narcotics in the past. The confidential informant can identify the way that illegal narcotics are packaged. | The confidential informant has purchased and distributed illegal narcotics in the past. The confidential informant can identify the way that illegal narcotics are packaged. |
| The confidential informant has provided information that has led to the arrest in two homicide cases. | The confidential informant has provided information that has led to the arrest in two homicide cases. | The confidential informant has provided information that has led to the arrest in two homicide cases. | The confidential informant has provided information that has led to the arrest in two homicide cases. | The confidential informant has provided information that has led to the arrest in two homicide cases. |

90.     It is common sense that different informants should have different resumes, and that the same informant should have different resumes over time.  But as this chart shows, none of this occurred in these cases.  As shown, there is only one difference between the five resumes.  The difference concerns the length of the relationship.  When seeking a warrant to arrest Williams, Norton swore to the magistrate that he had had a relationship with his informant for "over two months."  But four months earlier, on March 13, Norton had sworn to a magistrate that his relationship with what appears to be the same informant was already over two months in duration. Then, six weeks *after* telling the magistrate on July 7 that his relationship with the informant was about two months old, Norton told a magistrate again on August 21 that his relationship with the same informant was still only about two months old.  But then, on September 11 and 18, Norton's relationship with the informant suddenly jumped to "over two years."  None of this adds up and the only reasonable conclusion is that Norton was simply making the resumes up.

91.     Further evidence that Norton was simply making resumes up arises from the fact that each arrest made using the resume should have affected the subsequent versions of the resume.  Thus, when Norton arrested someone on March 13 based on the resume he offered to the court, the resume presented to the court on July 7 should have stated that the informant "provided information that has led to the obtaining of search warrants for *eleven* individuals" not "ten individuals," as the resume actually stated.  And after arresting Williams on July 7, the next resume offered to the court on August 21 should have attributed *twelve* warrants to the informant, and so on as Norton continued to use the resume.  None of this happened, of course, which is a further indication of that the resumes were all shams.

92.     Knowing nothing about all these frauds by Norton, the judge granted Norton's request for a warrant authorizing a search of Williams' person on July 7, 2009. While executing the warrant, officers allegedly discovered contraband and arrested Williams.

93.     Criminal proceedings were soon instituted against Williams in Virginia state court.  During the course of these proceedings, Norton never admitted his lies.  Had he done so, or had any of the Supervisory Defendants acted properly to intervene, the case against Williams would have immediately fallen apart.  Indeed, once Norton's lies were discovered by persons outside of the RPD, that is exactly what happened.

94.     Having no knowledge that his constitutional rights had been violated, and facing considerable jail time, Williams pled guilty on December 11, 2009.  Williams would never have pled guilty had he known of Norton's lies.  Indeed, Norton was apparently present when Williams pled guilty, having been subpoenaed in connection with the matter.  (Norton also appeared as a witness in connection with the matter on November 13, 2009.)  On March 24, 2010, the Richmond Circuit Court entered an order sentencing Williams to two years in jail for the alleged crimes Norton uncovered, as well as a fine of $1,886.[3]  That same day, however, the Court *also* sentenced Williams to four months in jail for a prior crime.  The sentence on the prior crime was previously suspended, but, given the new charges instigated by Norton, the Court re-imposed the four-month sentence.  Further, in an order on November 9, 2010, the Court declined to allow the two sentences to run concurrently.  Thus, as a result of Norton's fraudulent actions, Williams was sentenced to two years and four months in jail when he otherwise would not have been.

---

[3]     The hearing date for the sentencing was March 18, 2010, but Judge Snukals did not sign the sentencing order until March 24, 2010.

95.     In April 2012, Williams was released from jail, but the effects of Norton's misconduct did not end there.  After his release, Williams was required to submit to a period of supervised probation.  The terms of the probation required him to regularly report to his probation officer and submit to drug screenings.  The probation ensnared Williams in more legal trouble when, on August 3, 2013, he was arrested for allegedly violating the terms of probation. Williams was apparently released soon after his arrest, but his detention would have never occurred had it not been for Norton's original misconduct.

96.     Some time later, Norton's lies were discovered by officials outside of the Richmond Police Department. What came to light was a vast and long-standing fraud in Norton's applications for search warrants, as well as extraordinary failures in RPD's management of the search-warrant process.

97.     On September 15, 2015, prosecutors took the uncommon step of asking the court to vacate Williams' conviction.  In a motion to vacate, Assistant Commonwealth's Attorney Patrick Dorgan stated that "there is clear and convincing evidence that a fraud occurred in this case. As such, the Commonwealth moves that WILLIAMS' December 11, 2009 conviction be vacated."   Richmond Circuit Court Judge B.W. Snukals granted this request on April 12, 2016, stating that "the written motion, submitted exhibit and proffer of facts establishes by clear and convincing evidence that extrinsic fraud did occur and that such fraud renders [Williams'] conviction void."  The court's order provided some relief for Williams, but it obviously failed to give him back the time he spent in jail, or any compensation for the limitations on his liberty imposed by his terms of probation, or the circumstances arising therefrom.

### E. The Richmond Police Department's Involvement in Norton's Misconduct

98.　　Jason Norton was a bad cop, but not all bad cops wreak the havoc that Norton did. If a police department is operating properly, misconduct like Norton's will quickly be addressed and amends made.　But the RPD was not operating properly when it came to Norton. The Supervisory Defendants knew or should have known that Norton posed a serious risk of constitutional injury.　They had the opportunity to prevent or limit these harms, but failed to intervene in a timely and/or effective manner.　As a result of this failure, the Plaintiffs in this case suffered significant injury.

### 1.　Norton's Misconduct was Widely Known in the RPD.

99.　　Jason Norton, as has already been noted, was an officer with serious problems. He was corrupt, dishonest, and apparently unconcerned with the Constitution.　Norton's problems were not secret, however; they were known throughout the department.　Officer David Philips, for example, told the FBI that he "had heard rumors about NORTON from many people," and that "a lot of rumors about NORTON went around."　These rumors included the report "that NORTON would make up affidavit verbiage" to obtain search warrants.　But not all of Philips's knowledge came from others.　In particular, Philips told the FBI that "NORTON's paperwork was, and always had been, **garbage**. NORTON's 'labs' would not come back in time and he lacked attention to detail." (Emphasis added.)

100.　　Regarding Norton's interactions with informants, Philips also reported that "NORTON was buddies with his informants."　Philips told FBI agents that he "had locked up 12 of his former informants but NORTON was too 'buddy' with informants."　As further evidence of Norton's misconduct, Philips stated to the FBI that "sometimes NORTON would pay sources years later."

101.     NORTON's failure to follow procedure was known to other colleagues as well. In particular, Officer Gouchenour stated to the FBI that "NORTON failed to utilize a required RPD form when writing search warrants for people's cavities.  NORTON had never used the form before."  Additionally, Officer Jenkins told the FBI about an illegal search performed by Norton. According to Jenkins, "NORTON and a young officer went to the Days Inn on Dickens Road" to track down some suspects. Although Norton had no warrant, he "got the hotel manager to open a door to one of the hotel rooms." Once the door was opened, "NORTON rushed the room and seized $55 and 2 ounces of marijuana without any "paper" (search warrant).  No one was charged but the money and marijuana was put into evidence."

102.     Similarly, Officer Brandon Black, another of Norton's colleagues, told the FBI about rumors swirling through the department.  Black stated that he had "heard rumors and stories about NORTON regarding missing money, NORTON informing on other RPD officers to subjects, and NORTON being drunk at Shockoe Bottom."

103.     Another example of how rumors spread about Norton involves his possible connection with Gang A.  As noted above, while conducting surveillance of the gang, RPD detectives heard Norton's name mentioned as someone who could "supply[] or look[] after the guys in the gang."  When Detective Juan Romero learned of this, he told Don Davenport, a supervisor, but the information spread further.  Another officer, Paul Jenkins, learned it as well. Jenkins then "told his Lieutenant that they [i.e., members of the gang unit] can't share information freely once NORTON is in the Gang Unit."  An additional officer, David Philips, reported hearing this same information from Jenkins.

104.     Further evidence of how Norton's problems were widely known involves Norton's long-time partner, Tommy O'Connell.  According to FBI records, O'Connell "asked to

stop working with NORTON because he was a sinking ship." This request, of course, would be made to a supervisor at some level above Norton and O'Connell. Thus, according to FBI records, at least one of Norton's supervisors was told of some of Norton's various problems—problems that were serious enough to characterize him as a "sinking ship."

105.    Another important piece of information contained in the FBI reports concerns Major Steve Drew, an RPD officer having significant supervisory responsibility within the Department. During an FBI interview, Officer Paul Jenkins stated that he "heard second hand that Major STEVE DREW mentioned NORTON being salvageable." Norton, of course, was never "salvaged," but this information, combined with the evidence of rumors swirling through the department, confirms that Norton and his problems were widely known not just throughout the Department, but known to officers at the highest levels of the Department as well.

106.    A particularly powerful example of RPD's knowledge of Norton's troubles involves an RPD interview of R. A., one of Norton's informants. (As explained above, Norton had a relationship with R. A., and, after learning of a Task Force's plan to arrest him, tipped R. A. off on the planned arrest. Also, in the year prior to tipping R.A. off, Norton had fraudulently claimed that R. A. had informed him of criminal activity, thus allowing Norton to obtain a search warrant.) The interview was conducted by RPD Officer Tim Wyatt and occurred while R. A. was in the hospital. The interview concerned "[R. A.'s] relationship with Norton," was audio recorded, and then "given to 'IAD' (Internal Affairs Department)." This shows RPD officials understood the interview to raise serious concerns about Norton.

107.    In fact, it appears likely that an IAD officer or officers were involved in the interview. In a subsequent statement to the FBI, RPD Officer Paul Jenkins stated that he and "Detective Christina Kenney waited outside" the hospital room "since they weren't part of IAD."

Jenkins went on to reveal, alarmingly, that "KENNEY was told by a Sergeant with [RPD] to keep information about [R. A.] and Norton to herself."

108.    The exact date of this hospital interview is not yet certain, though it almost certainly occurred well before July 2012 because Officer Tim Wyatt, who conducted the interview, was transferred out of the Norton's department at that point.  Indeed, there is good reason to think it occurred much earlier.  In his November 2012 statement to the FBI regarding the hospital interview, Officer Jenkins stated that he learned about Norton's relationship with R. A. "[l]ast year," and then, in the very next paragraph, explained the hospital interview.  This leads to the reasonable inference that the interview happened in 2011.

109.    There is yet more reason to think that RPD supervisors knew of Norton's corrupt relationship with R.A. by 2011 or even earlier.  As explained above in the Complaint, FBI agents had observed highly suspicious conduct by Norton with regard to R. A. in April 2010.  Norton appeared to FBI agents at the time to be reluctant to arrest R. A., who had been observed selling cocaine.  Indeed, R. A. expressed his surprise at the arrest, telling the arresting officers that "My man Norton said things are cool."  Importantly, these events were recorded in the files of the RAVE Task Force, which was a joint task force between the FBI and the RPD.  Thus, these disturbing events, upon information and belief, were made part of official RPD files in April 2010.  Further, because the federal officers saw reason to record the events in such detail in an official record, there is a very strong likelihood that such matters were discussed with one or more of Norton's supervisors.

### 2.  Norton's Formal Reprimands

110.    Beyond all of this evidence, there is still additional evidence that Norton's misconduct was known by his supervisors.  As noted above, on March 25, 2011, Norton was

formally reprimanded for misconduct involving informants. One reprimand related to misconduct in February 2009 in which Norton observed a "hand to hand" drug buy, detained the individuals involved in the buy, and confiscated the drugs (marijuana and cocaine). In violation of Department policy, however, Norton did not arrest or seek charges against the persons. This behavior, of course, is consistent with the misconduct recounted above involving Norton's seizure of drugs and money, but not arresting those persons or providing a receipt to the persons for the items seized.

111.    What is especially troubling about this reprimand is Norton's explanation for his misconduct. Norton "stated that he may have been attempting to use the individual as an informant." Informants can, and are, used in such situations, but informants must first be registered with the RPD. As noted above, informants must be established as "reliable" to pass constitutional muster. According to the reprimand, neither of those two individuals were "registered as an informant." This reprimand thus shows that, as early as 2009, Norton was attempting to use informants who had not been established as reliable.

112.    The above reprimand was not the only one issued on March 25, 2011, however. Norton was also reprimanded that day for misconduct related to the handling of informants in July 2010. Norton's misconduct came to light when forged signatures were found on several N-10 forms. According to an internal investigation conducted by the RPD, the informant signatures on two N-10 forms "did not match" the signatures on the rest of the N-10 forms for that informant. Just as troubling, a signature on at least one N-10 form had a "name that did not match up" with the informant listed on the form. Thus, as of at least March 2011, the RPD knew of Norton's involvement in forged signatures on N-10 forms, and thus, also knew that Norton had likely lied about his sources in applying for warrants.

113.     The misconduct noted in these two reprimands would have been known to the Chief of Police at some point before March 25, 2011.  According to RPD General Order 1-16, a reprimand is a "Disciplinary Action" and "the Chief of Police is the final decision maker on all discipline."  Thus, in 2011 when the reprimands were issued, Defendant Norwood would have known that Norton had, as far back as 2009, been attempting to use unregistered informants.  Even if the reprimand was not brought to Defendant Norwood's attention pursuant to General Order 1-16, it is reasonable to conclude that Defendant Norwood and the other Supervisory Defendants were aware or should have been aware of such misconduct.  Lies of the sort perpetrated by Norton are some of the most serious violations that a law enforcement officer can commit.  They amount to intentional violations of the fundamental rights officers are sworn to uphold.  Any police department that takes seriously its duty to protect citizens from lawless behavior would certainly make sure that misconduct like Norton's was closely evaluated at the highest levels of departmental leadership.  Were the Supervisory Defendants to contend that they were unaware of the misconduct identified in the March 25, 2011 reprimands, it would be a shocking admission that Norwood and his closest advisors were unable to protect the citizens of Richmond from lawless conduct like Norton's.

114.     Further evidence of RPD's knowledge—and tolerance—of Norton's problems comes from Norton's partner, Bruce Gochenour.  Like many of Norton's other colleagues, Gochenour thought that Norton was "flying too fast and too loose."  "NORTON had a lot of informants," Gochenour told FBI investigators.  "NORTON's desk was littered with notes of information he received from informants," causing Gochenour to wonder how Norton "could track all the reporting." (This same problem was noted by Officer David Philips, who told the FBI that "NORTON's paperwork was, and always had been, garbage.")  Gochenour tried to help

Norton by giving him a spreadsheet, but Gochenour thought the real problem probably lied with management. According to the FBI investigation, Gochenour "blamed RPD management for NORTON's situation. GOCHENOUR stated that NORTON was producing for management so they let him hang himself."

115. Additional evidence of the Supervisory Defendants' knowledge is the fact that the FBI began investigating Norton by at least October 2012, and probably several months earlier. This investigation included interviews with RPD officers about the misconduct detailed in this Complaint. Because of this, the Supervisory Defendants either knew or should have known by sometime in the late summer or early fall of 2012 that evidence of Norton's misconduct was so significant that the federal government had begun an investigation into Norton. Yet, for whatever reason, no state-level investigation of Norton was apparently begun until *after* the federal investigation had concluded in the spring of 2015.

### 3. Systemic Problems in RPD's Confidential Informant Program

116. Beyond Norton's widespread (and well-earned) reputation for corruption and dishonesty, as well as his two reprimands for lying about informants, is another factor contributing to RPD's liability for the injuries in this case: the Supervisory Defendants' actual or constructive knowledge of egregious problems in RPD's confidential informant program.

117. As explained above, the RPD tracked officer payments to informants using an N-10 form. To prevent corruption, the RPD requires that payments to informants be witnessed by a second officer. That officer must sign the N-10 form, thus indicating that he or she witnessed the payment. If officers sign the form without actually witnessing a payment, a fundamental check on the integrity of the use of informants is lost. Without this check, violations of law would be bound to happen. And that is exactly what happened within the RPD.

118.    For example, in 2009, Norton alleged seven different times that his informant was C.I. # 933, also known as "R. A." Norton sought funds to pay R. A. and thus had to complete N-10 forms. To complete the form, Norton had to obtain a signature from R. A. acknowledging receipt of the funds, a signature of a fellow officer (acting as witness), and a third signature of a police supervisor. However, the N-10 forms Norton submitted regarding R. A. contain signatures of individuals other than R.A., and some signatures were of the same name, but in different handwriting styles. And yet, the forms were apparently witnessed by a fellow officer and approved by Norton's supervisor. It thus appears that Norton could practically conjure up his informants out of thin air.

119.    During its investigation, the FBI discovered that this problem with N-10 forms was widespread. In an interview with FBI agents, Officer David Philips, "stated that **all the officers in the RPD Narcotics department have done what PHILIPS did**, where he signed a form without being present during the payment of money to the source. PHILIPS stated that the RPD has changed this practice since NORTON. . . . PHILIPS stated that more times than naught, NORTON just gave PHILIPS paper and PHILIPS would sign the document without witnessing the payment to the source." (Emphasis added.) This practice is confirmed by Brandon Black, another officer who worked with Norton and confidential informants. When asked about his signature on a particular N-10 form, Black told the FBI that "the signature on the N-10 payment form was his but the date and time do not appear to be BLACK's handwriting. BLACK stated that he puts '01' for January instead of just '1' and Black has a dash in the middle of his 7s." In Black's opinion, therefore, he signed the form, but *did not enter a date or time.* Of course, if the would-be "witness" signs the N-10 before any payment has been made, he would have no way of knowing the correct date and time to put on the form. The date and time would

have to be filled in later by someone other than the witness.  That explains why Black believed the signature was his own, but not the date and time.

120.    What Philips identified (and Black provided an example of) was a **systematic failure in the integrity of RPD's confidential informant program.**  Philips did not say that one or two officers had done what he did; rather, he stated that "*all the officers* in the RPD Narcotics department have . . . signed a form without being present during the payment of money to the source." (Emphasis added.)  A failure of this magnitude would have been known to the Supervisory Defendants.  Indeed, Philips noted that "The RPD has changed this practice since NORTON," which suggests that the Supervisory Defendants knew a change was necessary. Even if the systemic failure was not actually known, however, it should have been known to these supervisors.  A practice engaged in by such a large number of officers would have been noticeable to any reasonable supervisor.

121.    The widespread custom of lying on N-10 forms (i.e., of signing the form without witnessing a payment) was not RPD's only problem related to informants.  According to Defendant Brian Corrigan, who was asked to clean up the RPD's confidential information program in August 2012, there were serious problems in the program. The problems chiefly related to the RPD's failure to maintain accurate records of informants and the assistance they provided.

122.    For example, one way in which the RPD purported to attempt to keep track of informants was through "resume sheets."  If an informant provided assistance in a particular circumstance (e.g., provided information leading to a search warrant), the assistance was supposed to be added to the informant's resume by the creation of a "resume sheet."  Resume sheets were thus the key way in which the RPD was supposed to be able to verify whether its

officers presented accurate resumes to courts in warrant applications.  When asked about the actual use of resume sheets in real practice, however, Corrigan testified that when placed in charge of the program in August 2012, "I found that resume sheets weren't being utilized, so I implemented them right away."  Thus, the RPD's confidential informant program systematically failed to keep track of how informants assisted police officers and did not provide basic checks on officer integrity.

123.    Corrigan's requirement that resume sheets actually be used in real practice was not his only reform.  After he arrived, he testified that he "tightened the reigns" on the program, making other reforms.  Elaborating on this, he stated:

> I mean, I audit the CIs monthly which means if the CI is inactive and hasn't done anything for a six-month period, I make them inactive which means they're eligible to be used, but I declare them inactive. I have a locked storeroom of file folders, CI master files that are listed as active, inactive and deactivated.  And I will declare them inactive. And I think one of the things was that there were so – there's an abundance of informants, and I wanted to narrow the number of active informants down.  And I've gotten – I mean, I'm on No. 1602 right now.  That's how many informant numbers have been put out.  And I have I would say a little over a hundred active informants right now.

Thus, before Corrigan began "tighten[ing] the reins" in August 2012, there was a vast array of active informants with incomplete or non-existent resumes.  Moreover, the records that did exist were not secured under lock and key.

124.    Given the breadth of the problems, the Supervisory Defendants could not help but to be aware of them.  Indeed, evidence of their awareness lies in the fact that *Lieutenant Corrigan was specifically brought in to clean up the informant program*.  Corrigan's transfer into this position was not a routine promotion or transfer, but a targeted effort by RPD leadership to fix serious problems. This strongly suggests that RPD leadership, including the Supervisory Defendants, had, before August 2012, actual knowledge of the widespread lack of recordkeeping

and oversight in the confidential informant program. Even if such actual knowledge was missing, however, the Supervisory Defendants should have known of these problems.

### 4. The RPD's Slow Response

125.    Evidence of Norton's misconduct surrounded the Supervisory Defendants for some time. Widespread rumors, Norton's "garbage" paperwork, and a longstanding custom of ignoring the N-10 form and resume sheet requirements easily put the Supervisory Defendants on actual or constructive notice that Norton's warrant affidavits could not be trusted. Further, in April 2010, a report of Norton's suspicious activity with regard to informant R.A. was written and entered into the files of the RAVE Task Force—a task force co-managed by the RPD. Then, in March 2011, Norton was formally reprimanded for lying about informants on multiple occasions and as early as 2009. And there is strong reason to believe that, because of the interview conducted by the RPD Internal Affairs Department with one of Norton's informants, R.A., RPD leadership was actually or constructively aware of Norton's misconduct again sometime in 2011. Beyond that, there can be no doubt that RPD supervisors were actually or constructively aware of Norton's misconduct in 2012. The hospital interview with R.A. occurred by July 2012 at the latest (when Officer Tim Wyatt was transferred out of the Special Investigations Division). Additionally, Lieutenant Corrigan was put in charge of the confidential informant program in August 2012, specifically tasked with cleaning it up. Thereafter, the FBI began a formal investigation of Norton in the early fall of 2012.

126.    Despite the wealth of indications during 2009-12 that Norton had engaged in serious misconduct, Plaintiffs Johnson and Williams remained in jail and subject to probation and other impediments on their liberty. Indeed, it was not until 2015 and 2016 that they were exonerated. Not only were the Plaintiffs' initial arrests and incarcerations intolerable, but so,

too, was the extraordinary delay in processing the Plaintiffs' releases and exonerations. While the Plaintiffs sat in prison and on probation in violation of their constitutional rights, the RPD instead sat on its hands, and failed to respond to troubling information about Norton's actions and the basis for his previous statements. According to public statements, an RPD investigation into Norton's unlawful actions was delayed, for no apparent reason, until *after* the federal government conducted its own investigation. *Even if* the RPD was not actually or constructively aware of Norton's frauds when he first committed them (and Plaintiffs allege the contrary), it was *certainly aware of them long* before the Plaintiffs were finally exonerated. That actual or constructive awareness, however, did not inspire the Supervisory Defendants to act.

## COUNT I

*Violation of the Fourth Amendment of the United States Constitution*
(Plaintiffs Johnson and Williams Against Defendant Norton)

127. The foregoing paragraphs are herein incorporated and re-alleged.

128. Officer Jason Norton intentionally or recklessly misrepresented material information to courts in his applications for search warrants.

129. As a direct and proximate cause of these misrepresentations, the Plaintiffs were seized, detained, imprisoned and subjected to supervised probation pursuant to legal process unsupported by probable cause.

130. The criminal proceedings instituted against each Plaintiff ultimately terminated in favor of each Plaintiff when courts of law voided each criminal conviction.

## COUNT II

*Violation of Fourteenth Amendment Right to Make a Voluntary and Intelligent Plea*
(Plaintiffs Johnson and Williams Against Defendant Norton)

131. The foregoing paragraphs are herein incorporated and re-alleged.

132.     Each Plaintiff in this case was sentenced to prison after pleading guilty.

133.     The United States Constitution guarantees to criminal defendants, including the Plaintiffs in this case, the right to make a voluntary and intelligent decision as to whether to plead guilty.

134.     Defendant Norton, by not revealing to anybody the fatal errors in his warrant affidavits, engaged in egregious impermissible conduct.  Had Norton revealed the fatal errors in his warrant affidavits, the Plaintiffs would not have pled guilty.

135.     As a direct and proximate result of Norton's actions, the Plaintiffs were deprived of their constitutional rights to make a voluntary and intelligent plea and suffered long periods of unnecessary confinement and supervised probation.

## COUNT III

*Deprivation of Fourteenth Amendment Right and/or Eighth Amendment Right*
(Plaintiffs Johnson and Williams Against Defendant Norton)

136.     The foregoing paragraphs are herein incorporated and re-alleged.

137.     As evidenced by the vacation of the Plaintiffs' sentences, the Plaintiffs should not have spent any time in jail.

138.     While the Plaintiffs were in jail and subject to supervised probation, Defendant Norton knew or should have known that the Plaintiffs' imprisonment and/or probation was unwarranted.

139.     Despite this actual or constructive knowledge, Defendant Norton negligently, recklessly or intentionally did not take reasonable steps to secure, or assist in securing, the Plaintiffs' release from jail and/or termination of supervised probation.

140.     Had Norton taken such steps, the Plaintiffs would have been released from jail before they were actually released, and/or been released from their probation obligations and consequences flowing from their probation status before such occurred.

141.     As a direct and proximate result of Defendant Norton's failure to take such steps, the Plaintiffs spent significant periods of time in jail and subject to probation in violation of their Fourteenth Amendment right to liberty and/or their Eighth Amendment right to be free from cruel and unusual punishment.

## COUNT IV

*Supervisory Claim for Constitutional Violations Committed by Norton*
(Plaintiffs Johnson and Williams Against Defendants Gleason, Sipple, Russell, Alston, Corrigan, Harrison, Blackwell, and Norwood in their Individual Capacities)

142.     The foregoing paragraphs are herein incorporated and re-alleged.

143.     Defendants Gleason, Sipple, Russell, Alston, Corrigan, Harrison, Blackwell, and Norwood had actual or constructive knowledge that: (1) Jason Norton posed a pervasive and unreasonable risk of committing constitutional violations identified above in Counts I, II and III, and/or (2) Jason Norton was committing constitutional violations identified above in Counts I, II and III, and/or (3) Jason Norton had committed constitutional violations identified above in Counts I, II and III, and/or (4) customs existed within the RPD that would give rise to constitutional injury of the sort suffered by the Plaintiffs.

144.     These Defendants' responses (or lack thereof) to that knowledge was so inadequate as to show deliberate indifference to, or tacit authorization of, the alleged offensive practices and/or constitutional violations.

145.     An affirmative causal link exists between the Defendants' responses (or lack thereof) and the constitutional injury suffered by the Plaintiffs.

## COUNT V

*Supervisory Claim for Constitutional Violations Committed by Norton*
(Plaintiffs Johnson and Williams Against Defendant City of Richmond)

146.     The foregoing paragraphs are herein incorporated and re-alleged.

147.     Bryan T. Norwood was, at times relevant to this action, a policymaker for the City of Richmond with regard to the activities of the Richmond Police Department.

148.     Norwood had actual or constructive knowledge that: (1) Jason Norton posed a pervasive and unreasonable risk of committing constitutional violations identified above in Counts I, II and III, and/or (2) Jason Norton was committing constitutional violations identified above in Counts I, II and III, and/or (3) Jason Norton had committed constitutional violations identified above in Counts I, II and III, and/or (4) customs existed within the RPD that would give rise to constitutional injury of the sort suffered by the Plaintiffs.

149.     Norwood's response (or lack thereof) to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices and/or constitutional violations.

150.     An affirmative causal link exists between Norwood's responses (or lack thereof) and the constitutional injury suffered by the Plaintiffs.

## COUNT VI

*Deprivation of Fourteenth Amendment Right and/or Eighth Amendment Right*
(Plaintiffs Johnson and Williams Against Defendants Gleason, Sipple, Russell, Alston, Corrigan, Harrison, Blackwell, and Norwood in their Individual Capacities)

151.     The foregoing paragraphs are herein incorporated and re-alleged.

152.     As evidenced by the vacation of the Plaintiffs' sentences, the Plaintiffs should not have spent any time in jail.

153.     While the Plaintiffs were in jail and/or subject to supervised probation, Defendants Gleason, Sipple, Russell, Alston, Corrigan, Harrison, Blackwell, and Norwood knew or should have known that the Plaintiffs' imprisonment and/or probation was unwarranted.

154.     Despite this actual or constructive knowledge, these Defendants negligently, recklessly, or intentionally failed to take reasonable steps to secure, or assist in securing, the Plaintiffs' release from jail and/or termination of supervised probation.

155.     Had these Defendants taken such steps, the Plaintiffs would have been released from jail before they were actually released, and/or been released from their probation obligations and consequences flowing from their probation status.

156.     As a direct and proximate result of these Defendants' failures to take such steps, the Plaintiffs spent significant periods of time in jail and on probation in violation of their Fourteenth Amendment right to liberty and/or their Eighth Amendment right to be free from cruel and unusual punishment.

## COUNT VII

*Deprivation of Fourteenth Amendment Right and/or Eighth Amendment Right*
(Plaintiffs Johnson and Williams Against Defendant City of Richmond)

157.     The foregoing paragraphs are herein incorporated and re-alleged.

158.     As evidenced by the vacation of the Plaintiffs' sentences, the Plaintiffs should not have spent any time in jail.

159.     Bryan T. Norwood was, at times relevant to this action, a policymaker for the City of Richmond with regard to the activities of the Richmond Police Department.

160.     While the Plaintiffs were in jail or on supervised probation, Norwood knew or should have known that the Plaintiffs' imprisonment or probation was unwarranted.

161.     Despite this actual or constructive knowledge, Norwood negligently, recklessly, or intentionally failed to take reasonable steps to secure, or assist in securing, the Plaintiffs' release from jail and/or termination of supervised probation.

162.     Had Norwood taken such steps, the Plaintiffs would have been released from jail before they were actually released and/or been released from their probation obligations and consequences flowing from their probation status.

163.     As a direct and proximate result of Norwood's failure to take such steps, the Plaintiffs spent significant periods of time in jail and on probation in violation of their Fourteenth Amendment right to liberty and/or their Eighth Amendment right to be free from cruel and unusual punishment.

## COUNT VIII

*Malicious Prosecution in Violation of Virginia Law*
(Plaintiffs Johnson and Williams Against Defendant Norton)

164.     The foregoing paragraphs are herein incorporated and re-alleged.

165.     Officer Jason Norton intentionally misrepresented material information to courts in his applications for search warrants.

166.     As a direct and proximate cause of Norton's intentional misrepresentation, the Plaintiffs were seized, prosecuted, imprisoned, and subjected to supervised probation pursuant to legal process unsupported by probable cause.  The legal process was instituted by or with the cooperation of Jason Norton.

167.     Officer Norton's misrepresentations were malicious, or could reasonably be inferred to be malicious due to the absence of probable cause.

168.     The criminal proceedings instituted against each Plaintiff ultimately terminated in a manner not unfavorable to the plaintiff.

THE DEFENDANTS' AFORESAID ACTIONS and omissions constitute a willful, wanton, reckless, and conscious disregard of Plaintiffs' rights, by reason of which Plaintiffs are entitled to recover punitive damages.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, joint and severally, in an amount *in excess of* $5 million ($5,000,000.00) each, and collectively in an amount *in excess of* $10 million ($10,000,000.00), or in such greater amount to be determined at trial, as well as costs, pre-judgment interest, and attorneys' fees, and grant such other and further relief that the Court may deem appropriate. Plaintiffs also respectfully request that the Court enter a judgment in their favor and against all Defendants except for the City of Richmond, jointly and severally, for punitive damages in the amount of $5 million ($5,000,000.00) each, and collectively in the amount of $10 million ($10,000,000.00) or in such greater amount to be determined at trial, and grant such other and further relief that the Court may deem appropriate.

**TRIAL BY JURY IS DEMANDED.**

BRAVETTE JOHNSON and<br>
CURTIS WILLIAMS

By:     /s/ Mark J. Krudys_____

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 E. Main Street, Suite 2020
Richmond, VA 23219
Phone: (804) 774-7950
Fax: (804) 381-4458
Email: mkrudys@krudys.com
Web: www.krudys.com

John Frederick Preis (VSB# 45764)
7719 Rock Creek Road
Henrico, VA 23229
Phone: (804) 289-8682
Email: jpreis@richmond.edu

Amy L. Austin (VSB# 46579)
THE LAW OFFICE OF AMY L. AUSTIN, P.L.L.C.
101 Shockoe Slip, Suite M
Richmond, VA  23219
Phone: (804) 343-1900
Fax: (804) 343-1901
Email: amyaustinlawyer@gmail.com

*Counsel for Plaintiffs Bravette Johnson and Curtis Williams*