**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

BRAVETTE JOHNSON and
CURTIS WILLIAMS

               Plaintiffs,

                              Civil Action No. 3:17-CV-00553-MHL

v.

CITY OF RICHMOND, *et al.*,

               Defendants.

**PLAINTIFFS' OPPOSITION TO DEFENDANT
CITY OF RICHMOND'S MOTION TO DISMISS**

On the opening page of its Memorandum in Support of Motion to Dismiss, the City of Richmond argues that "it is one thing for justice to be blind to a man's color" but "it's quite another for justice to be blind his crimes." Br. at 1. Yet if the City of Richmond is correct—that justice for the Plaintiffs here should hinge on their alleged guilt—then why did city prosecutors and state judges ignore that alleged guilt when they agreed that the Plaintiffs' convictions should be vacated? And further, why did federal prosecutors and federal judges agree that the plaintiffs in the related case, *Ensley v. City of Richmond*, should have their convictions vacated despite their alleged guilt? The City of Richmond, it appears, has itself become blind to a foundational principle in our constitutional law: "even a guilty man is entitled to a fair trial." *Poventud v. City of New York*, 750 F.3d 121, 137 (2d Cir. 2014) (holding that plaintiff's alleged guilt was irrelevant to his civil claim alleging intentional nondisclosure of *Brady* material) (citation and internal quotation marks omitted). The Court should focus on wrongs committed here, not on the guilt, if any, of the Plaintiffs. For this reason and those further stated below, the Court should deny the City of Richmond's Motion to Dismiss in its entirety.

## STATEMENT OF FACTS

The basic facts of this case are not in dispute. Those facts include the following: Jason Norton, an officer with the Richmond Police Department ("RPD") from 2004 through 2013, defrauded a magistrate in several applications for search warrants by attributing his knowledge to an informant that did not exist or was not reliable. Unaware of Norton's misrepresentations, the magistrate issued the warrants. Despite their issuance, the warrants were unconstitutional because they were not supported by probable cause. Norton later executed the warrants and arrested Plaintiffs during the searches. Because the searches were unconstitutional, any charges against Plaintiffs should have been immediately dismissed. This did not happen, however. Instead, the charges remained and Plaintiffs, facing the risk of long prison sentences, pled guilty. Years later, after Defendant Norton continued to lie and defraud the justice system, and the other individual Defendants continued to do nothing to correct the harm done despite their constitutional duties, someone outside the RPD discovered Norton's lies. This eventually caused Plaintiffs' convictions to be voided and the Plaintiff still in jail (Johnson) to be released.

Those are just the facts of Norton's fraudulent warrants, however. What is just as important in this case is the misconduct of then-Chief of Police Bryan T. Norwood. As the chief policymaker for the RPD during the period relevant to this suit,[1] Norwood's own constitutional violations are deemed to be those of the City itself under *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986). Thus, to the extent that Norwood has committed a constitutional violation, the City will be liable without regard to the doctrine of qualified immunity. *See Owen v. City of Independence*, 445 U.S. 622 (1980).

---

[1] The City of Richmond acknowledges that Norwood is the chief policymaker for the RPD with regard to the issues presented by this case. *See* Br. 4, 15.

The facts underlying Norwood's constitutional violations establish that Norwood had knowledge that Norton lied about his informants and yet failed to act on that knowledge. Norwood's knowledge is established chiefly through: (1) official records of Norton's suspicious and deceitful activity regarding a confidential informant in April 2010, ¶¶ 42-48, 109[2], (2) Norton's double-reprimand in March 2011 for deceit involving informants dating back to 2009 and 2010 ¶¶ 110-13, (3) an investigation of Norton in late 2011 by the RPD's Internal Affairs Division regarding Norton's work with an informant, ¶¶ 106-08, (4) Norwood's decision in the summer of 2012 to clean up the RPD's confidential informant program, ¶¶ 121-24, (5) the FBI's initiation of investigation in the summer or fall of 2012 into Norton's fraudulent activities with informants ¶¶ 23, 115, and (6) a widespread belief among management during 2010-2012 that Norton was a troubled cop who was playing "too fast and too loose." ¶ 114; *see also* ¶¶ 99-113. These events all permit a reasonable jury to find that sometime between April 2010 and the fall of 2012 (at the latest), Defendant Norwood knew that there was a significant risk that persons like the Plaintiffs were in jail but entitled to release.

Given this knowledge, what did Norwood do about it? Not much, or at least not enough. Despite Norwood's having such knowledge between at least April 2010 and the fall of 2012, Plaintiffs in this case continued to suffer the consequences of Norton's frauds. Plaintiff Johnson was arrested on March 11, 2010 and released from jail in November 2011, subjected to probationary duties and restrictions through 2012, and then re-incarcerated for a four-year sentence beginning in 2012—the length of the sentence being a direct result of Norton's misconduct. Johnson was not released from prison until on or about August 27, 2015. *See* ¶¶ 70, 80-85. Plaintiff Williams was arrested on July 7, 2009 and spent approximately 2 years and four

---

[2]     Unless otherwise noted, all ¶ references herein are to the Complaint, ECF Dkt. No. 1.

months in jail.  After his release in April 2012, he was subject to obligations associated with probation and arrested on again August 3, 2013 for allegedly violating his probation—a probation, of course, that was unlawful given Norton's misconduct.  *See* ¶¶ 86, 94-97.  Had Norwood acted on his knowledge, Plaintiffs Johnson and Williams would not have suffered these continuing infringements on their liberty.

Based on these failures, Plaintiffs brought suit against the City of Richmond.  The claims against the City are contained in Counts V and VII.  In Count V, the Plaintiffs allege that Bryan Norwood, a policymaker for the City with regard to policing matters, violated the Constitution by failing to act upon his knowledge of Norton's past, present or further constitutional violations.  In particular, Norwood failed to act despite his knowledge that Norton would violate, was violating, or had violated the Plaintiffs' rights to: (1) be free from malicious prosecution, (2) make knowing and intelligent pleas and (3) enjoy liberty under the Fourteenth and/or Eighth Amendments.  Count VII is similar to Count V in that it alleges a liberty claim under the Fourteenth and/or Eighth Amendments, but it is distinct in that it alleges that Norwood, regardless of his supervisory status, violated the Constitution by not responding to his knowledge that persons in the Plaintiffs' circumstances were very likely entitled to release.

Although Counts V and VII focus on the misdeeds of Norwood (also a defendant in this action), Norwood's constitutional violations are deemed to be the policy of the City of Richmond for the purposes of a § 1983 action. *See Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986).  Thus, whether the Plaintiffs state a claim against the City is tied to whether they state a claim against Norwood.  If there is a viable claim against Norwood, then the Plaintiffs possess a viable claim against the City as well.

# ARGUMENT

Defendant City of Richmond offers five arguments why it should not be held liable for the harm suffered by the Plaintiffs. In particular, it argues that:

(1) intervening causes undercut all claims, Br. at 10-12,

(2) *Townes* applies and requires the dismissal of all claims, Br. at 12-14,

(3) all claims lack proximate cause and damages, Br. at 14,

(4) all claims fail to state a claim under *Monell,* Br. at 14-22

(5) there are no claims under the Eighth or Fourteenth Amendment, Br. at 22-24

As explained below, none of these arguments is availing.

## A. The City of Richmond's First Three Arguments—All of Which Pertain to Causation—Are Without Merit.

In its first three arguments, the City of Richmond argues that the Plaintiffs' claims all suffer from causation problems.[3] As noted above, the underlying claims leading to liability here include (1) malicious prosecution claims, (2) knowing and intelligent plea claims and (3) liberty claims under the Eighth and/or Fourteenth Amendment. As explained below, causation does exist for each claim.

### 1. Causation Exists For the Plaintiffs' Liberty Claims under the Eighth and/or Fourteenth Amendments.

Although the City of Richmond argues that "all" of the Plaintiffs' claims suffer from causation problems, it does not specifically explain how the Plaintiffs' liberty claims under the Eighth and/or Fourteenth Amendments suffer from such problems. (The City does make non-

---

[3]     The City of Richmond, in its third argument, also suggests in a single sentence that the Plaintiffs cannot "claim damages," but this argument appears to be a variant of its causation arguments. Br. at 14 (stating that "The Plaintiffs cannot use this theory [i.e., the fruit of the poisonous tree theory] to show causation or claim damages..."). Given this, the Plaintiffs treat the City's isolated mention of "damages" as a part of the City's overall causation arguments.

causation arguments regarding the liberty claims, and Plaintiffs address those arguments in a separate section below. *See* infra Part C.)  If the City's other causation arguments are any indication, its view is apparently that, because Officer Norton's original misconduct was not a legal cause of the Plaintiffs' incarceration, any claim based on unlawful incarceration must lack causation as well.  The flaw in this argument is that Plaintiffs' liberty claims do not depend on whether Norton's original misconduct was the legal cause of their incarceration and other deprivations of liberty.  Rather, the claims depend *only* on the fact that Plaintiffs were entitled to be free of deprivations of their liberty—a fact nearly beyond dispute given that their convictions were vacated by courts of law.   Put differently, it is entirely immaterial to this claim whether Norton's original misconduct was the legal cause of the deprivations of liberty; all that matters is that (1) the Plaintiffs were, in violation of law, in jail or otherwise deprived of their liberty, (2) Norwood knew sometime before these deprivations ended that there was a risk that such deprivations were occurring, and (3) Norwood did not sufficiently respond.  There is thus no causation problem with the Plaintiffs' liberty claims.

### 2.   Causation Exists For the Plaintiffs' Knowing and Intelligent Plea Claims

The City of Richmond argues that this claim fails because "the actions of prosecutors, and the Plaintiffs through guilty pleas, broke the causal chain between the Defendants and any harm to the Plaintiffs." Br. at 10.  The City cites the unpublished (and thus non-precedential) *United States v. Murphy*, 380 F. App'x 344, 345 (4th Cir. 2010) in support of this argument, but acknowledges that *United States v. Fisher*, 711 F.3d 460 (4th Cir. 2013)—a published decision binding on this Court—"arguably alters" the holding in *Murphy.*

In *Fisher,* a Baltimore City police officer by the name of Mark Lunsford sought a warrant to search Cortez Fisher's residence and vehicle.  As Officer Norton did in the case before this

Court, Lunsford stated in his warrant application that a "confidential informant" had informed him that Fisher was involved in criminal activity. *Id*. at 463. After obtaining the warrant, Lunsford executed it and arrested Fisher based on what he allegedly found in Fisher's possession. Fisher later pled guilty and was sentenced to 10 years in prison. *Id*. Also similar to the case before this Court, it was later discovered that the "confidential informant [Lunsford] identified in his affidavit had no connection to the case and that another individual was the real informant." *Id*. (internal quotation marks omitted). Lunsford's misconduct in Fisher's case was part of a larger scheme in which Lunsford would "falsely attribute[e] information to a confidential informant with whom he was splitting reward money." *Id*. When Lunsford's misconduct became widely known, Fisher sought to set aside his guilty plea in a habeas action.

The Fourth Circuit sided with Fisher. Importantly, the Court specifically spoke to the issue of causation, stating that, a "reasonable defendant standing in [Fisher's] shoes likely would have altered his decision to plead guilty." *Id*. at 467. Thus, in the Fourth Circuit's opinion, Lunsford's nondisclosure *caused* Fisher's decision to plead guilty. Fisher's plea was therefore invalid because it was not knowing and intelligent.

*Fisher* is on all fours with the present case. Not only is this clear from the facts of *Fisher* itself, but it is also clear from the record in *Ensley v. City of Richmond*, a related case before this Court arising from other instances of Norton's misconduct. After being wrongfully imprisoned because of Norton's lies, three of the five plaintiffs in *Ensley* obtained their releases through federal habeas petitions. In the opinions granting those petitions, United States District Court Judge Henry Hudson cited *Fisher* as the key authority meriting relief. *See, e.g., United States v. Andrews*, No. 3:09CR368-HEH, 2015 WL 12830449, at *1 (E.D. Va. Apr. 1, 2015). Moreover, in his opinions, Judge Hudson noted that the "government concedes that there is a high

probability that critical information contained in the search warrant affidavit is false and that it is material to a finding of probable cause" and "therefore joins" in supporting the petitions. *Id*.

Given *Fisher* itself, Judge Hudson's opinions declaring that *Fisher* entitles several plaintiffs in *Ensley* to release, and the U.S. Attorney's Office's agreement with that view, there can be little doubt that the Plaintiffs in this case suffered a violation of their constitutional rights to make knowing and intelligent pleas. There was no gap in causation in *Fisher*, no gap in causation in Judge Hudson's habeas opinions, no gap in causation in the eyes of the U.S. Attorney's office, and there is no gap in causation here. The Plaintiffs have thus stated a claim for a violation of their right to make a knowing and intelligent plea.

### 3. Causation Exists for the Plaintiffs' Malicious Prosecution Claims

The bulk of the City of Richmond's causation arguments are aimed at the Plaintiffs' malicious prosecution claims. The City of Richmond's central argument is that the Plaintiffs are factually guilty (Plaintiffs do not concede factual guilt) and thus cannot hide behind a Fourth Amendment violation. More specifically, the City argues that because Plaintiffs were indicted by grand juries *knowing nothing about Norton's misconduct*, the indictments are "intervening cause[s]" of Plaintiffs' ultimate losses of liberty. Inherent in this argument is that the fruit of the poisonous tree doctrine, together with the exclusionary rule, does not apply in these circumstances. The fruit of the poisonous tree doctrine, by definition, does not recognize intervening causes. Rather, it establishes a "but for" causation rule that declares "poisoned" any consequence of a constitutional violation. Thus, the City's causation arguments are fundamentally about whether the fruit of the poisonous tree and exclusionary rule should apply in this case.

The City of Richmond correctly notes that several circuits have held that the fruit of the poisonous tree doctrine, and its partner, the exclusionary rule, does not apply in certain § 1983 cases. The prevailing logic in these cases is that "[t]he cost of applying the exclusionary rule in [the § 1983] context is significant ... [a]nd the deterrence benefits are miniscule." *Black v. Wiggington*, 811 F.3d 1259, 1268 (11th Cir. 2016); *see also Townes v. City of New York*, 176 F.3d 138, 148 (2d Cir. 1999) (explaining that applying the exclusionary rule in § 1983 cases "would vastly over deter police officers and would result in a wealth transfer that is peculiar, if not perverse"); *Wren v. Towe*, 130 F.3d 1154, 1158 (5th Cir. 1997) (per curiam); *Hector v. Wyatt*, 235 F.3d 154, 159 (3rd Cir. 2000) (refusing to apply exclusionary rule because an "officer who took a frisk one modest step too far could face vast liability"); *Lingo v. City of Salem,* 832 F.3d 953 (9th Cir. 2016) (noting that the exclusionary rule should apply "only where its deterrence benefits outweigh its substantial social costs").

Crucially, however, no circuit court has confronted the circumstances presented here— namely, ***a detention arising from the intentional deceit of a magistrate by a police officer.*** In such a case, there is good reason to think that the rule's "deterrence benefits [*would*] outweigh its substantial social costs." *Lingo*, 832 F.3d at 958. The different balance of costs and benefits arises from the fact that ***the exclusionary rule has little deterrent effect on officers who are willing to lie to obtain or preserve an arrest.*** This has been common knowledge for years in the field of law enforcement—so common, in fact, that officers in New York City had their own term for it: "testilying."[4] "Testilying" arose largely as a result of the Supreme Court's decision in *Mapp v. Ohio*, 347 U.S. 643 (1961), which extended the exclusionary rule to state criminal

---

[4]  MILTON MOLLEN ET AL.,COMM'N TO INVESTIGATE ALLEGATIONS OF POLICE CORRUPTION AND THE ANTI-CORRUPTION PROCS. OF THE POLICE DEP'T, CITY OF N.Y., ANATOMY OF FAILURE: A PATH FOR SUCCESS 36 (1994).

proceedings. Before *Mapp*, officers were likely to admit that they found the contraband on the suspect's person or at his residence—even if the search of the person or place was unconstitutional. Without the exclusionary rule, there was no reason to pretend otherwise. But after *Mapp* came down, there was a "suspicious rise" in so-called "dropsy" cases—cases in which "officers alleged that the defendant dropped the contraband on the ground."[5]

The phenomenon of "testilying" did not tail off once *Mapp* was absorbed into the legal landscape. For example, in 1994, a blue-ribbon commission charged with studying corruption in the New York City Police Department concluded that "testilying" was "probably the most common form of police corruption, particularly in connection with arrests for possession of narcotics and guns."[6] And more recent studies confirm that the problem is still wide-spread.[7]

Thus, in contrast to the criminal setting, applying the exclusionary rule (and its component, the fruit of the poisonous tree doctrine) in the civil setting in a case where an officer has intentionally defrauded the legal system actually **creates deterrence where little existed before**. An officer like Norton, for whom the exclusionary rule was apparently of no consequence in the criminal context because he was already willing to simply fabricate

---

[5] Comment, *Effect of* Mapp v. Ohio *on Police Search-and-Seizure Practices in Narcotics Cases*, 4 COLUM. J.L. & SOC. PROBS. 87, 95 (1968); *see also* Irving Younger, *The Perjury Routine*, Nation, May 8, 1967, at 597 (explaining that, after *Mapp*, "police made the great discovery that if the defendant drops the narcotics on the ground, after which the police man arrests him, the search is reasonable and the evidence is admissible."

[6] MOLLEN ET AL., at 36.

[7] Christopher Slobogin, *Testilying: Police Perjury and What to Do About It*, 67 COLO. L. REV. 1037, 1041-48 (1996) ("Whether it is conjecture by individual observers, a survey of criminal attorneys, or a more sophisticated study, the existing literature demonstrates a widespread belief that testilying is a frequent occurrence.").

"evidence" and repeatedly lie to magistrates to "justify" searches, might not be so keen to continue to do so if he faced personal civil liability for such actions.[8]

Of course, the value of such deterrence is not sufficient on its face to justify the rule, for the rule could be outweighed by costs to law enforcement, and, thus, society as a whole. Such costs, however, would be extraordinarily limited because they would be borne mainly by officers who insisted on willfully deceiving a magistrate.[9] Such limitations are entirely appropriate because the vast majority of law enforcement officers are honest, diligent, and dedicated to the public good—*and are not going to intentionally deceive*. Like all fields of work, however, a few will occasionally stray from the straight and narrow. When that occurs in the policing context, and liberty is consequently lost, *some* amount of deterrence is needed to protect the public. Indeed, the need for deterrence is particularly appropriate in this context because Norton has never been charged with any crime—even though he quite plainly perjured himself over and over again. Thus, applying the exclusionary rule in the civil setting will provide appropriate—and in this case, the *only*—deterrence for this unique instance of intentional misconduct.

The only court to apparently confront an issue like that presented here is the Northern District of Oklahoma in *Williams v. City of Tulsa*, 2016 WL 1572957 (N.D. Okla. Apr. 19,

---

[8]    Indeed, the importance of deterrence through a § 1983 action is magnified here because another major tool of deterrence—criminal punishment—is apparently not in play here. Norton has not been charged with any crimes.

[9]    Society would potentially also incur the costs associated with the release of a suspect that was factually guilty (though the Plaintiffs do not concede that they are factually guilty, and further do believe that factual guilt is relevant to this case). The cost of releasing a factually guilty suspect, however, is a routine cost associated with the exclusionary rule that, for over half a century, has failed to overcome its utility as a deterrent. *See Mapp v. Ohio*, 367 U.S. 643 (1961) (applying the exclusionary rule to state criminal adjudications). If it the exclusionary rule does not produce unacceptably high social costs when an officer *mistakenly* violates the Constitution, it certainly will not produce such costs when an officer *intentionally* violates the Constitution.

2016).  Importantly, however, the court in *Williams* did not face the argument that Plaintiffs advance here,[10] which is that, although the exclusionary rule may not be appropriate in the majority of § 1983 actions, it is entirely appropriate—***even essential***—in cases like that presented here.  Given that *Williams* does not consider the need for deterrence in cases of "testilying," the case is of limited use to this Court.

In sum, this Court should apply the exclusionary rule here in this case of intentional deceit because, under the logic of the rule, its benefits outweigh its costs.  No binding precedent suggests otherwise and this case presents the Court with a unique opportunity to better articulate the role of the exclusionary rule in § 1983 cases.

**B.  The City of Richmond's Fourth Argument—Which Pertains to *Monell*—is Without Merit.**

In its fourth argument, the City of Richmond argues that, even if constitutional violations occurred in this case, the City is not liable for those violations.  The City offers three reasons why this is so: (1) Defendant Norwood's conduct is not attributable to the City of Richmond under *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), (2) Defendant Norwood was not deliberately indifferent to the risk of constitutional harms such as that inflicted on the Plaintiffs, and (3) there was no custom of misconduct giving rise to the constitutional violations suffered by the Plaintiffs.  None of these arguments is availing.

**1.  Norwood's Actions Establish Municipal Policy under *Pembaur***

---

[10]     The court's opinion in *Williams* was issued as part of its ruling in a bench trial.  The Court invited the parties to submit briefs before ruling, and, although the defendant argued the exclusionary rule should not apply in § 1983 cases, the plaintiff did not address the issue at all.  *See Williams v. Henderson*, 2016 WL 3566093 (N.D.Okla.) (defendant's brief); *Williams v. Henderson*, 2016 WL 3566057 (N.D.Okla.) (plaintiff's brief).

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) "hold[s] that municipal liability under § 1983 attaches where—and *only* where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Quoting this passage from *Pembaur*, Br. at 16, the City argues that Plaintiffs' allegations do not meet this standard because they only allege "an act of *omission*, not commission." Br. at 15. "This [case] is really about deliberate indifference," the City argues, "not an express action that formed a City policy." *Id.*

The City of Richmond is entirely correct that Plaintiffs must plausibly allege deliberate conduct on the part of Norwood here, but the City has overlooked the fact that the phrase "deliberate indifference" contains the word "***deliberate.***" To be "deliberately indifferent" is to know of a significant risk that a constitutional harm will occur and then *deliberately* ignore the risk. See *Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir. 1994). If, as the City of Richmond correctly contends, this case "is really about deliberate indifference," then Plaintiffs have undeniably placed their claims within the realm of *Pembaur*, because "deliberate indifference" is a "deliberate choice to follow a course of action." *Pembaur*, 475 U.S. at 483; *see also* Compl. ¶¶ 146-150, 157-163 (alleging deliberate indifference by Norwood). Indeed, the City of Richmond approvingly quotes Judge Hudson's statement to this effect:

> As Judge Hudson pointed out in *Tobey v. Napolitano*, 808 F. Supp. [sic] at 844: "this is precisely why municipal liability requires a showing of deliberate indifference: 'To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983.'" (Citing *City of Canton* at 391).

Br. at 16. It is unclear why the City would urge this Court to follow *Tobey* when—according to the City's own admission—*Tobey* states that municipal policy can be established by deliberate indifference. Moreover, Judge Hudson's statement in *Tobey* is entirely consistent with settled law in this field. *See, e.g., City of Canton v. Harris*, 489 U.S. 378, 396 (1989) (O'Connor, J.,

concurring in part and dissenting in part) ("Where a Section 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of _Monell_ are satisfied."); _Amnesty Am. v. Town of W. Hartford_, 361 F.3d 113, 126 (2d Cir. 2004) (Sotomayor, J.) ("[A] single instance of deliberate indifference to subordinates' actions can provide a basis for municipal liability.").[11]

In sum, Plaintiffs have plausibly alleged that Norwood, the City's chief policymaker in the realm of policing, _deliberately_ behaved in a way that caused the Plaintiffs to suffer malicious prosecutions, to suffer deprivations of their rights to make knowing and intelligent pleas, and/or to suffer deprivations of liberty in violation of the Eighth and/or Fourteenth Amendment. Under _Pembaur_, Norwood's actions therefore establish a municipal policy.[12]

---

[11]  In a separate statement regarding _Tobey_, the City of Richmond argues that _Pembaur_, as applied in _Tobey_, requires the Plaintiffs to point to a "specific directive" or "specific action" and that the Plaintiffs have only alleged that "Norwood violated their rights by not adequately disciplining Detective Norton." Br. at 16. This argument is off-base in several respects. First, simply as a matter of accuracy, binding precedent does not require Plaintiffs to point to a "specific action" by Norwood, but rather only requires them to point to an "affirmative decision" by Norwood. _See Carter v. Morris,_ 164 F.3d 215, 218 (4th Cir. 1999). Indeed, this is the standard Judge Hudson specifically quoted and applied in _Tobey_. _Tobey_, 808 F. Supp. 2d at 841. Practically speaking, there may not be any daylight between a "specific directive," a "specific action," and an "affirmative decision," but to the extent there might be, it is important to note to the correct standard. Second, the Plaintiffs have alleged far more than that Norwood simply failed to adequately discipline Norton. They have alleged, for example, that Norwood had knowledge—_even after Norton's departure from the department_—that there was a significant risk that persons situated as the Plaintiffs were suffering continuing violations of their rights, and that Norwood deliberately ignored these risks. ¶¶ 146-150, 157-163; see also ¶¶ 99-126. Third and finally, even if the Plaintiffs only alleged that Norwood failed to discipline Norton, the failure to discipline Norton when aware of his misconduct and the risk such poses to persons situated as the Plaintiffs, is an "affirmative decision."

[12]  To the extent that Fourth Circuit precedent could somehow be read to distinguish between acts and omissions in the realm of municipal policy, relevant precedent _also_ makes clear that the distinction is ultimately irrelevant to whether a policy exists. _See Austin v. Paramount Parks, Inc._, 195 F.3d 715, 728–29 (4th Cir. 1999) ("Municipal policy may be found . . . in certain affirmative decisions of individual policymaking officials, or in certain omissions on the

## 2. Norwood Was Deliberately Indifferent

Deliberate indifference forms the basis of Counts V and VII, both of which allege that Norwood (a policymaker for the City of Richmond with regard to police matters) had knowledge of a substantial risk that persons situated as the Plaintiffs would be deprived of their rights to be free from malicious prosecution, their rights to make knowing and intelligent pleas, and/or their rights to be free from deprivations of liberty in violation of the Eighth and/or Fourteenth Amendment. The City of Richmond argues that Norwood "showed the opposite of deliberate indifference." Br. at 17. This argument is meritless.

Deliberate indifference requires a showing that the officer in question—here, Norwood— (1) had knowledge of a "pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff," (2) responded so inadequately as to "show deliberate indifference to or tacit authorization of the alleged offensive practices," and (3) the inaction caused "the particular constitutional injury suffered by the plaintiff." *Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir. 1994). The Plaintiffs have plausibly alleged each of these elements.

With regard to the first element, knowledge, there are six matters that would allow a reasonable jury to infer that Norwood knew that Norton was playing "too fast and too loose" with confidential informants, and thus that Norton posed a risk of constitutional injury to persons situated as the Plaintiffs. In particular, Norwood would have reasonably known that: (1) Norton engaged in highly suspicious activity with a confidential informant—including tipping the informant off to an likely arrest—in **April 2010**; (2) Norton was reprimanded in **March 2011** for deceit with regard to confidential informants dating back to 2009 and 2010; (3) a confidential

---

part of policymaking officials that manifest deliberate indifference to the rights of citizens.")
(quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir 1999).

informant was interviewed about his relationship with Norton in **late 2011** as part of an IAD investigation; (4) the RPD's confidential informant program in **mid-2012** lacked basic checks on integrity that would keep an officer from lying about the identity of an informant; (5) the FBI was investigating Norton by at least the **fall of 2012** (and likely earlier) for lying about the identity of his informants on warrant applications filed **as early as 2009**; and (6) Norton's colleagues and other supervisors thought he played "too fast and too loose," had encountered him lying on numerous occasions, and believed that "management" was letting Norton "hang himself" because he was "producing." Given all these allegations, a reasonable jury could easily find that, while the Plaintiffs were suffering harms caused by Norton's misconduct,[13] Defendant Chief Norwood knew of a significant risk that persons situated as the Plaintiffs might be subjected to such harms.

With regard to the second element of the deliberate indifferent test—an insufficient response—the Plaintiffs have alleged plausible facts showing that Norwood's response was so insufficient as to constitute deliberate indifference. The insufficiency of Norwood's response is demonstrated most plainly by the fact that Norwood could have taken steps to prevent or alleviate the harm suffered by persons situated as the Plaintiffs but did not take such steps. When it becomes clear that an officer under one's supervision has lied about his informants, and thus that people are likely currently in jail that should not be there, the first order of business ought to be to *help those people get out of jail or otherwise restore their rights.* This was an eminently feasible task that, once undertaken by the Commonwealth's Attorney's office, was accomplished forthrightly. Yet, for some unknown and unacceptable reason, this task was not

---

[13]    As noted above in the Statement of Facts, both Plaintiffs in this case suffered harms well beyond 2012. Bravette Johnson was not ultimately released from jail until 2015 and Curtis Williams was detained as late as August 2013. Their convictions were not overturned until 2015 and 2016.

begun until after the FBI completed, or nearly completed, its investigation.[14]  It was thus not until April 2015 that wrongful convictions caused by Norton were begun to be overturned, but Norwood undoubtedly had knowledge at the very least *by late 2012* that wrongful convictions very likely had occurred.

With regard to the third and final element of the deliberate indifference test—causation—the Plaintiffs have plausibly alleged that "there was an affirmative causal link between [Norwood's] inaction and the particular constitutional injury suffered by the [Plaintiffs]."  On this issue, there can be little debate.  Had Norwood, after gaining knowledge of Norton's misdeeds, taken reasonable steps, the Plaintiffs would not have suffered the harms that, for Bravette Johnson, continued through 2015 and for Curtis Williams, continued through 2013.

Against these points, the City of Richmond posits two arguments. First, the City argues that "Chief Norwood showed the opposite of deliberate indifference." Br. at 17.  Norwood's lack of indifference is established, the City argues, through Norwood's disciplining of Norton in March 2011 and Norwood's decision to have Brian Corrigan clean up the informant program in

---

[14]     It is not appropriate to let Norwood off the hook because federal agents were performing an investigation, however. First of all, the facts pled plausibly establish that Norwood had requisite knowledge before the federal agents began their investigation.  Moreover, the existence of a federal investigation does not in any way relieve Norwood of his *own* duty to help persons wrongfully put in jail by one of his *own* officers.  Additionally, the federal investigation was almost certainly not aimed solely at the restoration of Plaintiffs' liberty.  If that was its only purpose, FBI investigators would have only needed to compare Norton's warrant applications, not interview dozens of witnesses over a period of several years.  Clearly, a significant part of the investigation was determining the nature and scope of Norton's criminal conduct. Third, even if there were some reason to defer to federal investigators in this situation, a jury could reasonably conclude that Norwood *deferred for far too long*. If federal investigators spent a decade investigating this matter, would Norwood be justified in deferring for that long? Certainly not.  A 2.5 year investigation is obviously much shorter than that, but in the eyes of the Plaintiffs it was intolerably—and unconstitutionally—too long.

the summer of 2012. Br. at 17-18.  These are no doubt deliberate and positive actions by Norwood, but most importantly, ***they did nothing to prevent or alleviate the harm suffered by the Plaintiffs***. The reprimands in March 2011 did nothing to help the Plaintiffs, who at that point were already in jail.  Nor did the reprimands do anything to alleviate continuing restrictions on liberty applied to the Plaintiffs after their releases.  The same is true of Norwood's efforts to clean up the informant program in the summer of 2012.  It was appropriate to clean up the program, of course, but that action obviously did nothing to help the Plaintiffs in this case.  In short, Norwood's disciplining of Norton and efforts to clean up the informant program could ***only help future victims, not those who had already been, and were continuing to be, victimized***.  By ignoring persons situated as the Plaintiffs, Norwood was deliberately indifferent.

Second, the City of Richmond also argues that "Norwood's decision to reprimand, rather than fire, Norton, is not actionable under Fourth Circuit precedent." Br. at 18.  This argument fails for two reasons.  First, the Plaintiffs do not contend that Norwood was required (whether by Fourth Circuit precedent or otherwise) to fire Norton.  They simply contend that, by allowing Norton to continue to work with informants, Norwood was indifferent to the risk that persons like the Plaintiffs would end up wrongfully detained.  Second, the Fourth Circuit law cited by the City does not insulate Norwood from liability.

*Riddick v. School Bd*., 238 F.3d 518 (4th Cir. 2000) does not help the City here.  *Riddick* involved allegations that a school board was liable for various constitutional harms because the employee who committed those harms had previously been suspected of engaging in similar activity.  Although the Court sided with the school board in *Riddick*, the key distinction between that case and this one is that the *prior incident was deemed suspicious but not inappropriate*. In contrast, Norton's conduct here was inappropriate—as evidenced by the reprimand he received.

*Jones v. Wellham*, 104 F.3d 620 (4th Cir. 1997) is also of little help to the City of Richmond. In that case, a student raped by a school system employee in 1990 sued the school system. The student argued that the school system was liable because, in 1979, the same employee was disciplined for sexual misconduct with a student. The court refused to impose liability on the school system because the causal connection "between the decision to keep [the employee] on in 1979 and the constitutional violation ten years later is too remote . . . ." *Id.* at 627. In contrast to *Jones*, however, Norton's wrongful conduct continued; the RPD Internal Affairs Department interviewed R.A., one of his informants (who Norton had tried to tip off as to an arrest and had wrongly attributed on warrant affidavits and N-10 forms) about his ongoing relationship with Norton, and then the FBI began investigating Norton in mid to late 2012 for continued misconduct occurring over several years and spilling over from the start of their investigation and beyond. Perhaps if Norton had established a clean track record for ten years, as in *Jones*, Norwood could be excused for allowing him to work with informants, but given the short time frame, such an inference is not appropriate.

### 3. The Plaintiffs Do Not Allege A Custom Claim

The City of Richmond's final challenge to the Plaintiffs' *Monell* claims is that "there was no deliberate, 'widespread and permanent' practice forming an actionable municipal custom." Br. at 20 (quoting *Carter v. Morris*, 164 F.3d 215, 222 (4th Cir. 1999)).

The Plaintiffs do not seek to impose liability on the City of Richmond through a custom theory. Rather, they allege that Chief Norwood, as the policymaker for the City with regard to law enforcement matters, committed constitutional violations that, under *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) and related precedent, establish a municipal policy actionable under 42 U.S.C. § 1983.

**C. The City of Richmond's Fifth Argument—Which Pertains to the Plaintiffs' Liberty Claims—Is Without Merit.**

Finally, the City of Richmond argues that the Plaintiffs' liberty claims under the Fourteenth and/or Eighth Amendment fail to state a claim for relief. The City of Richmond first argues that the Plaintiffs' authority for this claim—*Golson v. Dep't of Corrections*, 914 F.2d 1491 (4th Cir. 1990) (unpublished disposition)—is inapposite. Br. at 22-23. *Golson* involved the detention of a prisoner after his term of imprisonment had expired. When the prisoner later brought a civil action seeking compensation for the period of overdetention, the Fourth Circuit held the he "state[d] a claim under the due process clause and the eighth amendment." *Id.* According to the City of Richmond, *Golson* is inapplicable here because the case only authorizes suit "against those responsible for holding the individual–for the conditions or manner of confinement–not those responsible for providing the legal basis for the incarceration." Br. at 23. Nothing in *Golson*, however, suggests that the entitlement to compensation for unlawful detention is so limited. Indeed, the fact that the right to be free of unlawful detention undoubtedly extends beyond the prison context is quite possibly why the court invoked *both* the Eighth Amendment *and* the Due Process Clause. Moreover, even if there were any ambiguity on that point, it is certainly a bedrock rule of constitutional law that, when a state officer is aware that a person is in jail but is in fact entitled to be free, but does nothing, the Constitution has been violated. Whether this is tied to the Eighth Amendment, the Fourteenth Amendment or some other provision of law is ultimately immaterial.

The City of Richmond also takes aim at any due process claim here by pointing to *Brooks v. City of Winston-Salem*, 85 F.3d 178 (4th Cir. 1996). Br. at 23. In the City's view, *Brooks* prohibits the Plaintiffs' due process claims because, as the Fourth Circuit put it in that case, "the Fourth Amendment provides all of the pretrial process that is constitutionally due to a criminal

defendant to detain him prior to trial." The City of Richmond, however, fails to recognize that *Brooks* only addresses which rights may be invoked "*prior to trial.*" *Id*. (emphasis added). *Brooks* thus says absolutely nothing about which rights may be invoked *after* a trial (or a guilty plea). If it becomes clear that a prisoner is entitled to release, and state actors fail to take reasonable steps to secure that release, the prisoner may claim after his release that he was denied due process. *See Golson v. Department of Corrections*, 914 F.2d 1491 (4th Cir. 1990) (unpublished disposition).

The City also argues that, even if a due process claim were permissible here, the only cognizable due process claim would be a fabrication of evidence claim (which is, in the City's view, nonetheless time barred) or malicious prosecution. Br. at 23. The implications of this argument are breathtaking. The City apparently believes that, if the Chief of Police knows that persons are very likely in jail but should not be, but he nonetheless keeps quiet, he has not violated the Constitution unless he has fabricated evidence or participated in a malicious prosecution. One hopes this is simply a litigating position, and not the City of Richmond's official position on the constitutional right to liberty enjoyed by the people of Richmond.

The City of Richmond argues that the Eighth Amendment is "inapplicable to the claims here." Br. at 24. This argument, however, is belied by *Golson*, 914 F.2d 149, in which the Fourth Circuit held that a plaintiff's allegations that he was not released from prison despite his entitlement to such a release states "a claim under the due process clause and the eighth amendment." Although the Eighth Amendment is usually invoked to challenge the conditions of confinement rather than the fact of confinement, courts (including the Fourth Circuit) have recognized confinement without lawful authority is fundamentally "cruel and unusual." *See, e.g.*, *Moore v. Tartler,* 986 F.2d 682, 686 (3d Cir.1993).

In sum, the City of Richmond's arguments regarding the Plaintiffs' right to liberty under the Fourteenth and/or Eighth Amendment are unavailing.

## CONCLUSION

For the reasons stated above, the Plaintiffs respectfully request that the Court deny Defendant City of Richmond's Motion to Dismiss in its entirety.

Respectfully submitted,

BRAVETTE JOHNSON and
CURTIS WILLIAMS

By: _____ /s/ Mark J. Krudys_____
Counsel

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 E. Main Street, Suite 2020
Richmond, VA  23219
Phone: (804) 774-7950
Fax: (804) 381-4458
Email: mkrudys@krudys.com

John Frederick Preis (VSB# 45764)
7719 Rock Creek Road
Henrico, VA 23229
Phone: (804) 289-8682
Email: jpreis@richmond.edu

Amy L. Austin (VSB# 46579)
THE LAW OFFICE OF AMY L. AUSTIN, P.L.L.C.
101 Shockoe Slip, Suite M
Richmond, VA  23219
Phone: (804) 343-1900
Fax: (804) 343-1901
Email: amyaustinlawyer@gmail.com
*Counsel for Plaintiffs Bravette Johnson and Curtis Williams*

**CERTIFICATE OF SERVICE**

I certify that on November 3, 2017, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which sent notification of such filing to all registered users.

By:  /s/ Mark J. Krudys_____

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 E. Main Street, Suite 2020
Richmond, VA  23219
Phone: (804) 774-7950
Fax: (804) 381-4458
Email: mkrudys@krudys.com
Web: www.krudys.com