**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**BRAVETTE JOHNSON and
CURTIS WILLIAMS,**

   **Plaintiffs,**

            **Civil Action No. 3:17-CV-00553-MHL**

**v.**

**CITY OF RICHMOND,** *et al.*,

   **Defendants.**

**PLAINTIFFS' OPPOSITION TO
DEFENDANT JASON NORTON'S MOTION TO DISMISS**

   Former Richmond detective Jason Norton wanted to put people in jail, but he had a problem: he couldn't do it legally.  So, he lied.  People he jailed through his intentional defrauding of the justice system—Plaintiffs in this case—spent long periods of time in jail and now seek redress.  Norton, however, sees things differently.  He believes that "Plaintiffs have received the relief to which they were entitled as evidenced by the dismissal of their criminal charges and their release from jail."  Br. at 13.  Norton's argument would apparently be the same if Plaintiffs *had completed their entire sentences and probations as a result of his deceit*.  Norton's argument, in other words, is that his egregious lies simply don't matter.  Plaintiffs, Norton suggests, *should feel lucky* that federal authorities eventually uncovered Norton's wrongs (despite Norton's attempt to conceal them). This is not only an astounding argument on its face, but it contradicts the law as well.  For the reasons stated below, the Court should deny Norton's Motion to Dismiss in its entirety.

## STATEMENT OF FACTS

Though Norton's misconduct has had enormous consequences, it can be described rather briefly. Norton, an officer with the Richmond Police Department ("RPD") from 2004 to 2013, repeatedly lied in his applications for search warrants by misrepresenting the identity and/or reliability of the confidential informants he used to establish probable cause. ¶¶ 64-69, 71-77, 87-91, 112. These lies led to the issuance of warrants and the subsequent arrests of Plaintiffs Bravette Johnson and Curtis Williams. ¶¶ 78, 92. As a result of Norton's lawless conduct, Plaintiffs each spent approximately two years in jail and were subjected to various other infringements on their liberty, such as post-release reporting and testing obligations. ¶¶ 79-85, 93-97.

## ARGUMENT

Based on these events, Plaintiffs have filed four claims against Norton: a malicious prosecution claim under the Fourth Amendment (Count I), a knowing and intelligent plea claim under the Due Process Clause (Count II), a liberty claim under the Fourteenth and/or Eighth Amendment (Count III), and a malicious prosecution claim under Virginia law (Count VII). Norton has asked this Court to dismiss all four claims. Each of his arguments is meritless.

### I. Plaintiffs State a Claim for Malicious Prosecution under the Fourth Amendment.

#### A. The Fundamental Question Presented: Should the Fruit of the Poisonous Tree Doctrine Apply to this Case?

In the Fourth Circuit, to state a claim of malicious prosecution, "a plaintiff must allege that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012). Norton argues that the Plaintiffs fail to state a claim under this test for three reasons: "(1) there was probable cause for Plaintiffs' arrests; (2)

the fruit of poisonous tree doctrine does not apply to Section 1983 claims; and (3) Plaintiffs' indictments are intervening and superseding causes that insulate Norton from liability." Br. at 6.

Although couched as three separate arguments, the arguments are really a variant of a single argument, which is: Norton did not *cause* the Plaintiffs' incarcerations because the fruit of the poisonous tree doctrine does not apply in Section 1983 actions. Consider Norton's first argument: in contesting the claim that Plaintiffs were seized pursuant to "legal process unsupported by probable cause," *Evans*, 703 F.3d at 647, Norton is arguing that, *even though his search warrants were not supported by probable cause*, and *even though Norton expressly lied to obtain the warrants for the specific purpose of making arrests*, Plaintiffs were not seized "pursuant" to these warrants. Br. at 7-8. Put differently, Norton is arguing that Plaintiffs' seizures were not "fruit" of his poisonous search warrants. Norton's second argument, by its own terms, argues that the fruit of the poisonous tree doctrine does not apply in this case. Br. at 8-13. And Norton's third argument regarding intervening and superseding causes is also a fruit of the poisonous tree argument. The rule that renders "fruit" poisonous if it grows from a tainted tree is fundamentally a "but for" causation rule. But the law of intervening and superseding causes concerns rules applicable in the world of proximate causation. Thus, by arguing that intervening and superseding causes exist, Norton is really arguing that the fruit of the poisonous tree doctrine does not apply. Br. at 14-15.

In sum, the fundamental question before this Court is whether the fruit of the poisonous tree doctrine should apply or not. If it does, the Plaintiffs' allegations state a claim for relief. For the reasons stated below, the Court should apply the doctrine in this case.

**B.   The Fruit-of-the-Poisonous-Tree Doctrine Should Be Applied Here**

In the field of constitutional torts, the law of causation is often based on ordinary tort law principles—principles "that make[] a man responsible for the natural consequences of his action.'" *Malley v. Briggs*, 475 U.S. 335, 344 n.7 (1986).  In the parlance of tort law, this means that plaintiffs must ordinarily show "both but-for and proximate causation." *Evans,* 703 F.3d at 647.  Given that the fruit of the poisonous tree doctrine is fundamentally a "but for" causation rule shorn of its proximate partner, courts have often held that the fruit of the poisonous tree rule does not apply in § 1983 cases.

A useful illustration is *Lingo v. City of Salem,* 832 F.3d 953 (9th Cir. 2016).  In *Lingo*, Lia Marie Lingo sued a police officer (among other defendants) for wrongfully arresting her at her home.  The officer in question went to Lingo's house to discuss a neighbor's complaint, but instead of knocking on Lingo's front door, he walked around the side of her house and entered a carport.  When an occupant of the house opened the door leading to the carport, the officer smelled marijuana, and, based on this smell, arrested Lingo.  At her criminal trial, Lingo argued that the officer's entry into her carport violated the Fourth Amendment and that all evidence obtained thereafter must be excluded as the fruit of the poisonous tree.  The trial court agreed and the charges against Lingo were dismissed.  Lingo then sued the officer in a § 1983 suit, arguing that the period of time she spent in jail was attributable to the officer's constitutional violation.  Lingo lost in the district court and then appealed to the Ninth Circuit.

The Ninth Circuit ruled against Lingo.  The Court first noted that, because the fruit of the poisonous tree doctrine is part of the exclusionary rule, the question presented was whether the exclusionary rule should apply.  *Id.* at 957.  The court then observed that, under Supreme Court precedent, the exclusionary rule applied "only where its deterrence benefits outweigh its substan-

tial social costs." *Id.* at 958 (quoting *Penn. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 363 (1998)). In an ordinary criminal case, the doctrine "takes away an obvious incentive—the successful prosecution of crime—that may otherwise induce the government to ignore constitutional rights." *Id.* at 958. In Lingo's case, however, the need for the added deterrence of civil punishment was minimal, and, even if there were such a need, civil liability could potentially impose "an extreme cost [on] law enforcement officers." *Id.*

Other circuits have agreed with the Ninth Circuit's analysis in *Lingo*. Like the Ninth Circuit, these courts view the exclusionary rule in the criminal setting as a sufficient incentive to refrain from constitutional violations, and civil liability as extraordinarily costly for police officers. *See Black v. Wiggington*, 811 F.3d 1259, 1268 (11th Cir. 2016) ("The cost of applying the exclusionary rule in [the § 1983] context is significant ... [a]nd the deterrence benefits are miniscule."); *Townes v. City of New York*, 176 F.3d 138, 148 (2d Cir. 1999) (explained that applying the exclusionary rule in § 1983 cases "would vastly over deter police officers and would result in a wealth transfer that is peculiar, if not perverse"); *Wren v. Towe*, 130 F.3d 1154, 1158 (5th Cir. 1997) (per curiam); *Hector v. Wyatt*, 235 F.3d 154, 159 (3rd Cir. 2000) (refusing to apply exclusionary rule because an "officer who took a frisk one modest step too far could face vast liability").

Importantly, however, in neither *Lingo* nor any of these other cases has a court confronted the circumstances presented here—namely, ***a detention arising from the intentional deceit of a magistrate by a police officer.*** In such a case, there is good reason to think that the rule's "deterrence benefits [*would*] outweigh its substantial social costs." *Lingo*, 832 F.3d at 958. The different balance of costs and benefits arises from the fact that ***the exclusionary rule has little deterrent effect on officers who are willing lie to obtain or preserve an arrest.*** This has been

common knowledge for years in the field of law enforcement—so common, in fact, that officers in New York City had their own term for it: "testilying."[1]  "Testilying" arose largely as a result of the Supreme Court's decision in *Mapp v. Ohio*, 347 U.S. 643 (1961), which extended the exclusionary rule to state criminal proceedings.  Before *Mapp*, officers were likely to admit that they found contraband on the suspect's person or at his residence—even if the search of the person or place was unconstitutional.  Without the exclusionary rule, there was no reason to pretend otherwise.  But after *Mapp* came down, there was a "suspicious rise" in so-called "dropsy" cases—cases in which "officers alleged that the defendant dropped the contraband on the ground."[2]

The phenomenon of "testilying" did not tail off once *Mapp* was absorbed into the legal landscape.  For example, in 1994, a blue-ribbon commission charged with studying corruption in the New York City Police Department concluded that "testilying" was "probably the most common form of police corruption, particularly in connection with arrests for possession of narcotics and guns."[3]  And more recent studies confirm that the problem is still wide-spread.[4]  Indeed, those who oppose the exclusionary rule cite "testilying" as one of the chief reasons that the rule fails to deter.[5]

----

[1]        MILTON MOLLEN ET AL., COMM'N TO INVESTIGATE ALLEGATIONS OF POLICE CORRUPTION AND THE ANTI-CORRUPTION PROCS. OF THE POLICE DEP'T, CITY OF N.Y., ANATOMY OF FAILURE: A PATH FOR SUCCESS 36 (1994).

[2]        Comment, *Effect of* Mapp v. Ohio *on Police Search-and-Seizure Practices in Narcotics Cases*, 4 COLUM. J.L. & SOC. PROBS. 87, 95 (1968); *see also* Irving Younger, *The Perjury Routine*, Nation, May 8, 1967, at 597 (explaining that, after *Mapp*, "police made the great discovery that if the defendant drops the narcotics on the ground, after which the police man arrests him, the search is reasonable and the evidence is admissible.")

[3]        MOLLEN ET AL., at 36.

[4]        Christopher Slobogin, *Testilying: Police Perjury and What to Do About It*, 67 COLO. L. REV. 1037, 1041-48 (1996) ("Whether it is conjecture by individual observers, a survey of criminal attorneys, or a more sophisticated study, the existing literature demonstrates a widespread belief that testilying is a frequent occurrence.").

[5]        Christopher Slobogin, *Why Liberals Should Chuck the Exclusionary Rule,* 1999 U. ILL. L. REV. 363, 387-88.  Further, the pressure to lie in a suppression hearing is augmented by the in-

Thus, in contrast to the criminal setting, applying the exclusionary rule (and its component, the fruit of the poisonous tree doctrine) in the civil setting in a case where an officer has intentionally defrauded the legal system actually ***creates deterrence were little existed before***. An officer like Norton, for whom the exclusionary rule was apparently of no consequence in the criminal context because he was already willing to simply fabricate "evidence" and repeatedly lie to magistrates to "justify" searches, might not be so keen to continue to do so if he faced personal civil liability for such actions.[6]

Of course, the value of such deterrence is not sufficient on its face to justify the rule, for the rule could be outweighed by costs to law enforcement, and, thus, society as a whole. Such costs, however, would be extraordinarily limited because they would be borne mainly by officers who insisted on willfully deceiving a magistrate.[7] Such limitations are entirely appropriate be-

___

terests of "judges, prosecutors, and fellow police," all of whom have "some independent 'stake'" in putting an apparently guilty man in jail. *Id.* This "independent stake" too frequently makes these actors all willing to engage in "subtle or not-so-subtle collusion" with a lying officer. *Id. See also* Myron W. Orfield, Jr., *Deterrence, Perjury, and the Heater Factor: An Exclusionary Rule in the Chicago Criminal Courts*, 63 COLO. L. REV. 75, 109-11 (1992) (in a study of prosecutors, defense attorneys and judges, reporting that 52% of respondents believed that, at least "half of the time," the prosecutor "knew or had reason to know" that police fabricate evidence during suppression hearings; that 93% of respondents (including 89% of the prosecutors) believed that prosecutors knew of police perjury "at least some of the time").

[6]    Indeed, the importance of deterrence through a § 1983 action is magnified here because the only other tool of deterrence—criminal punishment—is apparently not in play here. Norton has not been charged with any crimes, and, in the City of Richmond's opinion, that is likely warranted. *See* Memo in Support of City of Richmond's Motion to Dismiss, ECF Dkt. No. 22 at 5.

[7]    Society would potentially also incur the costs associated with the release of a suspect who was factually guilty (although Plaintiffs do not concede that they are factually guilty, and, further, do not believe that factual guilt is relevant to this case). The cost of releasing a factually guilty suspect, however, is a routine cost associated with the exclusionary rule that, for over half a century, has failed to overcome its utility as a deterrent. *See Mapp v. Ohio*, 367 U.S. 643 (1961) (applying the exclusionary rule to state criminal adjudications). If the exclusionary rule does not produce unacceptably high social costs when an officer *mistakenly* violates the Constitution, it certainly will not produce such costs when an officer intentionally violates the Constitution.

cause the vast majority of law enforcement officers are honest, diligent, and dedicated to the public good—*and are not going to intentionally deceive.* Like all fields of work, however, a few will occasionally stray from the straight and narrow. When that occurs in the policing context, and liberty is consequently lost, *some* amount of deterrence is needed to protect the public. Indeed, the need for deterrence is particularly appropriate in this context because Norton has never been charged with any crime—even though he quite plainly perjured himself over and over again. Thus, applying the exclusionary rule in the civil setting will provide appropriate—and in this case the *only*—deterrence.

Norton urges the Court to follow *Williams v. City of Tulsa*, 2016 WL 1572957 (N.D. Okla. Apr. 19, 2016), apparently the only opinion (published or unpublished) to consider an issue like that presented here. *Williams* arose out of a police officer's fabrication of confidential informants in his effort to obtain search warrants. When the officer's frauds were later revealed, a person wrongfully arrested and imprisoned as a result of the warrant brought a § 1983 malicious prosecution claim against the officer. Following the cases discussed above—*i.e.,* cases holding that the exclusionary rule does not normally apply in § 1983 cases—the court held that the plaintiff's claim must fail because the evidence against him was not tainted by the officer's fabrication. Importantly, however, the court in *Williams* did not face the argument that Plaintiffs advance here,[8] which is that, although the exclusionary rule may not be appropriate in the majority of § 1983 actions, it is entirely appropriate—**even essential**—in cases like that presented

---

[8] The court's opinion in *Williams* was issued as part of its ruling in a bench trial. The Court invited the parties to submit briefs before ruling, and, although the defendant argued the exclusionary rule should not apply in § 1983 cases, the plaintiff did not address the issue at all. *See Williams v. Henderson*, 2016 WL 3566093 (N.D.Okla.) (defendant's brief); *Williams v. Henderson*, 2016 WL 3566057 (N.D.Okla.) (plaintiff's brief).

here. Given that *Williams* does not consider the need for deterrence in cases of "testilying," the case is of limited use to this Court.

Finally, in a case related to the instant case, Norton has argued that (1) adequate deterrence already exists because a lying officer might face adverse employment actions, criminal prosecutions, or the release of the suspect he sought to put in jail in the first place, and (2) application of the exclusionary rule would over-deter officers. *See Ensley v. City of Richmond*, Case No. 3:17-cv-00024-MHL, ECF Dkt. No. 58, Norton Reply at 9. If Norton were to make these arguments here, the Court should reject them. First, with regard to Norton's adequate deterrence argument, this argument is deeply flawed because it suggests that *all* § 1983 actions against lying police officers are superfluous. *Every* time an officer commits a constitutional violation through deceit, he faces adverse employment actions, criminal prosecution, or the release of a suspect.[9] Congress obviously did not carve out an exception to § 1983 for officers who acted with deceit and this Court should respect Congress's choice. Second, on the issue of over-deterrence, Norton somehow believes that it is possible to *over*-deter deceit by police officers, as though there is some socially optimal level of deceit above zero. This is not only an absurd argument on its face, but is also insulting to the vast majority of scrupulously honest police officers who do not need civil liability to deter them from lying, and certainly would not see such liability as "over-deterrence."

---

[9]     Moreover, there is significant reason to doubt at least two of the three modes of deterrence cited by Norton. With regard to criminal sanctions, police officers are rarely prosecuted for misconduct and Norton's case is no exception. Despite extraordinary evidence of perjury, Norton has yet to be charged with any crime. With regard to employment consequences, it worth noting that after leaving the Richmond Police Department, Norton apparently remained in the field of law enforcement—taking a job as Deputy Sherriff in Hopewell, Virginia. *See* Frank Green, "Richmond prosecutor is probing cases of ex-detective," *Richmond Times-Dispatch*, May 16, 2015, available at http://www.richmond.com/news/local/crime/richmond-prosecutor-is-probing-cases-of-ex-detective/article_2c519cfd-1614-56d1-8d86-0a7e07e3fbd1.html

In sum, the Court should apply the exclusionary rule in this case because, unlike an ordinary search-and-seizure case, the rule's "deterrence benefits" are significant and there are few if any "substantial social costs" associated with its application. When the rule is applied in this case, the conclusion is inescapable that Norton, an officer willing to intentionally lie to a magistrate judge in a court of law *numerous* times, "(1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Evans*, 703 F.3d at 647. As such, the Court should deny Norton's Motion to Dismiss with regard to Count I.

II.     **The Plaintiffs State a Claim For The Denial of the Right to Make a Knowing and Intelligent Plea under the Fourteenth Amendment.**

Defendant Norton asks this Court to dismiss Count II, which alleges that he denied the Plaintiffs, both of whom pled guilty, the right to make a knowing and intelligent plea. Norton's arguments are without merit because, by withholding crucial information from the Plaintiffs during their pleas, Norton engaged in "misrepresent[ation]" that influenced the Plaintiffs' decisions to plead guilty, a violation of *Brady v. United States,* 397 U.S. 742, 748 (1970).

The Fourth Circuit has enforced this right in circumstances nearly identical to those presented here. In *United States v. Fisher*, 711 F.3d 460 (4th Cir. 2013), a Baltimore City police officer named Mark Lunsford sought a warrant to search Cortez Fisher's residence and vehicle. As Norton did in this matter, Lunsford stated in his warrant application that a "confidential informant" had informed him that Fisher was involved in criminal activity. *Id*. at 463. After obtaining the warrant, Lunsford executed it and arrested Fisher based on what he allegedly found in Fisher's possession. Fisher later pled guilty and was sentenced to 10 years in prison. *Id*. Also like in the case before this Court, it was later discovered that the "confidential informant [Lunsford] identified in his affidavit had no connection to the case and that another individual was the real

informant." *Id*. (internal quotation marks omitted). Lunsford's misconduct in Fisher's case was part of a larger scheme in which he would "falsely attribute[e] information to a confidential informant with whom he was splitting reward money." *Id*. When Lunsford's misconduct became widely known, Fisher sought to set aside his guilty plea in a habeas action.

The Fourth Circuit sided with Fisher. To set aside a guilty plea, the court explained, *Brady v. United States* requires the criminal defendant to show "government misrepresentations" that "induced him to plead guilty." *Id*. at 465, 467. In the court's opinion, Lunsford engaged in "affirmative government misrepresentation that 'strikes at the integrity of the prosecution'" *Id*. at 466, and, but for this misrepresentation, a "reasonable defendant standing in [Fisher's] shoes likely would have altered his decision to plead guilty." *Id*. at 467. Lunsford thus committed a violation of Fisher's right to make a knowing and intelligent plea under *Brady v. United States*.

*Fisher* is on all fours with the present case. Not only is this clear from the facts of *Fisher* itself, but it is also clear from the underlying proceedings in *Ensley v. City of Richmond*, Case No. 3:17-cv-00024-MHL, a related case before this Court arising from the same misconduct alleged here. After being wrongfully imprisoned because of Norton's lies, three of the five plaintiffs in *Ensley* obtained their releases through federal habeas petitions. In the opinions granting those petitions, United States District Court Judge Henry Hudson cited *Fisher* as the key authority meriting relief. *See, e.g., United States v. Andrews*, No. 3:09CR368-HEH, 2015 WL 12830449, at *1 (E.D. Va. Apr. 1, 2015). Moreover, in his opinions, Judge Hudson noted that the "government concedes that there is a high probability that critical information contained in the search warrant affidavit is false and that it is material to a finding of probable cause" and "therefore joins" in supporting the petitions. *Id*.

Given *Fisher* itself, Judge Hudson's opinions declaring that *Fisher* entitles several plaintiffs in *Ensley* to release, and the U.S. Attorney's Office's agreement with that view, there can be little doubt that the Plaintiffs in this case suffered a violation of their constitutional rights to make knowing and intelligent pleas. Further, given that § 1983 grants a cause of action to any person "depriv[ed] of any rights, privileges, or immunities secured by the Constitution," it is plain that Plaintiffs state a claim for relief under § 1983.

Norton nonetheless argues that "there can be no civil claim based on *Fisher*." Br. at 17. He proffers three reasons for this argument: (1) because "Norton did not commit a crime," (2) because "there is no allegation that Norton personally profited in any of these cases like the officer in *Fisher* had done" and (3) because there is "no allegation that the probable cause information in the search warrant affidavits was inaccurate or was provided by an unreliable informant." *Id*. Each point is based on a misreading of *Fisher*, a misreading of the Complaint, or both.

First, the argument that "Norton did not commit a crime," as Lunsford did in *Fisher*, is wrong. Norton did commit a crime: he lied under oath, over and over and over again. This is a plain violation of Virginia perjury law. *See* Va. Code. Ann. § 18.2-434. Further, denying a person his or her federal constitutional rights is also a federal crime. *See* 18 U.S.C. § 242. Thus, there can be no doubt here that Norton committed a crime.[10]

Second, with regard to the argument that Plaintiffs do not allege that Norton personally profited from his misdeeds, nothing in *Fisher* suggests that Officer Lunsford's financial gain was material to the result. Surely the same result would have obtained in *Fisher* had Lunsford been

---

[10]    Any argument that *Fisher* is inapposite because Norton has not yet been *convicted* of a crime is off base. Any rule that required a criminal conviction for a *Fisher* claim to become ripe would permit the state to detain persons indefinitely simply by declining to bring perjury charges. This, of course, is exactly what has happened in this case. Norton has thus faced no civil or criminal liability.

motivated by pure malice rather than financial gain. Moreover, even if financial gain is in some sense relevant to the holding in *Fisher*, the Complaint in this case *does* allege that Norton's misdeeds were aimed at procuring financial gain. The Complaint alleges that "Norton has a long history of using his job for personal financial gain," and that, by relying on an informant, Norton could obtain cash from the RPD to pay to the informant—a process that allows him to either "split the money with the informant" if the informant is real, or, if the informant is fake, "keep the entire payment." ¶ 77.

Third, with regard to Norton's argument that *Fisher* is inapposite because the Plaintiffs do not allege that "the probable cause information in the search warrant affidavits was inaccurate or was provided by an unreliable informant," this is completely unsupported by *Fisher*. Nothing in *Fisher* suggests that the knowing and intelligent plea violation there depended on the correctness of the probable cause information. In fact, the Court specifically acknowledged that the petitioner there may have in fact been guilty. *See Fisher*, 711 F.3d at 467. Regardless of his guilt, however, the petitioner was entitled to release from prison because his plea was not knowing and voluntary. Moreover, nothing in *Fisher* suggests that a knowing and intelligent plea claim is limited only to circumstances where an unreliable informant is used. Rather, the constitutional violation in *Fisher* depended on the nondisclosure of *any* information that would affect the voluntariness of a plea. And even if *Fisher* could be read otherwise, the Complaint plausibly alleges that Norton did not rely on *any* informant in composing his probable cause affidavits. *See* ¶¶ 71-77, 87-91.

In sum, the law is clear that Defendant Norton, by withholding the significant fact that he fraudulently obtained search warrants, deprived Plaintiffs of their constitutional right to make a knowing and intelligent plea. Having suffered a violation of their constitutional rights, they are

entitled to seek compensation under § 1983.  Norton's motion to dismiss Count II should therefore be denied.[11]

### III.    The Plaintiffs State a Claim For Deprivation of Liberty Under the Fourteenth and/or Eighth Amendment.

Defendant Norton asks this Court to dismiss Count III, which alleges that he deprived the Plaintiffs of liberty in violation of the Fourteenth and/or Eighth Amendments.  Norton's arguments are without merit because, by knowingly withholding information that would have resulted in the Plaintiffs' release from jail, he plainly caused their loss of liberty.

To understand the nature of Count III, it is first important to distinguish it from Counts I and II.  The misconduct underlying Counts I and II occurred up to and including the guilty pleas; in contrast, the misconduct underlying Count III occurred *after* the Plaintiffs' guilty pleas.[12]  Importantly, what Norton did after the guilty pleas was . . . *nothing*.  That is, he took no steps to secure the Plaintiffs' release, even though he knew well that they were wrongfully in jail because of his lies—*and knew so for years*.  Under the law, Norton had a duty to take action.

When a person is held in jail in violation of law, the person obviously has a right to be released.  State actors with actual or constructive knowledge of that right to be released have a duty to take reasonable steps to secure the person's release.  The most common way such duties are normally litigated is in so-called "overdetention" cases. An overdetention case involves a jailer's

---

[11]     Norton argues at the conclusion of his brief that *Townes v. City of New York*, 176 F.3d 138 (2d Cir. 1999), which involved an unreasonable search and seizure, requires the dismissal of Count II, which alleges a knowing and intelligent plea violation.  *See* Br. at 26-27. *Townes* is relevant to Count I and is discussed above with regard to Count I, but is wholly irrelevant to Count II.  Respectfully, this Court can no more ignore *Fisher* in favor of *Townes* than a three-judge panel of the Fourth Circuit could do. This Court should apply the case nearly identical to the one at bar rather than a case from a different circuit involving different misconduct and different constitutional rights.

[12]     Regardless of when the conduct occurred, the damages for such misconduct properly include the entire period of the Plaintiffs' wrongful detention because such misconduct was the legal cause of the detention.

failure to release a prisoner when his sentence has terminated. Such claims are therefore quintes-

sential liberty claims, and under Fourth Circuit precedent, they "state a claim under the due pro-

cess clause and the eighth amendment." *Golson v. Department of Corrections*, 914 F.2d 1491

(4th Cir. 1990) (unpublished disposition). Numerous other circuits recognize the cause of action

as well, although not all circuits tie it to the Eighth Amendment.[13]

In the Fourth Circuit, "to recover under the due process clause, a plaintiff must establish

that the defendants acted with something more than mere negligence." *Golson*, 914 F.2d 1491.

And, "[t]o prevail under an eighth amendment theory, a plaintiff must demonstrate the defend-

ants acted with deliberate indifference." *Id.* In short, if a state actor knows that a prisoner is en-

titled to release because his detention is unlawful, but does not take reasonable steps to secure his

release, the state actor has violated the prisoner's right to liberty under the Due Process Clause

and the Eighth Amendment.[14]

---

[13] S*ee, e.g., Moore v. Tartler,* 986 F.2d 682, 686 (3d Cir. 1993) ("Subjecting a prisoner to detention beyond the termination of his sentence has been held to violate the eighth amendment's proscription against cruel and unusual punishment."); *Douthit v. Jones,* 619 F.2d 527, 532 (5th Cir. 1980) ("Detention of a prisoner thirty days beyond the expiration of his sentence in the absence of a facially valid court order or warrant constitutes a deprivation of due process."); *Lewis v. O'Grady,* 853 F.2d 1366, 1370 (7th Cir. 1988); *Sivard v. Pulaski County,* 959 F.2d 662 (7th Cir.1992) (a prisoner suffers a due process violation when a sheriff detains him knowing that the detention is unwarranted); *Sanders v. English,* 950 F.2d 1152 (5th Cir.1992) (an officer's failure to release a plaintiff after determining that there is no basis for detention gives rise to cause of action under § 1983); *Cannon v. Macon Cty.*, 1 F.3d 1558, 1563 (11th Cir. 1993), opinion modified on unrelated grounds, 15 F.3d 1022 (11th Cir. 1994) (holding that the Due Process Clause creates a "right to be free from continued detention after it was or should have been known that the detainee was entitled to release"); *Davis v. Hall,* 375 F.3d 703, 714 (8th Cir. 2004) (citing *Golson*, 914 F.2d 1491) (plaintiff alleged that defendants "deprived him of a protected liberty interest by continuing to confine him after he completed his sentence and was ordered immediately released"); *Berry v. Baca,* 379 F.3d 764, 773 (9th Cir. 2004).

[14] Despite positing that "something more than mere negligence" is needed to state a Due Process claim, the *Golson* court did not specify what that "something" might be. In the subsequent case of *County of Sacramento v. Lewis,* 523 U.S. 833, 849 (1998), however, the Supreme Court explained that a § 1983 Due Process claim was actionable upon a showing of "deliberate indifference"—but only where "deliberation is practical." *Id.* at 851. Thus, demonstrating delib-

In Count III, Plaintiffs do not allege a classic overdetention case, but their allegations mirror the elements of those cases in all relevant respects. Like overdetained prisoners, the Plaintiffs here were in jail in violation of law (a fact confirmed by their eventual release and the vacating of their convictions). Also, as in cases concerning overdetained prisoners, the Defendant here had *actual knowledge* that the Plaintiffs' detentions were in violation of law (indeed, he had actual knowledge that *his own wrongful conduct had caused* unlawful detentions). And, finally, just as in a classic overdetention case, Defendant Norton failed to take reasonable steps to relieve the prisoners from the constitutional violation that they were suffering. Instead, he did nothing and let his lies stand. As such, the Plaintiffs have stated a plausible claim for the deprivation of liberty under the Due Process Clause and/or the Eighth Amendment.

Defendant Norton attempts to defeat Count III by offering two arguments, one aimed at the Eighth Amendment and one aimed at the Due Process Clause. First, with regard to the Eighth Amendment, Norton argues that such claims may only be brought against persons "responsible for holding the individual" in jail, not police officers whose deceit put the individual in jail in the first place. Br. at 19. *Golson*, however, does not make that distinction and Norton has cited no Fourth Circuit case that overrules *Golson*. As such, this Court is bound to adhere to the plain language of *Golson*.

Second, with regard to the Due Process Clause, Norton relies on *Brooks v. City of Winston-Salem*, 85 F.3d 178 (4th Cir. 1996). In *Brooks*, an innocent man was wrongfully arrested, but was released *before trial* when his innocence became clear. The man sued the arresting of-

---

erate indifference will not be enough when alleging misconduct in "high-speed law enforcement chases" (where there is no time to deliberate), but will be enough in the "custodial situation of a prison" where "forethought about an inmate's welfare is . . . feasible." *Id*. Thus, regardless of whether this Court proceeds under the Fourteenth or Eighth Amendment, the proper standard is deliberate indifference.

ficer for malicious prosecution under the Fourth Amendment, and, most relevant here, for deprivation of liberty for not attempting to terminate the criminal proceedings when the officer became aware of the arrestee's innocence. The Fourth Circuit accepted the malicious prosecution claim, but rejected the liberty claim, explaining that "the pretrial process that is constitutionally due to a criminal defendant in order to detain him prior to trial" is dictated entirely by "the Fourth Amendment," not the Due Process Clause. *Id*. at 184.

However, *Brooks* is inapposite here because it only addresses which rights may be invoked "*prior to trial*." *Id*. (emphasis added). *Brooks* thus says absolutely nothing about which rights may be invoked *after* the trial (or a guilty plea). Yet the Plaintiffs' liberty claim is directly aimed at Norton's post-plea behavior.[15] Moreover, apart from *Brooks*, Norton's argument that the Plaintiffs' guilty pleas permanently extinguished his duty to tell the truth about his own wrongful conduct is shocking in its consequences. Under Norton's argument, neither he, nor anyone else who knew or had reason to know of his frauds, had a duty to speak up—*ever*. Under his argument, though it might be common knowledge within a police department that a certain prisoner was entitled to be released from prison, each and every officer, Norton argues, including an officer like himself whose intentional lies caused the wrongful imprisonment, could remain silent and do nothing. The officers could permissibly remain quiet not only in the first year of the prisoner's sentence, but could continue doing so during the prisoner's second, and third, and

---

15    Norton argues that "the only conduct at issue here is what Norton may or may not have done before Plaintiffs' indictments." Brief at 19. However, the Plaintiffs made clear in their Complaint that Norton's post-plea behavior was unlawful, *see* ¶¶ 136-141, and the Plaintiffs in *Ensley v. City of Richmond* explicitly stated the same in their opposition to Norton's motion to dismiss in that case. *See* Case 3:17-cv-00024-MHL, Plaintiff's Oppos. to Norton Motion to Dismiss, ECF Dkt. No. 51 at 12-16. Norton has never addressed those points, but somehow continues to argue that only his pre-plea behavior is at issue in this case. That argument is plainly erroneous.

tenth, and twentieth and fiftieth years of wrongful imprisonment. Indeed, if the Plaintiffs in this

case were on death row, Norton apparently believes that he could, consistent with the Constitu-

tion, stand silently by while the Plaintiffs were put to death. Certainly, the United States Consti-

tution does not countenance such behavior. If a clerk at the county jail has a duty to double

check a prisoner's release date so that a prisoner is not held for an extra week, then certainly

former police detective Jason Norton has a duty to come clean about *intentional lies* so that a

prisoner is not wrongly held for thousands upon thousands of days.

In sum, the Plaintiffs have stated a claim under Count III and Norton's Motion to Dismiss

must be denied.[16]

### IV. Defendant Norton is Not Entitled to Qualified Immunity.

Defendant Norton argues that, even if Counts I, II, and III state a claim for relief, he may

not be held liable because he is entitled to qualified immunity for each of those claims. Qualified

immunity, as this Court well knows, is only meant to protect state actors when they make "bad

guesses in gray areas." *Wilson v. Kittoe,* 337 F.3d 392, 403 (4th Cir. 2003) (quoting *Maciariello*

*v. Sumner*, 937 F.2d 295, 298 (4th Cir. 1992), cert. denied, 506 U.S. 1080 (1993)). Thus, in

claiming qualified immunity, Norton is essentially arguing that whether or not to tell the truth in

a warrant application is a "grey area" in which he made a "bad guess." This is an astounding ar-

gument that, as explained below with regard to Counts I, II and III, should fail.[17]

---

[16]     As he did with regard to Count II, Norton argues at the end of his brief that *Townes v.
City of New York*, 176 F.3d 138 (2d Cir. 1999), which involved an unreasonable search and sei-
zure under the Fourth Amendment, requires the dismissal of Count III, which alleges a depriva-
tion of liberty under the Fourteenth and/or Eighth Amendment. *See* Br. at 26-27. As explained
above with regard to Count II, *see* note 11, *supra*, there is no basis for applying *Townes* to Count
III.

[17]     Without focusing his argument specifically on either Count I, II or III, Norton argues that
*Safar v. Tingle*, 859 F.3d 241 (4th Cir. 2017), "illustrates . . . the absence of any clearly estab-
lished duty requiring officers to second-guess a neutral third party's determination of probable

**A. Norton Is Not Entitled to Qualified Immunity For Count I**

In Count I, the Plaintiffs allege that Norton violated their Fourth Amendment rights to be free from malicious prosecution. As explained above, this claim is actionable because Norton's misconduct is the lawful cause of Plaintiffs' detention. In particular, Norton's misconduct caused this harm because the detention was the fruit of the poisonous tree—a doctrine that, together with the exclusionary rule, should apply in cases where a police officer knowingly and intentionally deceives a magistrate judge to obtain search warrants.

Despite this, Defendant Norton is certain to contend that, in arguing that the exclusionary rule should apply here, the Plaintiffs have implicitly admitted that Norton is entitled to qualified immunity. That is, if this Court is the first to hold that the doctrine applies here, it must also hold that Norton is entitled to qualified immunity. Any such argument, however, is mistaken.

Most fundamentally, qualified immunity concerns clearly established "constitutional rights" and "the exclusionary rule is 'not a personal constitutional right.'" *Davis v. United States*, 564 U.S. 229, 248 (2011) (quoting *Stone v. Powell,* 428 U.S. 465, 486 (1976)); *see also United States v. Rush*, 808 F.3d 1007, 1010 (4th Cir. 2015). Put differently, the non-application of the exclusionary rule does not violate the Constitution; it simply reflects a judicial appraisal of the need to deter police misconduct in a specific setting. Were it otherwise, the Fourth Amendment would hardly make sense given the numerous situations in which the Supreme Court has de-

---

cause to arrest." Norton thus argues that he had no "clearly established duty" *to tell the truth*. While it is true that constitutional rights implicated by a qualified immunity defense must be characterized at a high level of particularity, *see Mullenix v. Luna*, 136 S. Ct. 305 (2015), constitutional law is not so divorced from basic decency that this Court should find itself at sea trying to determine whether Norton violated clearly established law because he did not "second-guess" the magistrate to which he had just lied. *See Hope v. Pelzer,* 536 U.S. 730, 741, (2002) (holding that clearly established law is not confined to law declared in the context of a specific case, but includes all law of which a reasonable officer would know).

clined to apply the rule. *See, e.g., Pennsylvania Board of Probation and Parole v. Scott*, 524 U.S. 357 (1998) (permitting illegally seized evidence to be used during parole hearings); *United States v. Leon*, 468 U.S. 897 (1984) (permitting evidence obtained pursuant to an invalid warrant to be used provided the officer acted in good faith); *I.N.S. v. Lopez–Mendoza*, 468 U.S. 1032 (1984) (permitting illegally obtained evidence to be used in a civil deportation hearing). In such situations, rather than narrowing the reach of a constitutional right, courts have simply adjusted an evidentiary rule used to adequately deter misbehaving officers.

Given the true nature of the exclusionary rule, Norton can no more claim qualified immunity from the application of the rule than he could from any rule of procedure or evidence. Qualified immunity protects Norton from liability only where he violates "statutory or constitutional *rights*" that were not "clearly established." *Pearson*, 555 U.S. at 231 (emphasis added); *see also Ridpath v. Bd. of Governors Marshall Univ.,* 447 F.3d 292, 313 (4th Cir.2006) ("the lodestar for whether a *right* was clearly established is whether the law 'gave the officials 'fair warning' that their *conduct was unconstitutional*'") (quoting *Hope*, 536 U.S. at 741). Qualified immunity does *not* protect Norton from sub-constitutional rules of procedure or evidence that may not have existed at the time of the constitutional violation. For example, if the Supreme Court were to relax the pleading rules established under *Twombly* and *Iqbal* tomorrow, police officers sued for unconstitutional conduct occurring earlier this year could hardly claim that they lacked notice at that time that they might be held liable for such conduct. The qualified immunity inquiry in such a case would focus solely on "whether the law 'gave the officials 'fair warning' that their conduct was unconstitutional.'" *Ridpath* 447 F.3d at 313. The concept of "fair warning" applies to the potential unconstitutionality of an act, *not* to the potential for liability. An officer's overall liability could be affected by everything from changes in venue law, to changes in the applicable

statute of limitations, to changes in law of res judicata. Qualified immunity has never spread so broadly and the Court should not expand its scope here.

Given that the proper question regarding qualified immunity here pertains only to whether Norton violated "clearly established statutory or constitutional rights of which a reasonable person would have known," the analysis is simple. By intentionally deceiving a magistrate in his applications for search warrants, Norton violated a clearly established constitutional right. Whether or not an evidentiary rule may render him liable for that misconduct is entirely beside the point. The Court should thus deny Norton's claim to qualified immunity for Count I.

**B. Norton Is Not Entitled to Qualified Immunity For Count II**

In Count II, the Plaintiffs allege that Norton violated the Plaintiffs' constitutional rights to make knowing and intelligent pleas. As noted above, the nature of Plaintiffs' claims is exemplified in *United States v. Fisher*, 711 F.3d 460 (4th Cir. 2013), in which the Fourth Circuit held that, under *Brady v. United States*, 397 U.S. 742 (1970), a police officer's lies in a search warrant rendered a criminal defendant's subsequent guilty plea involuntary. Thus, it is plain that, as of April 1, 2013 (when *Fisher* was decided), there existed clearly established law holding that Norton's actions were unconstitutional.

But April 1, 2013 was most certainly not the day when clearly established law emerged on this issue. This is clear for two reasons. First, and most revealingly, *Fisher was decided on a habeas petition*. As this Court well knows, habeas relief is unavailable if the petitioner relies on "new rules"—*i.e.*, "constitutional rules of criminal procedure" — that were announced after the petitioner's conviction "bec[a]me final." *Teague v. Lane*, 489 U.S. 288, 310 (1989). Moreover, the "newness" of a rule depends on whether it was "dictated by precedent," which is "fundamentally . . . the same question as [under] the qualified immunity analysis." *O'Dell v. Netherland*,

95 F.3d 1214, 1223 (4th Cir. 1996) (emphasis in original), *as amended* (Dec. 9, 1996), *aff'd*, 521 U.S. 151 (1997). Thus, it is clear that the result in *Fisher* was "dictated by precedent" because courts deciding legal questions on habeas petitions do not have the authority to make new law. If *Fisher* was dictated by precedent, it follows that the rule of law applied in *Fisher preexisted Fisher* itself.[18]

Further evidence that *Fisher* did not announce a new rule comes from the First Circuit's analysis in *Ferrara v. United States*, 456 F.3d 278 (1st Cir. 2006)—a case explicitly relied on in *Fisher. See Fisher*, 711 F.3d at 465. *Ferrara* involved a habeas petitioner's argument that the government's failure to disclose exculpatory evidence deprived him of the right to make a knowing and intelligent guilty plea. The First Circuit ruled for the petitioner by applying the following rule: where the government has engaged in "egregiously impermissible conduct (say, threats, blatant misrepresentations, or untoward blandishments by government agents) [that] antedated the entry of [a] plea" and that misconduct "influenced [the] decision to plead guilty," the petitioner has suffered a violation of his right to make a knowing and intelligent plea. *Crucially*, the First Circuit held that the application of this rule was not barred by *Teague*. As the court explained, the rule was, under *Brady v. United States*, 397 U.S. 742 (1970), "well-settled when the petitioner's conviction became final in 1992." Thus, *Ferrara* holds that the rule applied by the Fourth Circuit in *Fisher* was "well-settled" at least as early as 1992, and, presumably, as far back

---

[18] The state may waive a *Teague* defense, but there is no indication in *Fisher* that such a waiver occurred. Nor is there any indication in the United States appellate brief of a waiver. *See generally Brief of United States*, *United States v. Fisher*, 2012 WL 610467 (4th Cir.) (Feb. 27, 2012). A reasonable conclusion, therefore, is that *Teague* was not an option because the petitioner was not seeking release based on new law.

as 1970.  Given that the Plaintiffs pled guilty in 2009 and 2010, their pleas were unlawful under well-settled law and Norton may not claim qualified immunity for his constitutional violations.[19]

Finally, respectfully, the Court should keep in mind that qualified immunity is only meant to protect state actors for making "bad guesses in gray areas." *Wilson,* 337 F.3d at 403. There is much to be said in favor of such a rule, for government officials—and police officers in particular—are frequently forced to make difficult decisions under extraordinary pressures.  But that context is not presented here.  Norton had plenty of time to think about the right decision to make, and, moreover, *the right decision—which was to admit his blatant and intentional lies in unlawfully obtaining search warrants—was perfectly clear.*  No officer in Norton's position could have thought that he or she was operating in a "gray area" where the law has nothing to say about the proper course of action.

### C.  Norton Is Not Entitled to Qualified Immunity For Count III

Defendant Norton fares no better with regard to qualified immunity on Count III.  Where a state actor has actual knowledge that an incarcerated person is entitled to release, but does nothing, the state actor is not faced with a question in a "gray area," but is faced with a clearly

---

[19]     The only aspect of *Fisher* that might point to its creation of new law would be Judge Agee's decision to dissent. Judge Agee argued in dissent that the Supreme Court's decision in "*Brady v. United States* did not encompass actions tangentially related to the plea process, like a warrant application months in advance of the defendant's guilty plea." *Fisher*, 711 F.3d at 475. Judge Agee may be correct that such facts were not before the Court in *Brady*, but, respectfully, he is incorrect in concluding that the rule of law laid down in *Brady* has nothing to say about misconduct in the application for a warrant.  *Brady* plainly holds that "misrepresentation" by the state renders a guilty plea invalid. *Brady*, 397 U.S. at 755.  By representing to the Plaintiffs in this case that their detention was justified by law, Norton engaged in misrepresentation under *Brady*.  Moreover, even if the facts presented here are not those precisely addressed in *Brady*, that does not automatically entitle Norton to qualified immunity.  *See Wilson*, 337 F.3d at 402-403 ("qualified immunity was never intended to relieve government officials from the responsi-bility of applying familiar legal principles to new situations") *Id*. (quoting *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001) (Michael, J., concurring)).

established duty. This duty is clearly stated in *Golson v. Department of Corrections*, 914 F.2d 1491 (4th Cir. 1990) (unpublished disposition), a case that has served as the basis for the denial of qualified immunity in the context of an unlawful detention. *See Wells v. Artrip*, No. 1:16CV00041, 2017 WL 1788385, at *5 (W.D. Va. May 3, 2017) (holding that the plaintiff "plausibly alleged that the defendants violated his constitutional right not to be held involuntarily and without legal authority beyond his term of incarceration" and that "this right was clearly established"). There is simply no argument that the United States Constitution speaks ambiguously on whether a person whose lies cause others to be incarcerated and on probation for years on end should speak up so that they may be released. The Court should therefore deny Norton's claim of immunity.

## V. The Plaintiffs' Section 1983 Claims Are Not Barred By The Statute of Limitations.

Defendant Norton argues that "each claim against Norton is predicated solely on the theory that Plaintiffs were illegally searched as a result of invalid search warrants. As such, Plaintiffs' Section 1983 claims are in reality claims for illegal searches, all of which are barred by the statute of limitations." Br. at 22. This argument, which other Defendants have expressly declined to make,[20] is incorrect.

Norton's error lies in belief that the accrual date in this case is "when the plaintiff possesses sufficient facts about the harm done to him," which, according to Norton, would have been "in 2009 and 2012 [sic]"[21] when the "search warrants at issue were obtained."[22] Br. at 22-

---

[20] It is notable that the Defendants in this case and in *Ensley v. City of Richmond* do not agree on whether the statute of limitations bars any of the Plaintiffs' claims in either case. The City of Richmond has not advanced a statute of limitations case in either case, and Defendants Gleason, Sipple and Russell have raised the statute of limitations in this instant case, and even then, only with regard to the malicious prosecution claim. Gleason Br. at 16-17.

[21] The correct dates are 2009 and 2010. *See* ¶¶ 70-71, 86.

23.  In other words, Norton believes that the Plaintiffs should have pursued these claims while they were in prison.  This is fundamentally mistaken because "habeas corpus is the exclusive remedy for a state prisoner who challenges the fact or duration of his confinement and seeks immediate or speedier release." *Heck v. Humphrey*, 512 U.S. 477, 481 (1994) (restating the holding in *Preiser v. Rodriguez,* 411 U.S. 475 (1973)).  Had the Plaintiffs attempted to bring this suit while in prison, they would have been subject to the so-called "*Heck* bar," which holds that, if a prisoner's allegations would "necessarily imply the invalidity of his conviction or sentence," the prisoner "has no cause of action under Section 1983 unless and until the conviction is . . . invalidated." *Heck*, 512 U.S. at 487, 489.  *See also Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 390 (4th Cir. 2014) (holding that malicious prosecution claim begins accruing at the time when conviction is invalidated).  A judge would have summarily dismissed the claims and required the Plaintiffs to pursue relief through habeas actions.  Indeed, even if permitted, anything *but* a habeas action would have been surpassingly strange, as a victory in a § 1983 action for these same claims while they were incarcerated would have resulted in damages for incarceration, *but not the Plaintiffs' release*.  Thus, the Plaintiffs would have remained in prison, and, one can only imagine, would have continued to run up a damages bill for each and every subsequent day they remained there.

Plaintiff Williams's conviction was invalidated on April 12, 2016 and Plaintiff Johnson's conviction was invalidated on August 27, 2015.  Because the Plaintiffs brought suit on August 8, 2017, which is within two years of the invalidation of their convictions, their claims are timely.

---

[22]  It is unclear how the Plaintiffs could have possibly possessed sufficient knowledge of Norton's unlawful misconduct when the warrants were issued (rather than years later when federal officials discovered the lies in the warrants that Norton and the other Defendants had concealed for a significant period), but because Norton's statute of limitations argument is flawed for a more fundamental reason, the Plaintiffs will not dwell on this point.

The case law cited by Norton does not contradict any of the foregoing. Norton first relies on *Brooks v. City of Winston Salem, N.C.* 85 F.3d 178, 182-83 (4th Cir. 1996) for the proposition that "a Section 1983 action that would *not* render a conviction or sentence invalid" could be brought by a prisoner rather than a habeas action. Br. at 23. This assertion is consistent with the explanation of law presented above, and, because the Plaintiffs' claims *do* imply invalidity, *Brooks* does not help Norton in any way. Norton also quotes *Covey v. Assessor of Ohio County*, 777 F.3d 186, 197 (4th Cir. 2015) as holding that Fourth Amendment claims "do not necessarily imply the invalidity of [a] conviction." Br. at 23. But Norton left out a key part of the quote. The full sentence is: "As *Heck* itself recognizes, civil claims **based on unreasonable searches** do not *necessarily* imply that the resulting criminal convictions were unlawful." *Id.* (bolded emphasis added). The Plaintiffs' claims, of course, are not based on unreasonable searches; they are based on wrongful prosecutions that would not have happened if Norton's lies had been exposed. Moreover, the law is clear that malicious prosecution claims (which derive from the Fourth Amendment, see *Manuel v. City of Joliet*, 137 S. Ct. 911, 914 (2017)), accrue at the time in which a conviction is invalidated. *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 390 (4th Cir. 2014). Thus, there is no such thing as a "blanket rule" holding that Fourth Amendment claims do not imply the invalidity of a conviction.[23]

---

[23] Although Norton does not rely on it, the Court in *Covey* also stated that "a civil-rights claim does not necessarily imply the invalidity of a conviction or sentence if (1) the conviction derives from a guilty plea rather than a verdict obtained with unlawfully obtained evidence and (2) the plaintiff does not plead facts inconsistent with guilt." *Id.* at 197. While this might seem to support Norton's statute of limitations argument, it ultimately does not because there can be little doubt that, when the court referred to a "conviction [that] derives from a guilty plea," the court must have had in mind a *valid* guilty plea. The Plaintiffs plausibly alleged, consistent with *Brady v. United States*, 397 U.S. 742 (1970), that their guilty pleas were invalid due to Norton's misrepresentations. Thus, *Covey* does not support Norton's argument. *See also Taylor v. Smith*, No. 4:09CV3148, 2009 WL 4263644, at *10 (D. Neb. Nov. 25, 2009) ("Under *Heck*, a claim that [a] plea was involuntary could not have been maintained prior to [the plaintiff's] pardon"); *Bills v.*

Finally, Norton relies on *Cramer v. Crutchfield*, 648 F.2d 943, 945 (4ᵗʰ Cir. 1981), another unreasonable search case.  In *Cramer*, a driver was prosecuted for a crime using evidence obtained in an allegedly unlawful search.  The charges were later dropped and the driver filed a search-and-seizure claim as well as a malicious prosecution claim.  The court held that the search and seizure claim was time-barred, but, importantly, *did not hold* that the malicious prosecution claim was time barred.  *Id.*  Thus, *Cramer* holds that a search or seizure claim begins accruing when the unlawful search or seizure happens, but says nothing at all about when a malicious prosecution claim accrues.  Because the Plaintiffs do not bring search or seizure claims in this case, *Cramer* offers no support to Norton.

In sum, the Plaintiffs' § 1983 claims, if they had been attempted while Plaintiffs were in prison, would have all been subject to the *Heck* bar.  This is apparent not only from the straightforward application of the *Heck* bar, but also from the fact that the Office of the Commonwealth's Attorney for the City of Richmond and the Richmond Circuit Court agreed that the allegations in this Complaint merited the invalidation of the Plaintiffs' convictions.  Norton has offered no argument, whether based on precedent or otherwise, that contradicts this conclusion.

## VI.    The Plaintiffs State a Claim for Relief Under State Malicious Prosecution Law

---

*Adair,* No. 08–12207, 2009 WL 440642, at *10 (E.D. Mich. Feb. 23, 2009) (holding that an inmate could not bring § 1983 action arguing that state officers forced him to plead no contest to charges for which he was serving time); *Smith v. Hayden,* No. 5:05–cv–00884, 2009 WL 1299033, at *6–7 (S.D. W.Va. Feb. 3, 2009) (inmate's *Bivens* claim that he was "railroaded" into involuntary plea not cognizable pursuant to *Heck*), *report and recommendation adopted,* 2009 WL 1287033 (S.D. W.Va. May 8, 2009). *Cf. Jean–Laurent v. Hennessy,* No. 05–CV–1155, 2008 WL 3049875, at *8 (E.D.N.Y. Aug. 1, 2008) ("[T]o determine whether plaintiff's guilty plea was entered involuntarily as a result of ineffective assistance of trial counsel would squarely violate the rule in *Heck,* as such an inquiry would necessarily require this Court to call plaintiff's conviction into question.").

Finally, Norton seeks the dismissal of Plaintiffs' malicious prosecution claim under state law. To state a malicious prosecution claim in Virginia, a plaintiff must plead and prove that a prosecution was "(1) malicious; (2) instituted by, or with the cooperation of, the defendant; (3) without probable cause; and (4) terminated in a manner not unfavorable to the plaintiff." *Hudson v. Lanier*, 255 Va. 330, 333 (1998). Norton contends the Plaintiffs do not plausibly allege violations of the first three elements of this claim. These arguments are mistaken.

With regard to Norton's malice, the Plaintiffs' allegations are sufficient. First, it is important to recognize that "[t]he existence of malice is generally a question to be resolved by the fact finder"—not the court on a motion to dismiss. *Id*. Thus, this Court should be quite hesitant to declare that malice is missing at this point in the case. Second, "malice is defined as any *controlling* motive other than a good faith desire to further the ends of justice, enforce obedience to the criminal laws, suppress crime or see that the guilty are punished." *Id*. (emphasis in original). Thus, if there is a controlling motive here "*other than*" furthering the ends of justice (and its related goals), then the Court may infer malice. Such a motive can be inferred here given Norton's history of financial fraud. A reasonable jury here could infer that Norton did what the corrupt officer did in *United States v. Fisher*—which was lie about informants so that he could pocket some or all of the money normally paid to informants. *See Fisher*, 711 F.3d at 463 (involving officer who was "falsely attributing information to a confidential informant with whom he was splitting reward money").

Next, the Plaintiffs have sufficiently alleged that the action against them was "instituted by, or with the cooperation of, [Norton]." Under Virginia law, a "defendant instigates or cooperates in the proceedings by either taking the original steps to initiate the proceeding ([i.e., make an] arrest) or by subsequently adopting and ratifying the steps that others have already taken to

initiate proceedings." *Bennett v. R & L Carriers Shared Servs*., LLC, 744 F. Supp. 2d 494, 512 (E.D. Va. 2010), *aff'd*, 492 F. App'x 315 (4th Cir. 2012). Further, even if a defendant does not fall into that definition, he may still be considered an "instigator" or "cooperator" if he acted without "an honest or good faith belief of the facts reported." *Id*. Both aspects of the test capture Norton's conduct here. Norton not only took "original steps to initiate the proceeding" by seeking bogus warrants and making "arrest[s]," but he also acted without an "honest or good faith belief of the facts reported." In particular, he withheld crucial facts that would have provided the Plaintiffs with a complete defense. Thus, the Plaintiffs have adequately pled that the action against them was "instituted by, or with the cooperation of, [Norton]."

Finally, with regard to the "without probable cause" element of the test, the Plaintiffs have alleged sufficient facts here that defeat a finding of probable cause. Virginia law defines probable cause in the malicious prosecution context as "such facts and circumstances [that] raise the belief in a reasonable mind, acting on those facts and circumstances, that the plaintiff is guilty of the crime of which he is suspected." *Andrews v. Ring,* 266 Va. 311, 322 (2003). Importantly, in applying this test, no Virginia court has apparently encountered a circumstance like that presented here—where the existence of probable cause (assuming, *arguendo*, that it existed in these cases) is generated through intentional and unlawful behavior. Where probable cause in generated in that way, there is good reason to hold the unlawful conduct tainted the existence of probable cause. The logic supporting this is discussed at length in Part A, above. Where an officer is willing to lie to establish and maintain probable cause throughout a case, a civil malicious prosecution claim is one of the few ways in which the officer may be meaningfully deterred. Thus, for the reasons stated more fully above, the Court should find that Norton's frauds tainted any existence of probable cause here.

Because the Plaintiffs have plausibly pled that their prosecutions were "(1) malicious; (2) instituted by, or with the cooperation of, [Norton]; (3) without probable cause; and (4) terminated in a manner not unfavorable to [them]," the Court should deny Defendant Norton's motion to dismiss Count VIII.

## **CONCLUSION**

For the reasons set forth above, Plaintiffs, by counsel, respectfully request that the Court deny Defendant Norton's Motion to Dismiss in its entirety.

<div align="center" style="text-align:right;">

BRAVETTE JOHNSON and
CURTIS WILLIAMS


By:   /s/ Mark J. Krudys          
      Counsel

</div>

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 E. Main Street, Suite 2020
Richmond, VA  23219
Phone: (804) 774-7950
Fax: (804) 381-4458
Email: mkrudys@krudys.com
Web: www.krudys.com

John Frederick Preis (VSB# 45764)
7719 Rock Creek Road
Henrico, VA 23229
Phone: (804) 289-8682
Email: jpreis@richmond.edu

Amy L. Austin (VSB# 46579)
THE LAW OFFICE OF AMY L. AUSTIN, P.L.L.C.
101 Shockoe Slip, Suite M
Richmond, VA  23219
Phone: (804) 343-1900
Fax: (804) 343-1901
Email: amyaustinlawyer@gmail.com

*Counsel for Plaintiffs Bravette Johnson and Curtis Williams*

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on November 3, 2017, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all registered users.

By:  /s/ Mark J. Krudys

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 E. Main Street, Suite 2020
Richmond, VA  23219
Phone: (804) 774-7950
Fax: (804) 381-4458
Email: mkrudys@krudys.com
Web: www.krudys.com