**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**


**BRAVETTE JOHNSON and**
**CURTIS WILLIAMS,**

        **Plaintiffs,**

                                 **Civil Action No. 3:17-CV-00553-MHL**

**v.**

**CITY OF RICHMOND,** *et al.*,

        **Defendants.**


**PLAINTIFFS' OPPOSITION TO DEFENDANT**
**BRYAN T. NORWOOD'S MOTION TO DISMISS**

       As the motions before the Court reveal, there are many points of dispute in this case. But there is one point that is most certainly *not* in dispute: that the Plaintiffs should not have spent a single day in jail, but instead spent several years in jail. The question before this Court is, in the broadest sense, what should happen now? That is, should persons unlawfully imprisoned for this enormous length of time be entitled to a remedy, or should the people responsible for the unlawful imprisonment be allowed to walk away? As explained below, our Constitution is not nearly as callous and unjust as Defendant Norwood would have this Court believe. The Plaintiffs are entitled to relief and this Court should deny Norwood's motion in its entirety.

**<u>STATEMENT OF FACTS</u>**

       The underlying facts of this case are no doubt familiar to the Court by now. Jason Norton, an officer with the Richmond Police Department ("RPD") from 2004 through 2013, lied in numerous applications for search warrants by attributing his knowledge of alleged criminal activity to an incorrect informant who did not exist or was not reliable. This scheme landed

Plaintiffs in jail and they have now brought suit for relief. In addition to Norton, Plaintiffs seek relief from Norwood, the City's then Chief of Police and chief policing policymaker, based on (1) his knowledge of Norton's misconduct and (2) his failure to act upon that knowledge.

## A. Defendant Norwood's Knowledge

Whether Defendant Norwood violated the Constitution depends in significant part on what he knew and when he knew it. Thus, what follows is a chronological review of the events and circumstances that would establish his knowledge. In evaluating the information below, it is important to keep in mind the type of knowledge that matters in this case. Under *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.1994), what matters is whether Norwood had "knowledge that [Norton] . . . engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff[s]." Importantly, the law does not require Plaintiffs to show that Norwood knew *for sure* that Norton had lied on search warrants and caused the unlawful detention of numerous persons, but simply that Norwood knew that Norton engaged in conduct that posed a "pervasive and unreasonable risk" of constitutional injury. The information below strongly supports the reasonable inference that *Norwood knew that Norton regularly lied about his dealings with informants which, because informants are regularly used to obtain warrants, posed a "pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff[s]."*

## 1. Norton's Tip Off and the RAVE Report – April 2010

In April 2010, federal officers encountered highly suspicious activity by Norton in connection with one of Norton's informants. This suspicious activity is recounted in detail in the Complaint, *see* ¶¶ 42-49[1], but briefly, the officers arrested an informant (1) who Norton first

---

[1]     Unless otherwise stated, all ¶ references herein are to the Complaint, ECF Dkt. No. 1.

tried to persuade the officers not to arrest and who, when Norton was unsuccessful, (2) Norton tipped off through a phone call just prior the arrest, attempting to assure that the arrest would not occur. The FBI agents involved in these events thought them so suspicious that they wrote a report focused specifically on Norton's behavior—a report that was made part of the official files of the RAVE Task force, a joint task force between the FBI and the RPD of which Norwood, as Chief of Police, would have had significant knowledge and responsibility. ¶ 48. If federal officials thought it was important to formally record this event in the RAVE files, there can be little doubt that the event was shared and/or discussed among supervisors like Norwood—thus putting Norwood on notice that Norton had suspicious and deceitful dealings with informants. In particular, an eminently reasonable inference from Norton's conduct is that Norton was scared that R.A., when arrested, would say something that he wasn't supposed to—something about his illicit dealings with Norton. That "something" might have been R.A.'s *lack of involvement* in warrant applications that Norton had previously swore to a magistrate that R.A. was involved in. ¶¶ 89, 106, 118. In short, Norton needed R.A. to keep secrets, and if R.A. was under arrest for selling cocaine, he might fail to keep those secrets, whether because of a mistake or in response to a reduction in his charges or sentence.

### 2. Norton's Reprimands for Misconduct with Informants – March 2011

Roughly a year later, Norton's misconduct with informants would have again come to Norwood's attention. On March 25, 2011—while Plaintiffs were wrongfully in jail—Norton was ***reprimanded for deceit in his handling of informants dating back to 2009 and 2010***. In particular, Norton was reprimanded for his involvement in forged signatures on forms used to verify payments to confidential informants (so-called "N-10 forms") and his attempt to use informants who had not yet been established as reliable—the exact behavior that underlies the

wrongful detentions in this case.  ¶¶ 32, 34, 110-113.  Because these were formal disciplinary

actions, they undoubtedly would have come to Norwood's attention.  *See* ¶ 113.  Not only would

such disciplinary measures put a reasonable officer in Norwood's position on notice of serious

problems with Norton's handling of informants but, when the disciplinary measures are seen

against the backdrop of Norton's suspicious conduct in April 2010, the inference that Norton was

engaging in deceitful conduct in relation to informants becomes much stronger.   Thus, a

reasonable jury could easily conclude that, in March 2011 and thereafter, Norwood would have

had knowledge sufficient to believe, and did in fact believe, that Norton regularly lied about his

relationship with informants, thus creating the substantial risk persons like the Plaintiffs could

have been wrongfully imprisoned.

### 3.  IAD's Investigation of Norton – Probably In The Last Quarter of 2011

Not long after Norton's reprimands, Norton was again the subject of a formal inquiry into his

misconduct with informants.  In this instance, sometime well before July 2012 and likely in

2011, *see* ¶ 108, one of Norton's informants mentioned above—R. A.—was subjected to a

recorded interview while he was in the hospital, the tape of which was later "given to 'IAD'

(Internal Affairs Department)."  ¶¶ 106-108.   The interview concerned R.A.'s relationship with

Norton and was conducted by an RPD officer as well as, in all likelihood, a member of the IAD.

Therefore, Norton was on RPD's disciplinary radar in 2011 and, given the seriousness of the

investigations into his conduct, Norwood would have very likely been privy to the serious

problems surrounding Norton.  When combined with Norton's suspicious behavior in 2010

(which specifically involved R.A.) and Norton's disciplinary actions in 2011 (which specifically

concerned his deceitful practices with informants dating back several years), a reasonable jury

could easily find that, in late 2011, Norwood would have had knowledge sufficient to believe,

and did in fact believe, that Norton regularly lied about his relationship with informants, thus creating the substantial risk persons like Plaintiffs could have been wrongfully imprisoned.

### 4.   Norwood's Attempt to Reform the Informant Program – Mid-2012

In August 2012, Defendant Brian Corrigan was placed in charge of RPD's confidential informant program.  His task was, quite simply, to clean it up.  And as Defendant Corrigan has admitted, there was lots of cleaning to do. In particular, there were two enormous problems with the program.  First, there was a widespread custom in the RPD of lying on N-10 forms, which are forms used to verify the identity of informants receiving payment for information.  As one of Norton's colleagues reported to the FBI, "***all the officers*** in the RPD Narcotics department" have signed an N-10 form indicating that they witnessed a payment ***without actually witnessing the payment***.  ¶ 119.  The importance of witnessing a payment cannot be overemphasized. Requiring such witnessing not only prevents financial corruption (such as the officer pocketing the fee that would normally be paid to an informant), but it also prevents officers from lying about the existence of informants to begin with.

The second major problem Corrigan faced was the program's complete failure to maintain "resume sheets."  ¶ 122.  An informant's "resume sheet" lists the assistance that the informant has provided to officers in the past, thus allowing RPD supervisors to verify that an officer's statement, for example, that "Informant X has previously provided reliable information leading to five arrests" was actually *true*. *Id*.  Obviously, if an informant program is not using resume sheets, it lacks any serious commitment to accuracy and preventing fraud.

Defendant Norwood, as the Chief of Police, would have very likely been responsible for placing Corrigan in charge of the confidential informant program. Moreover, given that Corrigan's installation in that position coincided with the opening of a federal investigation into

Norton's fraudulent practices involving informants, a reasonable jury could easily conclude that Norwood was aware of major problems with the program and that, if reforms were not quickly made, federal investigators would discover problems that would deeply embarrass the department. When this knowledge is combined with Norwood's other knowledge (Norton's suspicious behavior with R.A. in 2010; Norton's reprimands in March 2011 for conduct dating to 2009-2010; and an IAD investigation into Norton relating to his work with an informant in late 2011), a reasonable jury could easily find that, in August 2012, Norwood would have had knowledge sufficient to believe, and did in fact believe, that Norton regularly lied about his relationship with informants, thus creating the substantial risk that persons like the Plaintiffs could have been wrongfully imprisoned.

### 5. The Initiation of the Federal Investigation – Mid-2012 or Fall 2102

At around the same time as Norwood put Corrigan in charge of the confidential information program, Norwood was also undoubtedly aware that federal officials were investigating Norton's misconduct with informants. FBI files show interviews with RPD officials as early as October 2012, but it is quite likely that the investigation was initiated well before these recorded interviews. ¶ 115. Without a doubt, therefore, Norwood would have had knowledge sufficient to believe, and did in fact believe, that Norton lied about his informants, thus causing persons like Plaintiffs to remain in jail and subject to other impediments to their liberty in violation of law. The initiation of the federal investigation is thus one of the most important events in this case. It shows that, without a doubt, (1) there was strong reason to doubt the veracity of Norton's affidavits and (2) Norwood would have certainly been made aware of

this investigation.[2] A reasonable jury could easily decide that, by mid- to late-2012 *at the latest*, Norwood believed Norton lied on warrant applications about the identity of his informants, thus creating the substantial risk persons like Plaintiffs had been wrongfully imprisoned.

### 6. Knowledge Gained Informally – Probably between Mid-2010 and Mid-2012

Beyond the five events described above, Defendant Norwood very likely gained knowledge of Norton's problems in the way that many of us gain such knowledge—by hearing it from others. Although it is difficult to date some of these widely circulated statements about Norton, it is nonetheless reasonable to assume that these statements would have generally coincided with the events described above—dating from mid-2010 through mid-2012.

As explained in detail in the Complaint, *see* ¶¶ 49-50, 99-109, 114, widespread rumors indicated that Norton's paperwork was "garbage," that he had a cozy relationship with his informants, that he performed flagrantly illegal searches, that he was connected to a gang that the RPD was investigating, that he was "flying too fast and too loose," and that, despite his problems, he might still be "salvageable."  One of Norton's partners "blamed RPD management for NORTON's situation."  ¶ 114.  In his view, "NORTON was producing for management, *so [management] let him hang himself*." *Id.* (emphasis added).  This final statement indicates that Norton's problems were well known to management, which a reasonable jury could reasonably conclude included Defendant Norwood himself.[3]

---

[2]    Not only would a Chief of Police be made aware of such an investigation as a matter of course, but the fact that the federal investigators interviewed numerous RPD officers further permits the inference that Chief Norwood was aware of the investigation, as well as its basis.
[3]    Beyond all of this, the Complaint contains additional evidence of Norton's habit of deceit, including five different lies to his supervisors between July 2012 (when the federal investigation of Norton was likely getting started) and his separation from the RPD in mid-2013. ¶¶ 35-40. All of these lies were uncovered soon after Norton told them and two of them were part of an effort to avoid appearances in court. The attempt to avoid court dates is particularly disturbing because it suggests that Norton wanted to avoid proceedings in which he would be

**B. Norwood's Insufficient Response**

The Complaint shows that, in the face of Norwood's likely knowledge of the unconstitutional harm suffered by the Plaintiffs, Norwood failed to take reasonable steps to prevent or alleviate that harm. Most fundamentally, Norwood's insufficient response is shown by the fact that Plaintiffs' suffered continuing harm well past the time when Norton's misconduct was first discovered. Norwood's knowledge throughout 2011 and 2012 was sufficient to require a serious intervention, whether it be a prohibition on Norton's work with informants or, at a minimum, a prohibition on his reliance on informants in warrant applications. By late in 2012, however, Norwood's failures were even more pronounced. In particular, he passed off the matter of Norton's misconduct to the FBI rather than addressing it in his own department. The FBI's interests and Norwood's own constitutional obligations were not well aligned and, as a result, the Plaintiffs' constitutional rights were sacrificed to an FBI investigation that was less concerned with their rights than discovering Norton's crimes.

In sum, the Complaint shows that Defendant Norwood had both knowledge of harms suffered by the Plaintiffs as well as an opportunity to prevent or alleviate those harms. As explained below, and contrary to his arguments, these allegations state a claim for relief.

## ARGUMENT

Defendant Norwood offers several arguments why he should not be held liable for the harm suffered by the Plaintiffs. Each of these arguments is addressed below, but before addressing those arguments, it will be helpful to first explain the Plaintiffs' theory of the case as

---

required to testify under oath. Given that Norton left the Department in mid-2013 under a cloud of suspicion, there can be little doubt that Norwood would have been aware of these final, deceitful acts by Norton, and have further cause to doubt the legitimacy of arrests tied to him.

manifested in their Complaint.  Such will significantly assist the Court in seeing why the Plaintiffs have stated a claim for relief against Defendant Norwood.

### A.  The Plaintiffs' Theory of the Case Against Norwood

The statement of facts in the previous section evinces the heart of the Plaintiffs' grievances against Norwood, which is that Norwood likely knew that Norton lied about informants but did nothing, despite the fact that persons in the Plaintiffs' position would be unlawfully detained. This misconduct translates into two types of claims: (1) supervisory claims and (2) non-supervisory claims.

#### 1.  The Supervisory Claims

The supervisory claims against Defendant Norwood are contained in Count IV. In those claims, Plaintiffs allege that Norwood failed to supervise Defendant Jason Norton with regard to Norton's commission of the constitutional violations in Counts I, II and III.  Thus, in their supervisory claims against Norwood, Plaintiffs allege that Norwood failed to take reasonable steps to prevent or alleviate the harms suffered by Plaintiffs, despite Norwood's actual or constructive knowledge that Norton would violate, was violating, or had violated Plaintiffs' rights to (1) be free from malicious prosecution, (2) make knowing and intelligent pleas and (3) enjoy liberty under the Fourteenth and/or Eighth Amendment.

#### 2.  The Non-Supervisory Claims

In addition to the supervisory claims in Count IV, Plaintiffs also allege in Count VI that Norwood deprived them of their right to liberty under the Fourteenth and/or Eighth Amendments.  This count is similar to Count IV in that it is based on Norwood's failure to act upon his likely knowledge, but yet different in an important respect: Count VI is *not* a supervisory claim.  That is, Norwood's liability in this respect does not depend on his role as a

supervisor, but simply on his failure to act given his knowledge that persons like the Plaintiffs were unlawfully in jail or subject to other legal restraints.

### B. The Plaintiffs State a Plausible Claim for Supervisory Liability Against Norwood With Regard to the Fourth Amendment Violations.

In his motion to dismiss, Defendant Norwood makes four arguments why he is not liable as a supervisor for the Fourth Amendment violations. Each of these arguments is meritless.

#### 1. The Plaintiffs Have Stated a Plausible Fourth Amendment Claim.

Norwood first argues that he cannot be liable as a supervisor for the Fourth Amendment claim because Norton is not liable in the first instance. In this respect, Norwood advances the same arguments as Norton, which is that Norton did not *cause* Plaintiffs' incarceration because the fruit of the poisonous tree doctrine, which would taint the arrests with the poison of Norton's searches, does not apply in § 1983 cases. The Court should reject this argument.

Several circuits, it is true, have held that the fruit of the poisonous tree doctrine (which works in tandem with the exclusionary rule) does not apply in certain § 1983 cases. The prevailing logic in these cases is that "[t]he cost of applying the exclusionary rule in [the § 1983] context is significant ... [a]nd the deterrence benefits are miniscule." *Black v. Wiggington*, 811 F.3d 1259, 1268 (11th Cir. 2016); *see also Townes v. City of New York*, 176 F.3d 138, 148 (2d Cir. 1999) (explaining that applying the exclusionary rule in § 1983 cases "would vastly over deter police officers and would result in a wealth transfer that is peculiar, if not perverse"); *Wren v. Towe*, 130 F.3d 1154, 1158 (5th Cir. 1997) (per curiam); *Hector v. Wyatt*, 235 F.3d 154, 159 (3rd Cir. 2000) (refusing to apply exclusionary rule because an "officer who took a frisk one modest step too far could face vast liability"); *Lingo v. City of Salem,* 832 F.3d 953 (9th Cir. 2016) (noting that the exclusionary rule should apply "only where its deterrence benefits outweigh its substantial social costs").

Crucially, however, no circuit court has confronted the circumstances presented here—namely, ***a detention arising from the intentional deceit of a magistrate by a police officer.*** In such a case, there is good reason to think that the rule's "deterrence benefits [*would*] outweigh its substantial social costs." *Lingo*, 832 F.3d at 958. The different balance of costs and benefits arises from the fact that ***the exclusionary rule has little deterrent effect on officers who are willing to lie to obtain or preserve an arrest.*** This has been common knowledge for years in the field of law enforcement—so common, in fact, that officers in New York City had their own term for it: "testilying."[4] "Testilying" arose largely as a result of the Supreme Court's decision in *Mapp v. Ohio*, 347 U.S. 643 (1961), which extended the exclusionary rule to state criminal proceedings. Before *Mapp*, officers were likely to admit that they found the contraband on the suspect's person or at his residence—even if the search of the person or place was unconstitutional. Without the exclusionary rule, there was no reason to pretend otherwise. But after *Mapp* came down, there was a "suspicious rise" in so-called "dropsy" cases—cases in which "officers alleged that the defendant dropped the contraband on the ground."[5]

The phenomenon of "testilying" did not tail off once *Mapp* was absorbed into the legal landscape. For example, in 1994, a blue-ribbon commission charged with studying corruption in the New York City Police Department concluded that "testilying" was "probably the most

---

[4] MILTON MOLLEN ET AL.,COMM'N TO INVESTIGATE ALLEGATIONS OF POLICE CORRUPTION AND THE ANTI-CORRUPTION PROCS. OF THE POLICE DEP'T, CITY OF N.Y., ANATOMY OF FAILURE: A PATH FOR SUCCESS 36 (1994).

[5] Comment, *Effect of* Mapp v. Ohio *on Police Search-and-Seizure Practices in Narcotics Cases*, 4 COLUM. J.L. & SOC. PROBS. 87, 95 (1968); *see also* Irving Younger, *The Perjury Routine*, Nation, May 8, 1967, at 597 (explaining that, after *Mapp*, "police made the great discovery that if the defendant drops the narcotics on the ground, after which the police man arrests him, the search is reasonable and the evidence is admissible.")

common form of police corruption, particularly in connection with arrests for possession of narcotics and guns."[6] And more recent studies confirm that the problem is still wide-spread.[7]

Thus, in contrast to the criminal setting, applying the exclusionary rule (and its component, the fruit of the poisonous tree doctrine) in the civil setting in a case where an officer has intentionally defrauded the legal system actually *creates deterrence where little existed before*. An officer like Norton, for whom the exclusionary rule was apparently of no consequence in the criminal context because he was already willing to simply fabricate "evidence" and repeatedly lie to magistrates to "justify" searches, might not be so keen to continue to do so if he faced personal civil liability for such actions.

Of course, the value of such deterrence is not sufficient on its face to justify the rule, for the rule could be outweighed by costs to law enforcement, and, thus, society as a whole. Such costs, however, would be extraordinarily limited because they would be borne mainly by officers who insisted on willfully deceiving a magistrate.[8] Such limitations are entirely appropriate because the vast majority of law enforcement officers are honest, diligent, and dedicated to the public good—*and are not going to intentionally deceive*. Like all fields of work, however, a few will occasionally stray from the straight and narrow. When that occurs in the policing context,

---

[6]    MOLLEN ET AL., at 36.

[7]    Christopher Slobogin, *Testilying: Police Perjury and What to Do About It*, 67 COLO. L. REV. 1037, 1041-48 (1996) ("Whether it is conjecture by individual observers, a survey of criminal attorneys, or a more sophisticated study, the existing literature demonstrates a widespread belief that testilying is a frequent occurrence.").

[8]    Society would potentially also incur the costs associated with the release of a suspect who was factually guilty (though Plaintiffs do not concede that they are factually guilty, and further do believe that factual guilt is relevant to this case). The cost of releasing a factually guilty suspect, however, is a routine cost associated with the exclusionary rule that, for over half a century, has failed to overcome its utility as a deterrent. *See Mapp v. Ohio*, 367 U.S. 643 (1961) (applying the exclusionary rule to state criminal adjudications). If it the exclusionary rule does not produce unacceptably high social costs when an officer *mistakenly* violates the Constitution, it certainly will not produce such costs when an officer *intentionally* violates the Constitution.

and liberty is consequently lost, *some* amount of deterrence is needed to protect the public. Indeed, the need for deterrence is particularly appropriate in this context because another major tool of deterrence—criminal punishment—is apparently not in play here. Norton has never been charged with any crime—even though he quite plainly perjured himself over and over again. Thus, applying the exclusionary rule in the civil setting will provide appropriate—and in this case the *only*—deterrence.

The only court to apparently confront an issue like that presented here is the Northern District of Oklahoma in *Williams v. City of Tulsa*, 2016 WL 1572957 (N.D. Okla. Apr. 19, 2016). Importantly, however, the court in *Williams* did not face the argument that Plaintiffs advance here,[9] which is that, although the exclusionary rule may not be appropriate in the majority of § 1983 actions, it is entirely appropriate—***even essential***—in cases like that presented here. Given that *Williams* does not consider the need for deterrence in cases of "testilying," the case is of limited use to this Court.

In sum, this Court should apply the exclusionary rule in this case of intentional police officer deceit because, under the logic of the rule, its benefits outweigh its costs. No binding precedent suggests otherwise and this case presents the Court with a unique opportunity to better articulate the role of the exclusionary rule in § 1983 cases.

### 2. *Ashcroft v. Iqbal* Does Not Bar the Supervisory Claims Alleged Here.

Defendant Norwood alternatively argues that, even if the Plaintiffs state a Fourth Amendment malicious prosecution claim, he may not be held liable as a supervisor because the

---

[9] The court's opinion in *Williams* was issued as part of its ruling in a bench trial. The Court invited the parties to submit briefs before ruling and, although the defendant argued the exclusionary rule should not apply in § 1983 cases, the plaintiff did not address the issue at all. *See Williams v. Henderson*, 2016 WL 3566093 (N.D.Okla.) (defendant's brief); *Williams v. Henderson*, 2016 WL 3566057 (N.D.Okla.) (plaintiff's brief).

Supreme Court held in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) that supervisors can only be liable for their intentional constitutional violations. Norwood's argument fails because it misreads *Iqbal* as well as the Fourth Circuit's reading of *Iqbal*.

*Iqbal* arose from Javaid Iqbal's claim that Attorney General John Ashcroft (among other defendants) engaged in invidious discrimination by detaining him on the basis of his race and religion. Because Ashcroft obviously did not personally arrest and detain Iqbal, one issue in the case was whether Iqbal had to plead that Ashcroft himself engaged in purposeful discrimination, or simply that Ashcroft *supervised others* who engaged in purposeful discrimination. The Court held that, because "purpose rather than knowledge is required to impose *Bivens* liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities." *Id*. at 677. Thus, in requiring Javaid Iqbal to plead discriminatory purpose, the Court was *not* holding that supervisors can only commit constitutional violations by acting with purpose; rather, it was simply holding that the mental state for a supervisor in a supervisory claim must mirror the mental state required of the subordinate. Indeed, this is exactly the interpretation that circuits across the country have given it. *See Barkes v. First Corr. Med., Inc*., 766 F.3d 307, 319 (3d Cir. 2014), reversed on unrelated grounds, 135 S. Ct. 2042 (2015); *Starr v. Baca,* 652 F.3d 1202, 1207 (9th Cir. 2011); *Dodds v. Richardson*, 614 F.3d 1185, 1204 (10th Cir. 2010); *Whitson v. Stone County Jail,* 602 F.3d 920, 922, 927–28 (8th Cir. 2010); *Sandra T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010); *Sanchez v. Pereira–Castillo,* 590 F.3d 31, 49 (1st Cir. 2009).

Finally, and perhaps most relevantly, *Danser v. Stansberry*, 772 F.3d 340 (4th Cir. 2014) strongly suggests that the Fourth Circuit sees *Iqbal* and supervisory liability as compatible. In *Danser,* a prisoner named David Danser claimed that prison officials violated his Eighth

Amendment rights by failing to protect him from an attack by fellow prisoners. Most relevant here, Danser sued not only the guards on duty, but also the guards' supervisors, men by the names of Stansberry and Roy. The court held that Stansberry and Roy could not be held liable under *Iqbal* because "all that is present in the record before us is the mere fact that Stansberry and Roy were . . . supervisors, and under *Iqbal* that is insufficient as a matter of law . . . ." *Id.* at 349. In other words, the court applied the exact interpretation of *Iqbal* stated above—which is that it is a pleading case, not a supervisory liability case. If the Fourth Circuit thought *Iqbal* meant more than that, then it would have had no reason to, *in the very next sentence*, evaluate Danser's supervisory liability theory under *Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir.1994)—the Fourth Circuit's quintessential supervisory liability case. The court explained that Danser's supervisory claim failed *not* because of *Iqbal*, but because Danser failed to allege facts sufficient to show the supervisor's "tacit authorization" of the attack. If *Iqbal* did away with "tacit authorization" as a sufficiently culpable mental state, then *Danser* makes absolutely no sense.

In sum, *Iqbal* did not do away with supervisory claims. It simply established that a supervisor may not be held liable unless the supervisor possessed the same mental state as the subordinate who committed the underlying constitutional violation. The Court should therefore reject Norwood's *Iqbal* argument.

### 3. The Plaintiffs Have Adequately Alleged Supervisory Liability Based on the Fourth Amendment Violation

Norwood additionally argues that, even if *Iqbal* does not change the law of supervisory liability, the Plaintiffs fail to state a claim for relief under the existing law of supervisory liability. As explained below, Norwood's argument is without merit.

To state a claim for supervisory liability, a plaintiff must plausibly plead:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir. 1994). In keeping with *Iqbal,* a supervisor cannot be held liable unless he or she possessed a mental state sufficient to state a claim on the underlying claim. The underlying claim here is the malicious prosecution claim, which requires the plaintiff to "allege that the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." *Evans v. Chalmers*, 704 F.3d 636, 647 (4th Cir. 2012). Fourth Circuit law is clear that a plaintiff can state a malicious prosecution claim by pleading that the false statement leading to prosecution was "made deliberately or with a reckless disregard for the truth, which may be proved by showing that when viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Massey v. Ojaniit*, 759 F.3d 343, 357 (4th Cir. 2014); *see also Miller v. Prince George's Cty*, 475 F.3d 621, 627 (4th Cir. 2007) (plaintiff bringing malicious prosecution claim against a police detective must show that the detective "deliberately or with a reckless disregard for the truth made material false statements in his affidavit"). By combining the mental state required of a malicious prosecution claim with the supervisory liability standard, it becomes clear that Plaintiffs state a claim against Norwood if they have plausibly alleged that:

> (1) Norwood "entertained serious doubts as to the truth of [Norton's] statements or had obvious reasons to doubt the accuracy of the information [Norton] reported" (2) that [Norwood's] response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) that there was an affirmative causal link between [Norwood's] inaction and the particular constitutional injury suffered by the plaintiff[s].

As explained below, the Plaintiffs have plausibly alleged each of these three elements.

First, the Plaintiffs have adequately alleged that Norwood either "entertained serious doubts as to the truth of [Norton's] statements or had obvious reasons to doubt the accuracy of the information [Norton] reported." *Massey,* 759 F.3d at 357. The statement of facts contains numerous grounds for a reasonable jury to conclude that Norwood had "reason to doubt the accuracy" of the information in Norton's warrant applications. In particular, Norwood would have had reason to doubt Norton's reliance on confidential informants because he would have reasonably known that: (1) Norton engaged in highly suspicious and deceitful activity with a confidential informant—including tipping the informant off to an likely arrest—in **April 2010,** ¶¶ 42-48, 109; (2) Norton was doubly reprimanded in **March 2011** for deceit with regard to confidential informants dating back to 2009 and 2010, ¶¶ 110-13; (3) a confidential informant was interviewed about his relationship with Norton in **late 2011** as part of an IAD investigation of Norton, ¶¶ 106-08, (4) the RPD's confidential informant program in **mid-2012** (and prior) lacked basic checks on integrity that would keep an officer from lying about the identity of an informant, ¶¶ 121-24; (5) the FBI began investigating Norton **in the summer or fall of 2012** for lying about the identity of his informants on warrant applications filed **as early as 2009**, ¶¶ 23, 115; and (6) Norton's colleagues and other supervisors thought he played "too fast and too loose," had encountered him lying on numerous occasions, and believed that "management" was letting Norton "hang himself" because he was "producing." ¶ 114; *see also* ¶¶ 99-113 and 33-40. Given all these allegations, a reasonable jury could easily find that, while the Plaintiffs were suffering the continued effects of Norton's misconduct,[10] Defendant Norwood had "reason to

---

[10]     These continued effects included incarceration and/or limitation on liberty associated with probation. As explained in the Complaint, Norton's misconduct led to Bravette Johnson's

doubt the accuracy" of Norton's warrant applications, which, if inaccurate, would render unlawful the incarcerations of persons in Plaintiffs' circumstances.

Second, Plaintiffs have also adequately alleged "that [Norwood's] response to [his] knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices." Once Norwood had "reason to doubt the accuracy" of Norton's affidavits by the end of 2012 *at the latest* (and likely much earlier), Norwood apparently did nothing while Plaintiffs continued to suffer harm caused by Norton's misconduct. This was an insufficient response.

Further, it is not appropriate to let Norwood off the hook because federal agents began performing an investigation. First of all, the facts pled plausibly establish that Norwood had requisite knowledge before the federal agents began their investigation. Moreover, the existence of a federal investigation does not in any way relieve Norwood of his *own* duty to help persons wrongfully put in jail by one of his *own* officers. Additionally, the federal investigation was almost certainly not aimed solely at the restoration of Plaintiffs' liberty. If that was its only purpose, FBI investigators would have only needed to compare Norton's warrant applications, not interview dozens of witnesses over a period of several years. Clearly, a significant part of the investigation was determining the nature and scope of Norton's criminal conduct. Further, even if there were some reason to defer to federal investigators in this situation, a jury could

---

arrest on March 11, 2010 and a jail term ending in November 2011. This jail term was followed, however, by a period of probation and then, in 2012, a subsequent jail term of four years—the length of which was a direct result of Norton's prior misconduct. Johnson was not released from prison until on or about August 27, 2015. *See* ¶¶ 70, 80-85. With regard to Curtis Williams, the Complaint establishes that Norton's misconduct led to his arrest on July 7, 2009, and that he spent approximately 2 years and four months in jail. After his release in April 2012, Williams was subject to obligations associated with probation and even arrested on August 3, 2013 for allegedly violating his probation—a probation, of course, that was unlawful given Norton's misconduct. *See* ¶¶ 86, 94-97.

reasonably conclude that Norwood *deferred for far too long*. If federal investigators spent a decade investigating this matter, would Norwood be justified in deferring for that long? Certainly not. A 2.5 year investigation is obviously much shorter than that, but in the eyes of the Plaintiffs it was intolerably—and unconstitutionally—too long.

Third and finally, Plaintiffs have plausibly alleged that "there was an affirmative causal link between [Norwood's] inaction and the particular constitutional injury suffered by [Plaintiffs]." On this issue, there can be little debate. Had Norwood, after forming "reason to doubt the accuracy" of Norton's warrant affidavits, taken reasonable steps, Plaintiffs would have been released from jail and probation sooner than they were.

### C. The Plaintiffs State a Plausible Claim for Supervisory Liability Against Norwood Regarding Their Right to Make a Knowing and Intelligent Plea.

Defendant Norwood also argues that the Plaintiffs' knowing and intelligent plea claim must be dismissed for two reasons. Both arguments are meritless.

### 1. The Plaintiffs Have Adequately Stated a Knowing and Intelligent Plea Claim.

Norwood first argues that this claim is flawed because "Plaintiffs do not allege that anyone coerced them into pleading guilty, or concealed the consequences of their pleas, or deprived them of counsel's advice." Br. at 10. This argument directly contradicts *United States v. Fisher*, 711 F.3d 460 (4th Cir. 2013).

In *Fisher*, a Baltimore City police officer named Mark Lunsford sought a warrant to search Cortez Fisher's residence and vehicle. As Officer Norton did in the case before this Court, Lunsford stated in his warrant application that a "confidential informant" had informed him that Fisher was involved in criminal activity. *Id*. at 463. After obtaining the warrant, Lunsford executed it and arrested Fisher based on what he allegedly found in Fisher's possession. Fisher later pled guilty and was sentenced to 10 years in prison. *Id*. Also like in the

case before this Court, it was later discovered that the "confidential informant [Lunsford] identified in his affidavit had no connection to the case and that another individual was the real informant." *Id*. (internal quotation marks omitted). Lunsford's misconduct in Fisher's case was part of a larger scheme in which Lunsford would "falsely attribute[e] information to a confidential informant with whom he was splitting reward money." *Id*. When Lunsford's misconduct became widely known, Fisher sought to set aside his guilty plea in a habeas action.

The Fourth Circuit sided with Fisher. To set aside a guilty plea, the court explained, *Brady v. United States* requires the criminal defendant to show "government misrepresentations" that "induced him to plead guilty." *Id*. at 465, 467. In the court's opinion, Lunsford engaged in "affirmative government misrepresentation that 'strikes at the integrity of the prosecution'" *Id*. at 466, and, but for this misrepresentation, a "reasonable defendant standing in his shoes likely would have altered his decision to plead guilty." *Id*. at 467. Lunsford thus committed a violation of Fisher's right to make a knowing and intelligent plea under *Brady v. United States.*

*Fisher* is on all fours with the present case. Not only is this clear from the facts of *Fisher* itself, but it is also clear from the record in *Ensley v. City of Richmond*, a related case before this Court arising from the same misconduct alleged here. After being wrongfully imprisoned because of Norton's lies, three of the five plaintiffs in *Ensley* obtained their releases through federal habeas petitions. In the opinions granting those petitions, United States District Court Judge Henry Hudson cited *Fisher* as the key authority meriting relief. *See, e.g., United States v. Andrews*, No. 3:09CR368-HEH, 2015 WL 12830449, at *1 (E.D. Va. Apr. 1, 2015). Moreover, in his opinions, Judge Hudson noted that the "government concedes that there is a high probability that critical information contained in the search warrant affidavit is false and that it is material to a finding of probable cause" and "therefore joins" in supporting the petitions. *Id*.

Given *Fisher* itself, Judge Hudson's opinions declaring that *Fisher* entitles several plaintiffs in *Ensley* to release, and the U.S. Attorney's Office's agreement with that view, there can be little doubt that the Plaintiffs in this case suffered a violation of their constitutional rights to make knowing and intelligent pleas. Further, given that § 1983 grants a cause of action to any person "depriv[ed] of any rights, privileges, or immunities secured by the Constitution," it is plain that Plaintiffs state a claim for relief under § 1983.

*Fisher* is a published Fourth Circuit opinion and is thus binding on this Court. Norwood, however, claims that Fisher is "inconsistent" with two other cases.[11] One case, *Alvarez v. City of Brownsville*, 860 F.3d 799, 803 (5th Cir. 2017), is from the Fifth Circuit and thus must yield to the binding force of *Fisher*. The other case, *Haring v. Prosise*, 462 U.S. 306 (1983) is a collateral estoppel case involving the affect of a guilty plea on a post-plea § 1983 case alleging a Fourth Amendment violation. *Haring* does not address the question presented here, which is whether a post-plea § 1983 claim based on a *Due Process violation* is actionable. And even if *Haring* was in some sense relevant, the *Haring* Court held that the plaintiff there *could* bring the Fourth Amendment claim regardless of his prior plea. *Id*. at 323. In sum, *Fisher* is directly on point here and Norwood has offered no authority to the contrary.

### 2. The Plaintiffs Have Adequately Stated a Supervisory Claim Against Norwood with Regard to the Knowing and Intelligent Plea Violation.

Defendant Norwood also seeks dismissal of this claim because, even if an underlying violation can be stated, he argues that Plaintiffs have failed to plead a supervisory violation by Norwood. This is incorrect.

---

[11] Norwood also cites a third case, *United States v. Murphy*, 380 F. App'x 344 (4th Cir. 2010). Norwood admits, however, that *Fisher* "arguably alters" *Murphy*. Moreover, *Murphy* does not involve the factual circumstances presented here, and, being an unpublished disposition, is not binding precedent.

First, in keeping with the instructions in *Iqbal*, the Court must first determine the proper

mental state to demand of Norwood before finding him liable. Plaintiffs are claiming a violation

of their right to make a knowing and intelligent plea as established in *Brady v. United States*, 397

U.S. 742 (1970). Under *Brady*, a plea is constitutionally valid only if it is a "voluntary

expression of [the defendant's] own choice." *Id*. at 748. Furthermore, a plea is only truly

"voluntary" if the defendant has "sufficient awareness of the relevant circumstances and likely

consequences." *United States v. Moussaoui*, 591 F.3d 263, 278 (4th Cir. 2010 (quoting

*Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005)). These standards, however, speak only to the

validity of a plea in a criminal setting, not a defendant's liability for causing an involuntary plea

in a civil setting. It is thus appropriate to look to the closest analogue to the claims here: § 1983

claims alleging involuntary confessions. In such claims, a violation can be established through

either intentional or reckless conduct. *See Washington v. Buraker*, 322 F. Supp. 2d 702 (W.D.

Va. 2004) (permitting § 1983 coerced confession claim to proceed on showing of recklessness

because "[t]he officers involved did not face pressure to make snap decisions"). In the § 1983

setting, an officer behaves recklessly if he responds to a known risk of harm with deliberate

indifference. *See Farmer v. Brennan*, 511 U.S. 824 (1994). Given this, Plaintiffs have stated a

supervisory claim against Norwood in this context if they plausibly plead that:

> (1) [Norwood] had actual . . . knowledge[12] that his subordinate was engaged in
> conduct that posed a pervasive and unreasonable risk of constitutional injury to

---

[12]     To show actual knowledge under the deliberate indifference standard, the Plaintiffs need
not adduce "direct evidence." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). Rather, the
Plaintiffs can show such knowledge through "circumstantial evidence." *Id*. (quoting *Farmer*, 511
U.S. at 842). For example, where a plaintiff can show that his injury resulted from a problem that
was "longstanding, pervasive, well documented, or expressly noted by . . . officials in the past," a
jury can reasonably conclude that the state official "'must have known' about it." *Id*. (quoting
Farmer, 511 U.S. at 842). Additionally, even if long standing problems are not shown, there will
be instances in which the risk of injury will "be so obvious that the factfinder could conclude that

citizens like the plaintiff; (2) that [Norwood's] response to that knowledge was so
inadequate as to show deliberate indifference to or tacit authorization of the
alleged offensive practices, and (3) that there was an affirmative causal link
between [Norwood's] inaction and the particular constitutional injury suffered by
the plaintiff.

*Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir.1994). The Plaintiffs have met this standard.

Plaintiffs' allegations state a claim for relief under this standard for the same reasons
discussed above in relation to their malicious prosecution claim. Indeed, the two standards are,
in effect, nearly identical. The malicious prosecution standard required Plaintiffs to plausibly
plead that Norwood "entertained serious doubts as to the truth" of Norton's statements, which is
functionally identical to the requirement that Norwood know of the risk that Norton's statements
would be false. Thus, for the reasons stated above in Part B, Plaintiffs have stated a plausible
supervisory claim against Norwood regarding their right to make knowing and intelligent pleas.

**D. The Plaintiffs State a Plausible Claim for Supervisory Liability Against Norwood
Regarding Their Right to Liberty under the Fourteenth and/or Eighth Amendment.**

Defendant Norwood offers three arguments why Plaintiffs' liberty claims under the
Fourteenth and/or Eighth Amendments must be dismissed. All three arguments are meritless.

Norwood first argues that the Plaintiffs' authority for this claim—*Golson v. Dep't of
Corrections*, 914 F.2d 1491 (4th Cir. 1990) (unpublished)—is inapposite. Br. at 12-13. *Golson*
involved the detention of a prisoner after his term of imprisonment had expired. When the
prisoner later brought a civil action seeking compensation for the period of overdetention, the
Fourth Circuit held the he "state[d] a claim under the due process clause and the eighth
amendment." *Id.* According to Norwood, *Golson* is inapplicable here because Plaintiffs (1) do
not allege overdetention and (2) Norwood is not a jail official. Nothing in *Golson*, however,

---

the [official] did know of it because he could not have failed to know of it." *Brice v. Virginia
Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (citations omitted).

suggests that entitlement to compensation for unlawful detention is so limited. Indeed, the fact that the right to be free of unlawful detention undoubtedly extends beyond the prison context is quite possibly why the court invoked *both* the Eighth Amendment *and* the Due Process Clause.

Norwood's second argument is that, to the degree this claim alleges bystander liability, he is not liable under that doctrine. Br. at 13-14. "To succeed on a theory of bystander liability, a plaintiff must demonstrate that a law-enforcement officer (1) knew that a fellow officer was violating an individual's constitutional rights; (2) had a reasonable opportunity to prevent the harm; and (3) chose not to act." *Stevenson v. City of Seat Pleasant, Md.*, 743 F.3d 411, 417 (4th Cir. 2014) (internal quotation marks and modifications omitted). Although Plaintiffs have framed their allegations as supervisory claims, the doctrines substantially overlap[13] and, not surprisingly, Plaintiffs' allegations also state a claim for bystander liability.[14] As explained in the previous sections, the Complaint contains numerous allegations that would allow a reasonable jury to infer that Norwood had actual knowledge that Norton had lied in his application for search warrants— especially once the federal investigation was underway. Such lies rendered Plaintiffs' incarcerations unlawful, thus imposing on Norton a duty to come clean about his frauds. Norton's failure to come clean amounted to a violation of Plaintiffs' Fourteenth and/or Eighth Amendment rights—a violation of which Norwood would have been aware of as a bystander. Norwood had a "reasonable opportunity to prevent the harm" but "chose not to act." As such,

---

[13] *See, e.g., Morrison v. Jordan*, No. CIV.A 7:08-CV-00643, 2009 WL 4363922, at *5 (W.D. Va. Dec. 1, 2009) (treating allegations against supervisor as "claims of bystander liability *and* supervisory liability").

[14] It is irrelevant whether Plaintiffs used the magic words "bystander liability" in the Complaint because the elements of the action were nonetheless pled in the Complaint. *See Stevenson*, 743 F.3d at 418 (holding that a plaintiff need not "recite expressly the elements of bystander liability" to properly allege a bystander liability claim).

even if Plaintiffs' supervisory claim is framed as a bystander claim, it still states a claim upon which relief can be granted.

Third and finally, Norwood argues that Plaintiffs do not state a supervisory claim against him for the violation of their Fourteenth and Eighth Amendment rights.[15]  As with the other supervisory claims, it is first necessary to determine the mental state required of a subordinate committing a deprivation of liberty in violation of the Fourteenth and/or Eighth Amendment.  As the Fourth Circuit explained in *Golson v. Department of Corrections*, 914 F.2d 1491 (4th Cir. 1990) (unpublished), a Fourteenth Amendment violation requires "something more than mere negligence"[16] and an Eighth Amendment violation can be stated if "the defendants acted with deliberate indifference." *Golson*, 914 F.2d 1491.  Integrating the required mental state into the supervisory liability standard, it becomes clear that Plaintiffs state a supervisory claim against Norwood if they plausibly allege that:

---

[15]     In Count VI, Plaintiffs allege that Norwood violated their Eighth and Fourteenth Amendment rights in a non-supervisory capacity.  Defendant Norwood has not contested these allegations in any way. As such, that issue is not before the Court at this time. *See Baker v. Patterson Med. Supply, Inc*., No. 4:11CV37, 2011 WL 2731259, at *3 (E.D. Va. July 13, 2011) (stating that, because defendant raised "argument for the first time in its reply brief" the "court will not consider it" on a motion to dismiss, though the defendant is "free, of course, to raise the issue at a later time") (citing *Clawson v. FedEx Ground Package System, Inc.,* 451 F.Supp.2d 731, 734 (D. Md. 2006) and *United States v. Williams,* 445 F.3d 724, 736 n. 6 (4th Cir.2006)).

[16]     As explained in the Plaintiffs' Opposition to Norton's Motion to Dismiss, the mental state "greater than negligence" required in this context is likely recklessness, which is similar to the deliberate indifference standard applied in the Eighth Amendment context.  (See *County of Sacramento v. Lewis,* 523 U.S. 833, 849 (1998), subsequent to *Golson,* wherein the Supreme Court explained that a § 1983 Due Process claim was actionable upon a showing of "deliberate indifference"—but only where "deliberation is practical." *Id*. at 851. Thus, demonstrating deliberate indifference will not be enough when alleging misconduct in "high-speed law enforcement chases" (where there is no time to deliberate), but will be enough in the "custodial situation of a prison" where "forethought about an inmate's welfare is . . . feasible." *Id*.)  Thus, regardless of whether this Court proceeds under the Fourteenth or Eighth Amendment, the proper standard is deliberate indifference.

> (1) [Norwood] had actual . . . knowledge that [Norton] was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that [Norwood's] response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices, and (3) that there was an affirmative causal link between [Norwood's] inaction and the particular constitutional injury suffered by the plaintiff[s].

*Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir.1994).

As with the other supervisory claims, the Plaintiffs have met this standard. As explained above, a reasonable jury could easily find that Norwood had actual knowledge that Norton's deceitful practices with informants created a significant risk that persons situated as the Plaintiffs were would be placed in jail in violation of law. A reasonable jury could also find that Norwood failed to reasonably respond to this knowledge and that, as a result, the Plaintiffs were incarcerated longer than they should have been. Because a reasonable jury could reach these three conclusions based on the facts alleged, the Plaintiffs have stated a plausible supervisory claim against Norwood with regard to violations of their liberty rights.

**E. Defendant Norwood Is Not Entitled to Qualified Immunity.**

Defendant Norwood argues that he is entitled to qualified immunity on all claims against him. Br. at 15-19. This argument is without merit because, although qualified immunity protects officers from liability where they make "bad guesses in gray areas," *Wilson v. Kittoe,* 337 F.3d 392, 403 (4th Cir. 2003) (internal quotation marks omitted), Norwood was not at all acting in a gray area. Each and every claim against him in this suit plausibly alleges that he had ***actual knowledge of a significant risk that persons in the Plaintiffs' circumstances were unlawfully in jail, but yet did not reasonably act to prevent or alleviate their harm.*** Failing to act in such circumstances is not a bad guess in a gray area; it is the wrong call in a black and white circumstance.

With regard to the malicious prosecution claim, Norwood is not entitled to qualified immunity. On this claim, the question before the Court is whether Norwood acted in a "gray area" when, despite "obvious reasons to doubt the accuracy of the information" leading to an unlawful incarceration, he was "deliberate[ly] indifferen[t]" to that knowledge by failing to take steps to prevent or shorten the incarceration. *See supra* at Part B (stating the supervisory liability standard applicable to the malicious prosecution claim). When there are "obvious reasons" to doubt someone's incarceration, officials hardly face a close call in determining what to do. The *obvious* thing to do is to initiate an investigation to determine whether the incarceration is lawful or not. Norwood did not do that. Norwood alternatively argues that, even if this Court were to apply the exclusionary rule in this case, the novelty of the application would entitle him to qualified immunity. What Norwood fails to appreciate, however, is that qualified immunity concerns clearly established "constitutional rights" and "the exclusionary rule is 'not a personal constitutional right.'" *Davis v. United States*, 564 U.S. 229, 248 (2011) (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976)); *see also United States v. Rush*, 808 F.3d 1007, 1010 (4th Cir. 2015). Thus, if the Court were to apply the exclusionary rule, it would not be laying down a new rule of constitutional law – it would be making an evidentiary ruling that does not modify any constitutional rights.

Second, Norwood cannot claim qualified immunity for the knowing and intelligent plea claim. On this claim, the question again before the Court is whether Norwood acted in a "gray area" when, despite Norwood's "actual . . . knowledge" that one of his subordinates engaged in conduct (*i.e.*, the misrepresentation of information relevant to a guilty plea) that "posed a pervasive and unreasonable risk of constitutional injury to citizens" like Plaintiffs, Norwood failed to take reasonable steps to prevent or shorten the incarcerations. This is most certainly not

a "grey area." *Brady v. United States*, 397 U.S. 742 (1970), clearly holds that an officer's misrepresentation can render a guilty plea invalid and *Fisher v. United States*, 711 F.3d 460 (4th 2013) makes plain the obvious implication of this, which is that, by withholding lies underlying a search warrant, an officer engaged in misrepresentation under *Brady*. Given this, Norwood is not entitled to qualified immunity.[17]

Third and finally, Norwood cannot claim qualified immunity on Plaintiffs' liberty claim in violation the Fourteenth and Eighth Amendments. On this claim, the question before the Court is much like the others: namely, whether Norwood acted in a "gray area" when, despite his "actual . . . knowledge" that one of his subordinates engaged in conduct that "posed a pervasive and unreasonable risk of constitutional injury to citizens" like Plaintiffs, he failed to take reasonable steps to prevent or shorten the incarceration. For the reasons already stated, Norwood may not claim qualified immunity here because it is hardly a "gray area." *Golson v. Department of Corrections*, 914 F.2d 1491 (4th Cir. 1990) demonstrates that clear law existed on this issue at the time of Norwood's violations. The court in *Golson* stated as clearly as possible that, when a person has reason to believe that someone is in jail but ought not to be, that person has a duty to act. Norwood might argue that *Golson*'s facts are not similar enough to those here, but this argument is unavailing because "'the nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent denial of qualified immunity.'" *Id*. at 403 (internal quotation marks omitted). This is because the goal of qualified immunity is to "ensure that before they are subjected to suit, officers are on *notice* their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (emphasis added) (quoting *Saucier v. Katz,* 533 U.S., at 206). The

---

[17]     To the extent that Norwood might contend that *Fisher* established new law, and thus that there was no clearly established law *prior to Fisher*, Norwood would still lack qualified immunity for failing to take reasonable steps *after Fisher,* which was decided in April 2013.

identical-case argument thus ignores that officers do not need "notice" on how to "apply[] familiar legal principles to new situations." *Wilson*, 337 F.3d at 403 (quoting *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001) (Michael, J., concurring)). It is a certainly a "familiar legal principle[]" (stated in *Golson*, among other places) that, where a police officer lies and persons are detained as a result of those lies, the Constitution has been violated, and a police chief in Norwood's circumstances would hardly find him or herself in uncharted terrain if he or she discovered those lies.

### F. The Plaintiffs Claims are Not Time-Barred.

In a footnote, Norwood argues that all of the Plaintiffs' claims are time-barred because Plaintiffs "have been on notice of all their claims more than two years." Br. at 5, n.1. Norwood misunderstands how to analyze statute of limitations in the wrongful detention context.

The statute of limitations on Plaintiffs' claims did not begin to run until their convictions were invalidated. This follows directly from *Heck v. Humphrey*, 512 U.S. 477, 487, 489 (1994), which holds that, if a prisoner's allegations would "necessarily imply the invalidity of his conviction or sentence," the prisoner "has no cause of action under Section 1983 unless and until the conviction is . . . invalidated." The allegations in this Complaint undeniably "imply"—not to mention directly explain—that Plaintiffs' convictions were invalid because Norton lied. Thus, the causes of action alleged in this Complaint arose on April 12, 2016 (for Williams) and August 27, 2015 (for Johnson) when their convictions were invalidated. Because the Plaintiffs filed suit on August 8, 2017, which is within two years of the invalidation of their convictions, their claims are timely.

## CONCLUSION

For the reasons stated above, the Plaintiffs respectfully request that the Court deny

Defendant Norwood's Motion to Dismiss in its entirety.

Respectfully submitted,

BRAVETTE JOHNSON and CURTIS WILLIAMS


By:      /s/ Mark J. Krudys_____
                    Counsel

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
919 E. Main Street, Suite 2020
Richmond, VA  23219
Phone: (804) 774-7950
Email: mkrudys@krudys.com

John Frederick Preis (VSB# 45764)
7719 Rock Creek Road
Henrico, VA 23229
Phone: (804) 289-8682
Email: jpreis@richmond.edu

Amy L. Austin (VSB# 46579)
THE LAW OFFICE OF AMY L. AUSTIN, P.L.L.C.
101 Shockoe Slip, Suite M
Richmond, VA  23219
Phone: (804) 343-1900
Email: amyaustinlawyer@gmail.com

*Counsel for Plaintiffs Bravette Johnson and Curtis Williams*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on November 3, 2017, I electronically filed the foregoing document with the

Clerk of Court using the CM/ECF system, which will send notification of such filing to all

registered users.

By:   /s/ Mark J. Krudys

       Mark J. Krudys (VSB# 30718)
       THE KRUDYS LAW FIRM, PLC
       SunTrust Center
       919 E. Main Street, Suite 2020
       Richmond, VA  23219
       Phone: (804) 774-7950
       Fax: (804) 381-4458
       Email: mkrudys@krudys.com
       Web: www.krudys.com