**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**BRAVETTE JOHNSON and
CURTIS WILLIAMS,**

                **Plaintiffs,**

                                      **Civil Action No. 3:17-CV-00553-MHL**

**v.**

**CITY OF RICHMOND, *et al.*,**

                **Defendants.**

## <u>PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS BY DEFENDANTS ALSTON, CORRIGAN, HARRISON, AND BLACKWELL</u>

Defendants Michael Alston, Brian Corrigan, Martin Harrison, and William Blackwell (collectively referred to herein as "Defendants") have moved to dismiss the Plaintiffs' Complaint. For the reasons below, this Court should deny the Defendants' Motion.

## <u>STATEMENT OF FACTS</u>

The underlying facts of this case are no doubt familiar to the Court by now. Jason Norton, an officer with the Richmond Police Department ("RPD") from 2004 through 2013, lied in numerous applications for search warrants by attributing his knowledge of alleged criminal activity to an incorrect informant who did not exist or was not reliable. This scheme landed the Plaintiffs in jail and they bring suit for relief. In addition to Norton, Plaintiffs seek relief from the moving Defendants and Defendants Norwood (and the City of Richmond, for which Norwood was chief policymaker for the RPD), Gleason, Sipple and Russell, based on (1) their knowledge of Norton's misconduct and (2) their failure to act upon that knowledge.

## A. The Defendants' Knowledge

Whether the Defendants violated the Constitution depends in significant part on what they knew and when they knew it. Thus, what follows is a chronological review of the events and circumstances that would establish their knowledge.[1] In evaluating the information below, it is important to keep in mind the type of knowledge that matters in this case. Under *Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir.1994), what matters is whether the Defendants had "knowledge that [Norton] . . . engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff[s]." Importantly, the law does not require the Plaintiffs to show that the Defendants knew *for sure* that Norton had lied on search warrants and caused the unlawful detention of numerous persons, but simply that the Defendants knew that Norton engaged in conduct that posed a "pervasive and unreasonable risk" of constitutional injury. The information below strongly supports the reasonable inference that *the Defendants knew that Norton regularly lied about his dealings with informants which, because informants are regularly used to obtain warrants, posed a "pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff[s]."*

---

[1]     Relevant to Defendants' knowledge, but in no way dispositive of it, is the terms of their supervision over Norton. The Complaint states that during the years 2012 and 2013, Defendant Lt. Alston served as Norton's Direct Supervisor, and, during the same time period, Defendant Lt. Corrigan served as Norton's Intermediate Supervisor. Complaint, ¶¶ 16-17 (unless otherwise stated, all ¶ references herein are to the Complaint). Defendant Harrison was also responsible for supervising Norton; from in or about 2011 through at least March 2013, Harrison also served as the Head of RPD's Special Investigations Division. According to the RPD website, Harrison currently leads the Department's Internal Affairs Division. ¶ 18. With regard to Defendant Cpt. Blackwell, he was responsible for supervising Norton from in or about 2009 through 2011, during which time he also oversaw the RPD's confidential informant program. ¶19. Upon information and belief, Defendant Alston, Corrigan, Harrison, and Blackwell have continued to work for RPD through the date of filing of the Complaint (¶¶ 16-19).

### 1. Norton's Tip Off and the RAVE Report – April 2010

In April 2010, federal officers encountered highly suspicious activity by Norton in connection with one of Norton's informants. This suspicious activity is recounted in detail in the Complaint, *see* ¶¶ 42-49, but briefly, the officers arrested an informant (1) who Norton first tried to persuade the officers not to arrest and who, when Norton was unsuccessful, (2) Norton tipped off through a phone call just prior the arrest, attempting to assure that the arrest would not occur. The FBI agents involved in these events thought them so suspicious that they wrote a report focused specifically on Norton's behavior—a report that was made part of the official files of the RAVE Task force, a joint task force between the FBI and the RPD. ¶ 48. If federal officials thought it was important to formally record this event in the RAVE files, there can be little doubt that the event was shared and/or discussed among supervisors as well as placed in Norton's personnel file—thus putting the Defendants on notice that Norton had suspicious and deceitful dealings with informants. In particular, an eminently reasonable inference from Norton's conduct is that Norton was scared that R.A., when arrested, would say something that he wasn't supposed to—something about his illicit dealings with Norton. That "something" might have been R.A.'s *lack of involvement* in warrant applications that Norton had previously swore to a magistrate that R.A. was involved in. ¶¶ 89, 106, 118. In short, Norton needed R.A. to keep secrets, and if R.A. was under arrest for selling cocaine, he might fail to keep those secrets, whether because of a mistake or in response to a reduction in his charges or sentence.

### 2. Norton's Reprimands for Misconduct with Informants – March 2011

Roughly a year later, Norton's misconduct with informants was again noted at RPD. On March 25, 2011, while Plaintiffs were wrongfully in jail, Norton was ***reprimanded for deceit in his handling of informants dating back to 2009 and 2010***. In particular, Norton was

reprimanded for his involvement in forged signatures on forms used to verify payments to confidential informants (so-called "N-10 forms") and his attempt to use informants who had not yet been established as reliable—the exact behavior that underlies the wrongful detentions in this case. ¶¶ 32, 34, 110-113. Because these were formal disciplinary actions, they undoubtedly would have come to the Defendants' attention. Regardless of which particular Defendant was supervising Norton in March 2011, the reprimand would have been placed in Norton's personnel file, thus giving all supervisors knowledge, and an ongoing reminder, of Norton's misconduct with informants. Further, not only would such disciplinary measures put a reasonable officer in the Defendants' position on notice of serious problems with Norton's handling of informants, but, when the disciplinary measures are seen against the backdrop of Norton's suspicious conduct in April 2010, the inference that Norton was engaging in deceitful conduct in relation to informants becomes much stronger. Thus, a reasonable jury could easily conclude that, in March 2011 and thereafter, the Defendants would have had knowledge sufficient to believe, and did in fact believe, that Norton regularly lied about his relationship with informants, thus creating the substantial risk persons like the Plaintiffs could have been wrongfully imprisoned.

### 3. IAD's Investigation of Norton – Probably In The Last Quarter of 2011

Not long after Norton's reprimands, Norton was again the subject of a formal inquiry into his misconduct with informants. In this instance, sometime well before July 2012 and likely in 2011, *see* ¶ 108, one of Norton's informants mentioned above—R. A.—was subjected to a recorded interview while he was in the hospital, the tape of which was later "given to 'IAD' (Internal Affairs Department)." ¶¶ 106-108. The interview concerned R.A.'s relationship with Norton and was conducted by an RPD officer as well as, in all likelihood, a member of the IAD. Therefore, Norton was on RPD's disciplinary radar in 2011 and, given the seriousness of the

investigations into his conduct, persons in supervisory roles like the Defendants would have very likely been privy to the serious problems surrounding Norton.  When combined with Norton's suspicious behavior in 2010 (which specifically involved R.A.) and Norton's disciplinary actions in 2011 (which specifically concerned his deceitful practices with informants), a reasonable jury could easily find that, in late 2011, Defendants would have had knowledge sufficient to believe, and did in fact believe, that Norton regularly lied about his relationship with informants, thus creating the substantial risk persons like the Plaintiffs could have been wrongfully imprisoned.

### 4.  Reforms to the Informant Program – Mid-2012

In August 2012, Defendant Brian Corrigan was placed in charge of RPD's confidential informant program.  His task was, quite simply, to clean it up.  And as Corrigan has admitted, there was lots of cleaning to do. In particular, there were two enormous problems with the program.  First, there was a widespread custom in the RPD of lying on N-10 forms, which are forms used to verify the identity of informants receiving payment for information.  As one of Norton's colleagues reported to the FBI, "***all the officers*** in the RPD Narcotics department" have signed an N-10 form indicating that they witnessed a payment ***without actually witnessing the payment***.  ¶ 119. The importance of witnessing a payment cannot be overemphasized.  Requiring such witnessing not only prevents financial corruption (such as the officer pocketing the fee that would normally be paid to an informant), but it also prevents officers from lying about the existence of informants to begin with.

The second major problem Corrigan faced was the program's complete failure to maintain "resume sheets."  ¶ 122.  An informant's "resume sheet" lists the assistance that the informant has provided to officers in the past, thus allowing RPD supervisors to verify that an officer's statement, for example, that "Informant X has previously provided reliable information

leading to five arrests" was actually *true*. *Id*. Obviously, if an informant program is not using resume sheets, it lacks any serious commitment to accuracy and preventing fraud.

Corrigan's installation into this position in mid-2012 shows that it was widely known at that time—and certainly at least some time prior to that—that there were serious problems in the informant program. A reasonable jury could therefore infer that, as of this time and a reasonable period of time beforehand, the Defendants had knowledge that major problems existed in the program and that those problems carried with them the risk of corruption of the exact sort Norton was engaged in. When this knowledge is combined with the Defendants' other knowledge (Norton's suspicious behavior with R.A. in 2010; Norton's reprimands in March 2011; and an IAD investigation into Norton relating to his work with an informant in late 2011), a reasonable jury could easily find that, in August 2012, the Defendants would have had knowledge sufficient to believe, and did in fact believe, that Norton regularly lied about his relationship with informants, thus creating the substantial risk that persons like the Plaintiffs could have been wrongfully imprisoned.

### 5. The Initiation of the Federal Investigation – Mid-2012 or Fall 2012

At around the same time as Corrigan was placed in charge of the confidential informant program, the Defendants were also undoubtedly aware that federal officials were investigating Norton's misconduct with informants. FBI files show interviews with RPD officials as early as October 2012, but it is quite likely that the investigation was initiated well before these recorded interviews. ¶ 115. Without a doubt, therefore, the Defendants would have had knowledge sufficient to believe, and did in fact believe, that Norton lied about his informants, thus causing persons like the Plaintiffs in this case to remain in jail and subject to other impediments to their liberty in violation of law. The initiation of the federal investigation is thus one of the most

important events in this case. It shows that, without a doubt, (1) there was strong reason to doubt the veracity of Norton's affidavits and (2) persons in supervisory roles, like the Defendants, would have certainly been made aware of this investigation. A reasonable jury thus could easily decide that, by mid- to late-2012 *at the latest*, the Defendants believed Norton lied on warrant applications about the identity of his informants, thus creating the substantial risk persons like the Plaintiffs had been wrongfully imprisoned.

### 6. Knowledge Gained Informally – Probably between Mid-2010 and Mid-2012

Beyond the five events described above, the Defendants very likely gained knowledge of Norton's problems in the way that many of us gain such knowledge—by hearing it from others. Although it is difficult to date some of these widely circulated statements about Norton, it is nonetheless reasonable to assume that these statements would have generally coincided with the events described above—dating from mid-2010 through mid-2012.

As explained in detail in the Complaint, *see* ¶¶ 49-50, 99-109, 114, widespread rumors indicated that Norton's paperwork was "garbage," that he had a cozy relationship with his informants, that he performed flagrantly illegal searches, and that he was connected to a gang that the RPD was investigating, that he was "flying too fast and too loose," and that, despite his problems, he might still be "salvageable." One of Norton's partners "blamed RPD management for NORTON's situation." ¶114. In his view, "NORTON was producing for management, *so [management] let him hang himself*." *Id.* (emphasis added). This final statement indicates that Norton's problems were well known to management, which a reasonable jury could reasonably conclude included Defendants.[2]

---

[2] Beyond all of this, the Complaint contains additional evidence of Norton's habit of deceit, including five different lies to his supervisors between July 2012 (when the federal

## B. The Defendants' Insufficient Response

The Complaint shows that, in the face of the Defendants' likely knowledge of the unconstitutional harm suffered by the Plaintiffs, the Defendants failed to take reasonable steps to prevent or alleviate that harm. Most fundamentally, their insufficient response is shown by the fact that the Plaintiffs suffered continuing harm well past the time when Norton's misconduct was first discovered. Knowledge of Norton's 2010 and 2011 incidents (whether at the time or when first seen in Norton's personnel file upon becoming his supervisor) was sufficient to require a serious intervention, whether it be a prohibition on Norton's work with informants, or, at a minimum, a prohibition on his reliance on informants in warrant applications. By late in 2012, however, the Defendants' failures were even more pronounced. In particular, while the FBI was investigating Norton, the Defendants were, as far as can be discerned, doing nothing to address the continuing harms caused by Norton.[3] The FBI's interests and the Defendants' own constitutional obligations were not well aligned, and, as a result, the Plaintiffs' constitutional

---

investigation of Norton was likely getting started) and his separation from the RPD in mid-2013. ¶¶ 35-40. All of these lies were uncovered soon after Norton told them and two of them were part of an effort to avoid appearances in court. The attempt to avoid court dates is particularly disturbing because it suggests that Norton wanted to avoid proceedings in which he would be required to testify under oath. Given that Norton left the Department in mid-2013 under a cloud of suspicion, there can be little doubt that Defendants would have been aware of these final, deceitful acts by Norton, and have further cause to doubt the legitimacy of arrests tied to him.

[3]    These continuing harms included incarceration and/or limitation on liberty associated with probation. As explained in the Complaint, Norton's misconduct led to Bravette Johnson's arrest on March 11, 2010 and a jail term ending in November 2011. This jail term was followed, however, by a period of probation and then, in 2012, a subsequent jail term of four years—the length of which was a direct result of Norton's prior misconduct. Johnson was not released from prison until on or about August 27, 2015. *See* ¶¶ 70, 80-85. With regard to Curtis Williams, the Complaint establishes that Norton's misconduct led to his arrest on July 7, 2009 and that he spent approximately 2 years and four months in jail. After his release in April 2012, Williams was subject to obligations associated with probation and even arrested on August 3, 2013 for allegedly violating his probation—a probation, of course, that was unlawful given Norton's misconduct. *See* ¶¶ 86, 94-97.

rights were sacrificed to an FBI investigation that was less concerned with their rights than discovering Norton's crimes.

In sum, the Complaint shows that the Defendants had both knowledge of harms suffered by the Plaintiffs as well as an opportunity to prevent or alleviate those harms. As explained below, and contrary to their arguments, these allegations state a claim for relief.

## ARGUMENT

Defendants Alston, Corrigan, Harrison, and Blackwell offer several arguments why they should not be held liable for the harm suffered by Plaintiffs. Each of these arguments is addressed below, but, before addressing them, it will be helpful to first explain the Plaintiffs' theory of the case as manifested in their Complaint. Such will significantly assist the Court in seeing why Plaintiffs have stated a claim for relief against Defendants.

### A. The Plaintiffs' Theory of the Case Against Defendants

The statement of facts in the previous section evinces the heart of the Plaintiffs' grievances against Defendants, which is that Defendants likely knew that Norton lied about informants, but did nothing, despite the fact that persons in the Plaintiffs' positions would be unlawfully detained. This misconduct translates into two types of claims: (1) supervisory claims and (2) non-supervisory claims.

#### 1. The Supervisory Claims

The supervisory claims against Defendants are contained in Count IV. In that claim, the Plaintiffs allege that Defendants failed to supervise Defendant Jason Norton with regard to his commission of the constitutional violations in Counts I, II and III. This, in turn, requires an understanding of what is alleged in Counts I, II and III, which is as follows:

- **Count I**: **Fourth Amendment Malicious Prosecution Claim**. Under this claim, the Plaintiffs seek relief for the periods of their detentions beginning with their indictments

and ending with their releases, because, as a result of Norton's lies in seeking search warrants, Plaintiffs were detained without probable cause and the criminal proceedings against them were terminated in their favor.

- **Count II**: **Knowing and Intelligent Plea Claim.** Under this claim, the Plaintiffs seek relief for the periods of their detentions beginning at their pleas and ending when the criminal proceedings against them were terminated in their favor. This claim is based on Norton's failure to disclose his lies during the plea process, thus depriving the Plaintiffs of the right to make a knowing and intelligent plea under *Brady v. United States*, 397 U.S. 742 (1970).

- **Count III**: **Liberty Claim under the Fourteenth and/or Eighth Amendment.** Under this claim, the Plaintiffs seek relief for the periods of their detentions beginning just after their pleas and ending when the criminal proceedings against them were terminated in their favor. This claim is based on Norton's failure to disclose his lies after the Plaintiffs pled guilty, thus depriving the Plaintiffs of the right to be free from unlawful detention.

Thus, in the supervisory claims alleged in Count IV, Plaintiffs allege that Defendants failed to take reasonable steps to prevent or alleviate the harms suffered by Plaintiffs, despite Defendants' actual or constructive knowledge that Norton would violate, was violating, or had violated the Plaintiffs' rights to: (1) be free from malicious prosecution, (2) make knowing and intelligent pleas, and (3) enjoy liberty under the Fourteenth and/or Eighth Amendment.

There are two additional points about the supervisory claims that are significant. First, although most supervisory claims involve an allegation that the supervisor knew that the subordinate would commit a violation *in the future*, Plaintiffs have also alleged here that Defendants failed to supervise *during or after* the violations. *See* ¶¶ 125-26, 142-45; *see also* ¶¶98-124. The reason for these "during or after" allegations is that the constitutional violations committed by Norton began at the time of the searches *and continued until Plaintiffs were released years later*. Thus, Defendants are liable to Plaintiffs not only because they failed to

supervise Norton *before* the violations occurred, but also during the period in which the violations were occurring or had occurred.[4]

Second, the supervisory claim refers back to Counts I, II and III *as a group*, rather than separately, because it is generally unimportant to Plaintiffs' case against Defendants which constitutional violation(s) Norton actually committed.[5]  If Norton committed the violation specified in Count I, but not in Counts II or III, Defendants would be just as liable as they would have had Norton committed the violation in Count II, but not Counts I and III.  It is the Plaintiffs' position, of course, that Norton committed the violations named in all of Counts I, II and III, but because Defendants' liability does not hinge on which one of those Counts Norton violated, it was not necessary to separately allege Defendants' liability on a count-by-count basis.  Consequently, *if the Plaintiffs state a claim in any of Counts I, II or III against Norton, they state a claim for relief in Count IV against Defendants as long as they can show that Defendants, in the face of sufficient knowledge of the violation, failed to respond appropriately.*

### 2.  The Non-Supervisory Claims

In addition to the supervisory claims in Count IV, the Plaintiffs also allege in Count VI that Defendants deprived them of their rights to liberty under the Fourteenth and/or Eighth Amendments.  These counts are similar to Count IV in that they are based on Defendants'

---

[4]     There is no reason to think that a supervisory claim only extends to prospective constitutional violations, rather than ongoing constitutional violations. Indeed, it is nonsensical to think that a supervisor could be held liable for failing to interrupt a foreseeable constitutional violation, but escape liability for failing to intervene while the violation *was actually occurring*. To the extent that this understanding of supervisory liability overlaps with bystander liability, the Plaintiffs have stated a claim on that ground as well. This issue is more fully discussed, *infra*, p. 24-25, note 15.

[5]     The only slight difference between the claims would be the length of incarceration that would be actionable against Defendants.  As the explanation of Counts I, II, and III, above, shows, the length of unlawful incarceration differs slightly between the Counts.

failures to act upon their likely knowledge, but are different in an important respect: Count VI is *not* a supervisory claim. That is, Defendants' liability in this respect does not depend on their roles as supervisors, but simply on their failures to act given their knowledge that Norton's misconduct would likely have caused persons like the Plaintiffs to be unlawfully jailed.

### B. The Plaintiffs' Claims are Not Time Barred.

Defendants' first challenge to the Plaintiffs' claims is that they are barred by the statute of limitations. The claims are time-barred, Defendants assert, because Plaintiffs were on notice of their § 1983 claims "at the time of the allegedly illegal search and seizure." Br. at 10. Alternatively, Defendants argue that Plaintiffs' 1983 claims accrued "no later than the filing of their motions to vacate." Br. at 12. Each of these arguments is meritless.

There is a cruel irony—apparently lost to Defendants—in the argument that Plaintiffs were on notice of their claims at the time of the unlawful searches and seizures. The irony is that, in defending themselves on the supervisory claims against them, Defendants repeatedly claim, in effect, "how could *we* know that Norton was lying in his warrant affidavits?" Yet, when it comes to arguing the statute of limitations, Defendants do not hesitate to argue that Plaintiffs *should have known of Norton's frauds at the time of their arrests*. One can only imagine *how* Plaintiffs were supposed to know of Norton's scheme when they were arrested. Were they supposed to see it in his eyes? Hear it in his voice? Surely not.

According to Defendants, Fourth Circuit law holds that "a plaintiff has notice of a potential Section 1983 claim at the time of the search and seizure." Br. at 10. This assertion is deeply misleading. Fourth Circuit law holds no such thing. Rather, Fourth Circuit law holds that a claim under § 1983 accrues "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." *Nasim v. Warden, Md. House of*

*Corr.,* 64 F.3d 951, 955 (4th Cir.1995) (en banc).[6] It will often be true that sufficient facts will be known to the plaintiff at the time of arrest, such as if an officer uses excessive force or searches a car without justification. But it obviously will not always be true. If an officer wiretaps a phone without a warrant, and the wiretap is not discovered until years later, the plaintiff's claim is not forever lost, but has accrued at the moment of discovery.

This simple and logical rule is almost certainly not a surprise to the Defendants because, *of the seven cases in their string-cite supporting their claim that "a plaintiff has notice of a potential Section 1983 claim at the time of the search and seizure," all seven cases follow the contrary rule explained just above.* To wit:

- *Smith v. McCarthy*, 349 F. App'x 851 (4th Cir. 2009), does not hold, as Defendants assert, that "a plaintiff has notice of a potential Section 1983 claim at the time of the search and seizure," but rather holds that *"the cause of action under § 1983 accrues 'when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action.'"* (citations omitted, emphasis added).
- *Irving v. Hall*, No. 3:16CV308, 2016 WL 6780312, at *4 (E.D. Va. Nov. 15, 2016) does not hold, as Defendants assert, that "a plaintiff has notice of a potential Section 1983 claim at the time of the search and seizure," but rather holds that *"[a] claim accrues when the plaintiff becomes aware of his or her injury, or when he or she 'is put on notice ... to make reasonable inquiry' as to whether a claim exists."* (citations omitted, emphasis added).
- *Craddock v. Fisher*, No. 3:12CV430, 2015 WL 1825720, at *4 (E.D. Va. Apr. 21, 2015) does not hold, as Defendants assert, that "a plaintiff has notice of a potential Section 1983 claim at the time of the search and seizure," but rather holds that *"[a] claim accrues when the plaintiff becomes aware of his or her injury, or when he or she 'is put on notice ... to make reasonable inquiry' as to whether a claim exists."* (citations omitted, emphasis added).
- *Keck v. Virginia*, No. 3:10CV555, 2011 WL 4589997, at *11 (E.D. Va. Sept. 9, 2011), *report and recommendation adopted*, No. 3:10CV555, 2011 WL 4573473 (E.D. Va. Sept. 30, 2011), does not hold, as Defendants assert, that "a plaintiff has notice of a potential Section 1983 claim at the time of the search and seizure," but rather holds that *a 1983 "claim accrues when the plaintiff becomes aware of his or her injury or when he*

---

[6] A somewhat different rule applies in cases where the plaintiff is incarcerated and a § 1983 action would imply the invalidity of the plaintiff's underlying conviction. That rule, established by *Heck v. Humphrey*, 512 U.S. 477 (1994), is discussed just below.

*or she is put on notice ... to make reasonable inquiry' as to whether a claim exists."* (citations omitted, emphasis added).

- *Horne v. Bailey*, No. 1:10CV641 CMH/IDD, 2010 WL 9012432, at *2 (E.D. Va. June 25, 2010), does not hold, as Defendants assert, that "a plaintiff has notice of a potential Section 1983 claim at the time of the search and seizure," but rather holds that *a 1983 action accrues when the plaintiff "possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action."* (citations omitted, emphasis added).

- *Blackmon v. Perez*, 791 F. Supp. 1086, 1090 (E.D. Va. 1992) does not hold, as the Defendants assert, that "a plaintiff has notice of a potential Section 1983 claim at the time of the search and seizure," but rather holds *a § 1983 claim accrues at "that point ... where the plaintiff knows or has reason to know of the injury which is the basis of his action."* (citations omitted, emphasis added).

In sum, Defendants' argument that the statute of limitations accrued here at the time of Plaintiffs' arrests is, as their own citations demonstrate, entirely baseless.

Defendants alternatively argue that, if Plaintiffs did not know of their claims on the days of their arrests, they must have known by the dates when the Commonwealth's Attorney sought to vacate their convictions. Br. at 12. This argument, however, ignores *Heck v. Humphrey*, 512 U.S. 477, 481 (1994), which holds that, if a plaintiff's § 1983 allegations would "necessarily imply the invalidity of his conviction or sentence," the prisoner "has no cause of action under Section 1983 unless and until the conviction is . . . invalidated." The claims here would certainly imply the invalidity of their sentences because the claims are all based on the fact that Plaintiffs should not have been incarcerated. Plaintiffs' convictions were invalidated on August 27, 2015 (Johnson) and April 12, 2016 (Williams). Because Plaintiffs filed suit on August 8, 2017, which is within two years of the invalidation of their convictions, their claims are not time barred.

### C. *Ashcroft v. Iqbal* Does Not Bar the Supervisory Claims Alleged Here.

Using only eleven words in a footnote, Defendants also argue "[s]upervisory liability *may* no longer constitute a viable Section 1983 claim" under *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

Br. at 17, n.6 (emphasis added). Defendants wisely put little stock in this argument because it misreads both *Iqbal* and Fourth Circuit precedent.

Numerous courts of appeal have evaluated *Iqbal*'s effect on supervisory claims and determined that such claims are still viable provided that the supervisor's mental state is identical to the mental state required of the subordinate. *See Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 319 (3d Cir. 2014), reversed on unrelated grounds, 135 S. Ct. 2042 (2015); *Starr v. Baca,* 652 F.3d 1202, 1207 (9th Cir. 2011); *Dodds v. Richardson*, 614 F.3d 1185, 1204 (10th Cir. 2010); *Whitson v. Stone County Jail,* 602 F.3d 920, 922, 927–28 (8th Cir. 2010); *Sandra T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010); *Sanchez v. Pereira–Castillo,* 590 F.3d 31, 49 (1st Cir. 2009). While the Fourth Circuit has not directly addressed the issue, the recent case of *Danser v. Stansberry*, 772 F.3d 340 (4th Cir. 2014), strongly suggests that the Fourth Circuit sees *Iqbal* and supervisory liability as entirely compatible. In *Danser,* the Court analyzed a Plaintiff's supervisory claim under *Iqbal* and then separately analyzed the claim under the Fourth Circuit's supervisory liability doctrine established in *Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir.1994). If supervisory liability is no longer viable after *Iqbal*, then *Danser* makes absolutely no sense. The Defendants' half-hearted argument under *Iqbal* should thus be rejected.

**D. The Defendants are Properly Suable as Supervisors.**

Defendants next claim that, because they "were not responsible for Norton at or around the time of Plaintiffs' respective arrests," Plaintiffs' claims must fail. Br. 13. In support of this, Defendants cite *Brown v. Poplin*, 3:10cv565, 2011 WL 5119483 (W.D.N.C. Oct. 27, 2011), as support for "black letter law" that "a plaintiff cannot bring a Section 1983 claim for supervisory liability where the named defendant was not a supervisor at the time of the events on which the claim is based." Br. 13. The plaintiff in *Brown* alleged that a defective investigation caused his

conviction for murder and accused the sheriff of failing to re-investigate the crime. There were two problems with the claim, however: (1) the sheriff was not in office during the original investigation and (2) the sheriff, while he was in office, had no "notice that the charges against plaintiff should have been reinvestigated." *Id*. at *8. Thus, directly contrary to Defendants' reading of *Brown*, the sheriff's lack of supervisory status "at the time of the events on which the claim is based" ***was not solely dispositive of the sheriff's supervisory liability***. Br. at 13. It is hard to see, therefore, how *Brown* illustrates "black letter law" holding that "a plaintiff cannot bring a Section 1983 claim for supervisory liability where the named defendant was not a supervisor at the time of the events on which the claim is based." *Id*. What *Brown* instead illustrates, is that where a supervisor is on "notice that the charges against plaintiff should have been reinvestigated," supervisory liability is actionable. *Brown*, 2011 WL 5119483 at *8.

Given *Brown*'s actual holding, it is clear that Defendants are not immune from liability simply because they were not Norton's supervisors during either or both arrests. Regardless of their status as supervisors at the time of the arrests, Defendants were supervisors of Norton at a time when there was reason to believe that Norton had "engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff[s]." *Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir. 1994). For example, the Complaint alleges that Alston supervised Norton during 2012 and 2013, *see* ¶ 16; Corrigan supervised Norton during 2012 and 2013, *see* ¶ 17; Harrison supervised Norton from in or about 2011 through at least March 2013, ¶ 18; and Blackwell supervised Norton from in or about 2009 through 2011. ¶ 19. Thus, Alston, Corrigan and Harrison all supervised Norton during 2012 and 2013—a period in which, as explained in the Statement of Facts, there was *substantial* reason for Norton's supervisors (i.e., persons who would have regularly reviewed Norton's personnel file) to believe that Norton had

lied about his confidential informants and that persons <u>had</u> been unlawfully imprisoned as a result.  *See* ¶¶ 115, 121-126.  Defendant Blackwell, who *did* supervise Norton during Plaintiffs' arrests and who Defendants do not contend is categorically immune from a supervisory claim, Br. at 14-15 (not addressing Blackwell), would likewise have had knowledge of Norton's misconduct from 2009 to 2011 and therefore have had reason to question the lawfulness of persons detained pursuant to Norton's informant-based arrests.

### E.  The Complaint Alleges that the Defendants Acted Personally to Deprive the Plaintiffs of Their Constitutional Rights.

Defendants next argue that "Plaintiffs have not, and cannot, allege that [Defendants] acted personally in any alleged deprivation of rights." Br. at 15.  This argument is meritless because it is based on an erroneous understanding of what it means, as a matter of constitutional law, to "act personally" in connection with the harms suffered here.

The crux of the flaw in Defendants' argument can be illustrated with the following question: if a supervisor comes to know that one of his subordinate officers obtained search warrants using made-up informants, that the subordinate still had not come clean about the frauds, and that persons were very likely unlawfully in jail as a result, *and the supervisor does nothing,* is the supervisor personally involved with the unlawful detention?  The answer, one hopes, is obvious. When a supervisor gains knowledge of the sort alleged in the Complaint, *the* supervisor **becomes** personally involved.  At that point, the supervisor simply cannot wipe his hands of the knowledge and say, "well, I wasn't around for the arrest, so I have no duty to act."

This hypothetical is simply a colloquial way of stating the law of supervisory liability, which imposes a duty on a supervisor to act when he has "*knowledge* that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff."  *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation

marks omitted, emphasis added). The Complaint plausibly alleges that Defendants had such knowledge, and, because the doctrine of supervisory liability imposes a constitutional duty to act upon such knowledge, Plaintiffs have properly alleged that Defendants acted personally to deprive the Plaintiffs of their constitutional rights.

**F. The Supervisory Claims are Not Defeated by Intervening Causes.**

Using four different arguments, Defendants claim that Plaintiffs' supervisory claims are defeated by intervening causes. None of the arguments has any merit.

### 1. Post-Arrest Conduct, as well as "Isolated Events Separated by Months or Years," Support Supervisory Liability.

Defendants first argue that "...the bulk of Plaintiffs' allegations detail conduct that occurred *after* Plaintiffs' arrests, not before. Plaintiffs cannot support a claim for supervisory liability by citing incidents that occurred *after* the alleged constitutional violation." Br. at 18 (emphasis in original). The error in this argument is that it assumes that the only actionable misconduct here is the arrests themselves. That is not true, however. Count IV, the supervisory claim against Defendants, alleges that Defendants had knowledge that, among other things, "(1) Jason Norton posed a pervasive and unreasonable risk of committing constitutional violations identified above in Counts I, II and III, and/or (2) Jason Norton was committing constitutional violations identified above in Counts I, II and III, and/or (3) Jason Norton had committed constitutional violations identified above in Counts I, II and III." ¶ 143. Counts I, II, and III include the malicious prosecution count, the knowing and intelligent plea count, and the liberty count. ¶¶ 127-141. The supervisory claim against Defendants thus alleges wrongful conduct lasting far beyond the arrests themselves. Most prominently, Plaintiffs' unlawful incarcerations lasted beyond their arrests. If, as the Complaint alleges, post-arrest events put Defendants on

further notice of Norton's continuing constitutional violations, the post arrest events are clearly relevant to the supervisory claims.

Defendants also argue that supervisory liability is inappropriate here because the events permitting an inference of knowledge were separated by months or even years. Of course, there is no "isolated events" rule in the law of supervisory liability, so Defendants' argument comes down to the following: no reasonable jury could infer from the facts alleged that Defendants had knowledge of Norton's unconstitutional behavior. The events giving rise to Defendants' knowledge are identified above in the Statement of Facts, but it is worth noting here that several of the events, although separated in time, would have appeared in Norton's personnel file—a file with which Norton's supervisors would have been quite familiar. Moreover, and quite importantly, the initiation of a federal investigation into Norton sometime in the late summer or early fall of 2012, whether labeled an "isolated" event or not, would *by itself* have put the Defendants on notice that there was a significant risk that persons in the Plaintiffs' position had suffered or were suffering constitutional injury because of Norton.

**2. The "Remediating Action" Noted by the Defendants Does Not Demonstrate That They Sufficiently Responded.**

Defendants also argue that they were not deliberately indifferent because they sufficiently responded to the risks posed by Norton. This "sufficient response," according to the Defendants, was Norton's reprimands in March 2011. Br. at 20-21. Putting aside the fact that most of the Defendants here were not involved in the reprimand (and thus cannot claim it as a sufficient response), a reasonable jury could easily conclude from the facts alleged that Defendants did not sufficiently respond to Norton's problems. *Reprimanding* Norton in 2011 is hardly a sufficient response to Defendants' knowledge that, because of Norton, persons were likely unlawfully in

jail. A sufficient response to *that* constitutional violation would have consisted of efforts to secure the release of the wrongfully jailed.  But Defendants can point to no such action.[7]

### 3. The Fruit of Poisonous Tree Doctrine Should Apply to Supervisory Liability Based on the Malicious Prosecution Claim.

Defendants alternatively argue that "Plaintiffs' entire theory of liability hinges on the fruit of the poisonous tree doctrine, which was never intended to apply in the civil context." Br. at 22. The fruit of the poisonous tree doctrine is addressed below, but, as an initial matter, it is *not* true that Plaintiffs' "entire theory of liability" depends on the fruit of the poisonous tree doctrine.  In fact, only Plaintiffs' malicious prosecution claim depends on that doctrine.  The Plaintiffs' knowing and intelligent plea claims, as well as their liberty claims under the Eighth and/or Fourteenth Amendment, are actionable without regard to the fruit of the poisonous tree doctrine, and supervisory liability thus may be imposed regardless of the doctrine's applicability.

With regard to the doctrine's applicability in the malicious prosecution context, the Plaintiffs acknowledge that several circuits have held that the fruit of the poisonous tree doctrine (which works in tandem with the exclusionary rule) does not apply in certain § 1983 cases.  The prevailing logic in these cases is that "[t]he cost of applying the exclusionary rule in [the § 1983] context is significant ... [a]nd the deterrence benefits are miniscule." *Black v. Wiggington*, 811 F.3d 1259, 1268 (11th Cir. 2016); *see also Townes v. City of New York*, 176 F.3d 138, 148 (2d Cir. 1999) (explaining that applying the exclusionary rule in § 1983 cases "would vastly over deter police officers and would result in a wealth transfer that is peculiar, if not perverse"); *Wren v. Towe*, 130 F.3d 1154, 1158 (5th Cir. 1997) (per curiam); *Hector v. Wyatt*, 235 F.3d 154, 159

---

[7]     Defendants also argue here that Plaintiffs have not adduced a pattern of misconduct occurring before their arrests that would have put Defendants on notice of Norton's problems. Br. at 21. This argument assumes, however, that the sole constitutional harm here was the arrests. As explained above, this assumption is mistaken.  *See* Argument Section, Part E.

(3rd Cir. 2000) (refusing to apply exclusionary rule because an "officer who took a frisk one modest step too far could face vast liability"); *Lingo v. City of Salem,* 832 F.3d 953 (9th Cir. 2016) (noting that the exclusionary rule should apply "only where its deterrence benefits outweigh its substantial social costs").

Crucially, however, no circuit court has confronted the circumstances presented here— namely, ***a detention arising from the intentional deceit of a magistrate by a police officer.*** In such a case, there is good reason to think that the rule's "deterrence benefits [*would*] outweigh its substantial social costs." *Lingo*, 832 F.3d at 958. The different balance of costs and benefits arises from the fact that ***the exclusionary rule has little deterrent effect on officers who are willing to lie to obtain or preserve an arrest.*** This has been common knowledge for years in the field of law enforcement—so common, in fact, that officers in New York City had their own term for it: "testilying."[8] "Testilying" arose largely as a result of the Supreme Court's decision in *Mapp v. Ohio*, 347 U.S. 643 (1961), which extended the exclusionary rule to state criminal proceedings. Before *Mapp*, officers were likely to admit that they found the contraband on the suspect's person or at his residence—even if the search of the person or place was unconstitutional. Without the exclusionary rule, there was no reason to pretend otherwise. But after *Mapp* came down, there was a "suspicious rise" in so-called "dropsy" cases—cases in which "officers alleged that the defendant dropped the contraband on the ground."[9]

---

[8]     MILTON MOLLEN ET AL.,COMM'N TO INVESTIGATE ALLEGATIONS OF POLICE CORRUPTION AND THE ANTI-CORRUPTION PROCS. OF THE POLICE DEP'T, CITY OF N.Y., ANATOMY OF FAILURE: A PATH FOR SUCCESS 36 (1994).

[9]     Comment, *Effect of* Mapp v. Ohio *on Police Search-and-Seizure Practices in Narcotics Cases*, 4 COLUM. J.L. & SOC. PROBS. 87, 95 (1968); *see also* Irving Younger, *The Perjury Routine*, Nation, May 8, 1967, at 597 (explaining that, after *Mapp*, "police made the great discovery that if the defendant drops the narcotics on the ground, after which the police man arrests him, the search is reasonable and the evidence is admissible."

The phenomenon of "testilying" did not tail off once *Mapp* was absorbed into the legal landscape. For example, in 1994, a blue-ribbon commission charged with studying corruption in the New York City Police Department concluded that "testilying" was "probably the most common form of police corruption, particularly in connection with arrests for possession of narcotics and guns."[10] And more recent studies confirm that the problem is still wide-spread.[11]

Thus, in contrast to the criminal setting, applying the exclusionary rule (and its component, the fruit of the poisonous tree doctrine) in the civil setting in a case where an officer has intentionally defrauded the legal system actually ***creates deterrence where little existed before***. An officer like Norton, for whom the exclusionary rule was apparently of no consequence in the criminal context because he was already willing to simply fabricate "evidence" and repeatedly lie to magistrates to "justify" searches, might not be so keen to continue to do so if he faced personal civil liability for such actions.[12]

Of course, the value of such deterrence is not sufficient on its face to justify the rule, for the rule could be outweighed by costs to law enforcement, and, thus, society as a whole. Such costs, however, would be extraordinarily limited because they would be borne mainly by officers who insisted on willfully deceiving a magistrate. Such limitations are entirely appropriate because the vast majority of law enforcement officers are honest, diligent, and dedicated to the public good—*and are not going to intentionally deceive*. Like all fields of work, however, a few

---

[10]     MOLLEN ET AL., at 36.
[11]     Christopher Slobogin, *Testilying: Police Perjury and What to Do About It*, 67 COLO. L. REV. 1037, 1041-48 (1996) ("Whether it is conjecture by individual observers, a survey of criminal attorneys, or a more sophisticated study, the existing literature demonstrates a widespread belief that testilying is a frequent occurrence.").
[12]     Indeed, the importance of deterrence through a § 1983 action is magnified here because another major tool of deterrence—criminal punishment—is apparently not in play. Norton has not been charged with any crimes.

will occasionally stray from the straight and narrow. When that occurs in the policing context, and liberty is consequently lost, *some* amount of deterrence is needed to protect the public. Indeed, the need for deterrence is particularly appropriate in this context because Norton has never been charged with any crime—even though he quite plainly perjured himself over and over again. Thus, applying the exclusionary rule in the civil setting will provide appropriate—and in this case the *only*—deterrence.

The only court to apparently confront an issue like that presented here is the Northern District of Oklahoma in *Williams v. City of Tulsa*, 2016 WL 1572957 (N.D. Okla. Apr. 19, 2016). Importantly, however, the court in *Williams* did not face the argument that Plaintiffs advance here,[13] which is that, although the exclusionary rule may not be appropriate in the majority of § 1983 actions, it is entirely appropriate—**even essential**—in cases like that presented here. Given that *Williams* does not consider the need for deterrence in cases of "testilying," the case is of limited use to this Court.

In sum, this Court should apply the exclusionary rule in this case of intentional police officer deceit because, under the logic of the rule, its benefits outweigh its costs. No binding precedent suggests otherwise and this case presents the Court with a unique opportunity to better articulate the role of the exclusionary rule in § 1983 cases.

G. **The Complaint States a Claim for Deprivation of Liberty under the Eighth and/or Fourteenth Amendments.**

---

[13] The court's opinion in *Williams* was issued as part of its ruling in a bench trial. The Court invited the parties to submit briefs before ruling, and, although the defendant argued the exclusionary rule should not apply in § 1983 cases, the plaintiff did not address the issue at all. *See Williams v. Henderson*, 2016 WL 3566093 (N.D.Okla.) (defendant's brief); *Williams v. Henderson*, 2016 WL 3566057 (N.D.Okla.) (plaintiff's brief).

Defendants alternatively argue that Plaintiffs' deprivation of liberty claim is not actionable because "the Complaint is completely devoid of any allegation that *any* of the named Officers participated personally in Plaintiffs' searches, arrests, prosecutions, guilty pleas or incarcerations." Br. at 24. The error in this argument, as has already been discussed above, is that Defendants ***became personally involved when they acquired actual or constructive knowledge that persons situated as the Plaintiffs were in jail but nonetheless entitled to release***. It is thus completely irrelevant whether Defendants "knew about the search warrants at issue or were aware of Plaintiffs' arrests," as Defendants argue. *Id*. To reiterate the point made above, if a state actor learns that someone, or a class of persons, is unlawfully in jail, the actor is obligated *to do something*. The state actor need not conduct a midnight jailbreak in the cause of liberty, or begin a personal political crusade, but he must do *something*.

It is worth noting in conclusion that Defendants' argument here would apparently apply to a prisoner on death row. Thus, in their view, if a "dead man walking" is on his way to the death chamber, and they learned that the man's incarceration and impending death were unlawful because of a flawed arrest, they could lawfully stay quiet and witness the execution because they did not know "about the search warrant[] at issue or were aware of [the man's] arrest[]." Br. 24. The United States Constitution is not so callous as to permit this tragedy.[14]

---

[14]    Defendants entertain the possibility that Plaintiffs' claims may ring in bystander liability, but ultimately dismiss that possibility. Br. at 24. Even if Plaintiffs' liberty claims are characterized as bystander claims, however, they still state a claim for relief. The Complaint contains numerous allegations that would allow a reasonable jury to infer that Defendants had actual knowledge that Norton had lied in his application for search warrants—especially once the federal investigation was underway. Such lies rendered Plaintiffs' incarcerations unlawful, thus imposing on Norton a duty to come clean about his frauds. Norton's failure to come clean amounted to a violation of the Plaintiffs' Fourteenth and/or Eighth Amendment rights—a violation of which Defendants would have been aware as bystanders. Defendants had a "reasonable opportunity to prevent the harm" but "chose not to act." As such, even if the

**H. The Complaint States a Claim for Supervisory Liability Based on Malicious Prosecution.**

Defendants advance several arguments against their liability for malicious prosecution, but mistakenly assume that Plaintiffs allege that Defendants *themselves* engaged in malicious prosecution. This is not true. Plaintiffs allege that Defendants are liable because they *supervised* a person who committed malicious prosecution, had actual or constructive knowledge of the substantial risk that their subordinate would engage or had engaged in malicious prosecution, and failed to reasonably respond.

Defendants acknowledge that Plaintiffs' allegations against them may be supervisory in nature, not direct. *See* Br. at 27, n.9. Such supervisory claims nonetheless fail, they argue, for the reasons stated in Section II of their brief (which argues that the statute of limitations bars the Plaintiffs' claims, Br. 10-13), Section III of their brief (which argues that Defendants did not supervise Norton during the time of Plaintiffs' arrests, Br. at 13-15) and Section IV of their brief (which argues that Defendants did not "personally" deprive Plaintiffs of their rights, Br. at 15-17). These arguments have been addressed above. *See supra* Arg. Part B (addressing arguments in Part II of Defendants' brief); Arg. Part D (addressing arguments in Part III of Defendants' brief) and Arg. Part E (addressing arguments in Part IV of Defendants' brief).

**I. The Defendants Are Not Entitled to Qualified Immunity.**

Defendants finally argue that they are entitled to qualified immunity because the "Complaint offers no indication how any reasonable officer, including Lt. Corrigan, Lt. Alston,

---

Plaintiffs' supervisory claim is framed as a bystander claim, it still states a claim upon which relief can be granted. See *Stevenson v. City of Seat Pleasant, Md.*, 743 F.3d 411, 417 (4th Cir. 2014) ("To succeed on a theory of bystander liability, a plaintiff must demonstrate that a law-enforcement officer (1) knew that a fellow officer was violating an individual's constitutional rights; (2) had a reasonable opportunity to prevent the harm; and (3) chose not to act.") (internal quotation marks and modifications omitted).

Cpt. Blackwell and Cpt. Harrison, would have known that any of Plaintiffs' constitutional rights were violated." Br. at 30. This argument is without merit.

With regard to the supervisory claim based on malicious prosecution (Count IV), the Defendants are not entitled to qualified immunity. In this context, as with all qualified immunity issues, the question before the Court is whether Defendants made "bad guesses in gray areas," *Wilson v. Kittoe,* 337 F.3d 392, 403 (4th Cir. 2003). If, as the Complaint plausibly alleges, the Defendants had actual or constructive knowledge that Norton was playing "too fast and too loose" with his search warrants near the time of Plaintiffs' arrests, then Defendants hardly faced a difficult decision in a "gray area." Rather, they faced an obvious duty in a black-and-white context: the duty to speak up. But Defendants did not do that. They therefore may not take refuge in the defense of qualified immunity.

Next, with regard to the supervisory claim for Plaintiffs' deprivation of the right to make a knowing and intelligent plea (Counts IV), Defendants also were not acting in a "gray area." If the Complaint's plausible allegations are taken as true, as they must be here, it is clear that Defendants failed to act despite having actual or constructive knowledge of Norton's misconduct. The failure to act in this context was not a close call; it was a duty established by *Brady v. United States*, 397 U.S. 742 (1970), which plainly holds that an officer's misrepresentation can render a guilty plea invalid. *Fisher v. United States*, 711 F.3d 460 (4th Cir. 2013) did not establish new law in this regard, but simply applied the plain holding of *Brady*: which is that, by withholding lies underlying a search warrant, an officer engages in misrepresentation under *Brady*. Given this, Defendants are not entitled to qualified immunity.

Finally, with regard to the supervisory claim for the deprivation of Plaintiffs' liberty (Count IV), and the direct claim for the deprivation of Plaintiffs' liberty (Count VI), Defendants

also may not claim refuge in the doctrine of qualified immunity. *Golson v. Department of Corrections*, 914 F.2d 1491 (4th Cir. 1990) demonstrates that clear law existed on this issue at the time of the Defendants' violations. The court in *Golson* stated as clearly as possible that, when a person has reason to believe that someone is in jail but ought not to be, that person has a duty to act. To the extent Defendants might contend that *Golson* is not sufficiently similar to the case at hand, it is important to note that "'the nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent denial of qualified immunity.'" *Id*. at 403 (internal quotation marks omitted). This is because the goal of qualified immunity is to "ensure that before they are subjected to suit, officers are on *notice* their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (emphasis added) (quoting *Saucier v. Katz,* 533 U.S., at 206); *see also Ridpath v. Bd. of Governors Marshall Univ.,* 447 F.3d 292, 313 (4th Cir.2006) ("the lodestar for whether a right was clearly established is whether the law 'gave the officials 'fair warning' that their conduct was unconstitutional'") (quoting *Hope*, 536 U.S. at 741); see also *Wilson*, 337 F.3d at 403 (quoting *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001) (Michael, J., concurring)). ("[Q]ualified immunity was never intended to relieve government officials from the responsibility of applying familiar legal principles to new situations."). It is a certainly a "familiar legal principle[]" that, where a police officer lies and persons are detained as a result of those lies, the Constitution has been violated, and persons aware of these lies would hardly find themselves in uncharted terrain as to whether to speak up or stay quiet. No reasonable officer could think that the Constitution permitted him to stay quiet.

## CONCLUSION

For the reasons stated above, the Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss in its entirety.

Respectfully submitted,

BRAVETTE JOHNSON and
CURTIS WILLIAMS

By:      /s/ Mark J. Krudys     
Counsel

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
919 E. Main Street, Suite 2020
Richmond, VA 23219
Phone: (804) 774-7950
Email: mkrudys@krudys.com

John Frederick Preis (VSB# 45764)
7719 Rock Creek Road
Henrico, VA 23229
Phone: (804) 289-8682
Email: jpreis@richmond.edu

Amy L. Austin (VSB# 46579)
THE LAW OFFICE OF AMY L. AUSTIN, P.L.L.C.
101 Shockoe Slip, Suite M
Richmond, VA 23219
Phone: (804) 343-1900
Email: amyaustinlawyer@gmail.com

*Counsel for Plaintiffs Bravette Johnson and Curtis Williams*

## CERTIFICATE OF SERVICE

I certify that on November 3, 2017, I electronically filed the foregoing document with the

Clerk of Court using the CM/ECF system, which will send notification of such filing to all

registered users.

By:   /s/ Mark J. Krudys

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 E. Main Street, Suite 2020
Richmond, VA  23219
Phone: (804) 774-7950
Fax: (804) 381-4458
Email: mkrudys@krudys.com
Web: www.krudys.com