**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

**BRAVETTE JOHNSON and
CURTIS WILLIAMS,**

    **Plaintiffs,**

             **Civil Action No. 3:17-CV-00553-MHL**

v.

**CITY OF RICHMOND, *et al.*,**

    **Defendants.**

**PLAINTIFFS' OPPOSITION TO DEFENDANTS
<u>GLEASON, SIPPLE, AND RUSSELL'S RULE 12(b)(6) MOTION TO DISMISS</u>**

   Defendants Christopher Gleason, Charles Sipple, and Roger Russell (collectively referred to as "the Defendants") have moved this Court to dismiss the claims against them. For the reasons stated below, the Court should deny the motion in its entirety.

<u>**STATEMENT OF FACTS**</u>

   The underlying facts of this case are no doubt familiar to the Court by now. Jason Norton, an officer with the Richmond Police Department ("RPD") from 2004 through 2013, lied in numerous applications for search warrants by attributing his knowledge of alleged criminal activity to an incorrect informant who did not exist or was not reliable. This scheme landed the Plaintiffs in jail and they have now brought suit for relief. In addition to Norton, the Plaintiffs seek relief from Defendants Gleason, Sipple and Russell (as well as other Norton supervisors), based on (1) their knowledge of Norton's misconduct and (2) their failure to act upon that knowledge.

## A. The Defendants' Knowledge

Whether the Defendants violated the Constitution depends in significant part on what they knew and when they knew it.[1] Thus, what follows is a chronological review of the events and circumstances that would establish their knowledge. In evaluating the information below, it is important to keep in mind the type of knowledge that matters in this case. Under *Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir.1994), what matters is whether the Defendants had "knowledge that [Norton] . . . engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff[s]." Importantly, the law does not require the Plaintiffs to show that the Defendants knew *for sure* that Norton had lied on search warrants and caused the unlawful detention of numerous persons, but simply that the Defendants knew that Norton engaged in conduct that posed a "pervasive and unreasonable risk" of constitutional injury. The information below strongly supports the reasonable inference that *the Defendants knew that Norton regularly lied about his dealings with informants which, because informants are regularly used to obtain warrants, posed a "pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff[s]."*

### 1. Norton's Tip Off and the RAVE Report – April 2010

In April 2010, federal officers encountered highly suspicious activity by Norton in connection with one of Norton's informants. This suspicious activity is recounted in detail in the

---

[1] Relevant to Defendants' knowledge, but in no way dispositive of it, is the terms of their supervision over Norton. Defendant Gleason served as Norton's Direct Supervisor from 2009 through approximately June 2012. Complaint ¶13. (unless otherwise stated, all ¶ references herein are to the Complaint). Defendant Sipple served as Norton's Intermediate Supervisor during the period from in or before 2008 through, upon information and belief, April 2011. ¶14. Defendant Russell was also responsible for supervising Jason Norton from July 2007 through April 2011. In addition, Russell served as the Head of the RPD's Special Investigations Division. ¶15. Per his LinkedIn page, from April 2011 to the present, Defendant Russell has served as "Officer in Charge" of the RPD's Internal Affairs Division. *Id.*

Complaint, *see* ¶¶ 42-49, but briefly, the officers arrested an informant (1) who Norton first tried to persuade the officers not to arrest and who, when Norton was unsuccessful, (2) Norton tipped off through a phone call just prior to the arrest, attempting to assure that the arrest would not occur. The FBI agents involved in these events thought them so suspicious that they wrote a report focused specifically on Norton's behavior—a report that was made part of the official files of the RAVE Task force, a joint task force between the FBI and the RPD. ¶ 48. If federal officials thought it was important to formally record this event in the RAVE files, there can be little doubt that the event was shared and/or discussed among supervisors as well as placed in Norton's personnel file—thus putting the Defendants on notice that Norton had suspicious and deceitful dealings with informants. In particular, an eminently reasonable inference from Norton's conduct is that Norton was scared that R.A., when arrested, would say something that he wasn't supposed to—something about his illicit dealings with Norton. That "something" might have been R.A.'s *lack of involvement* in warrant applications that Norton had previously sworn to a magistrate that R.A. was involved in. ¶¶ 89, 106, 118. In short, Norton needed R.A. to keep secrets, and if R.A. was under arrest for selling cocaine, he might fail to keep those secrets, whether because of a mistake or in response to a reduction in his charges or sentence.

### 2. Norton's Reprimands for Misconduct with Informants – March 2011

Roughly a year later, Norton's misconduct with informants was again noted at RPD. On March 25, 2011—while Plaintiffs were wrongfully in jail—Norton was ***reprimanded for deceit in his handling of informants dating back to 2009 and 2010***. In particular, Norton was reprimanded for his involvement in forged signatures on forms used to verify payments to confidential informants (so-called "N-10 forms") and his attempt to use informants who had not yet been established as reliable—the exact behavior that underlies the wrongful detentions in this

case. ¶¶ 32, 34, 110-113. Because these were formal disciplinary actions, they undoubtedly would have come to the Defendants' attention. Regardless of which particular Defendant was supervising Norton in March 2011, the reprimand would have been placed in Norton's personnel file, thus giving all supervisors knowledge, and an ongoing reminder, of Norton's misconduct with informants. Further, not only would such disciplinary measures put a reasonable officer in the Defendants' position on notice of serious problems with Norton's handling of informants, but, when the disciplinary measures are seen against the backdrop of Norton's suspicious conduct in April 2010, the inference that Norton was engaging in deceitful conduct in relation to informants becomes much stronger. Thus, a reasonable jury could easily conclude that, in March 2011 and thereafter (if not before), Defendants would have had knowledge sufficient to believe, and did in fact believe, that Norton regularly lied about his relationship with informants, thus creating the substantial risk persons like Plaintiffs could have been wrongfully imprisoned.

### 3. IAD's Investigation of Norton – Probably In The Last Quarter of 2011

Not long after Norton's reprimands, Norton was again the subject of a formal inquiry into his misconduct with informants. In this instance, sometime well before July 2012 and likely in 2011, *see* ¶108, one of Norton's informants mentioned above—R. A.—was subjected to a recorded interview while he was in the hospital, the tape of which was later "given to 'IAD' (Internal Affairs Department)." ¶¶ 106-08. The interview concerned R.A.'s relationship with Norton and was conducted by an RPD officer as well as, in all likelihood, a member of the IAD. Therefore, Norton was on RPD's disciplinary radar in 2011 and, given the seriousness of the investigations into his conduct, persons in supervisory roles like the Defendants would have very likely been privy to the serious problems surrounding Norton. When combined with Norton's suspicious behavior in 2010 (which specifically involved R.A.) and Norton's disciplinary actions

in 2011 (which specifically concerned his deceitful practices with informants), a reasonable jury could easily find that, in late 2011, the Defendants would have had knowledge sufficient to believe, and did in fact believe, that Norton regularly lied about his relationship with informants, thus creating the substantial risk persons like Plaintiffs could have been wrongfully imprisoned.

### 4. Reforms to the Informant Program – Mid-2012

In August 2012, Brian Corrigan was placed in charge of RPD's confidential informant program. His task was, quite simply, to clean it up. And as Defendant Corrigan has admitted, there was lots of cleaning to do. In particular, there were two enormous problems with the program. First, there was a widespread custom in the RPD of lying on N-10 forms, which are forms used to verify the identity of informants receiving payment for information. As one of Norton's colleagues reported to the FBI, "***all the officers*** in the RPD Narcotics department" have signed an N-10 form indicating that they witnessed a payment ***without actually witnessing the payment***. ¶ 119. The importance of witnessing a payment cannot be overemphasized. Requiring such witnessing not only prevents financial corruption (such as the officer pocketing the fee that would normally be paid to an informant) but it also prevents officers from lying about the existence of informants to begin with.

The second major problem Corrigan faced was the program's complete failure to maintain "resume sheets." ¶ 122. An informant's "resume sheet" lists the assistance that the informant has provided to officers in the past, thus allowing RPD supervisors to verify that an officer's statement, for example, that "Informant X has previously provided reliable information leading to five arrests" was actually *true*. *Id*. Obviously, if an informant program is not using resume sheets, it lacks any serious commitment to accuracy and preventing fraud.

Corrigan's installation into this position in mid-2012 shows that it was widely known at that time - and certainly at least some time prior to that- that there were serious problems in the informant program. A reasonable jury could thus infer that, as of this time and a reasonable period of time beforehand, Defendants had knowledge that major problems existed in the program and that those problems carried with them the risk of corruption of the exact sort Norton was engaged in. When this knowledge is combined with Defendants' other knowledge (Norton's suspicious behavior with R.A. in 2010; Norton's reprimands in March 2011; and an IAD investigation into Norton relating to his work with an informant in late 2011), a reasonable jury could easily find that, in August 2012, Defendants would have had knowledge sufficient to believe, and did in fact believe, that Norton regularly lied about his relationship with informants, thus creating the substantial risk that persons like Plaintiffs could have been wrongfully imprisoned.

### 5. The Initiation of the Federal Investigation – Mid-2012 or Fall 2012

At around the same time as Corrigan was placed in charge of the confidential information program, the Defendants were also undoubtedly aware that federal officials were investigating Norton's misconduct with informants. FBI files show interviews with RPD officials as early as October 2012, but it is quite likely that the investigation was initiated well before these recorded interviews. ¶ 115. Without a doubt, therefore, the Defendants would have had knowledge sufficient to believe, and did in fact believe, that Norton lied about his informants, thus causing persons like the Plaintiffs in this case to remain in jail and subject to other impediments to their liberty in violation of law. The initiation of the federal investigation is thus one of the most important events in this case. It shows that, without a doubt, (1) there was strong reason to doubt the veracity of Norton's affidavits and (2) persons in supervisory roles, like the Defendants,

would have certainly been made aware of this investigation. A reasonable jury thus could easily decide that, by mid- to late-2012 *at the latest*, the Defendants believed Norton lied on warrant applications about the identity of his informants, thus creating the substantial risk persons like the Plaintiffs had been wrongfully imprisoned.

### 6. Knowledge Gained Informally – Probably between Mid-2010 and Mid-2012

Beyond the five events described above, the Defendants very likely gained knowledge of Norton's problems in the way that many of us gain such knowledge—by hearing it from others. Although it is difficult to date some of these widely circulated statements about Norton, it is nonetheless reasonable to assume that these statements would have generally coincided with the events described above—dating from mid-2010 through mid-2012.

As explained in detail in the Complaint, *see* ¶¶ 49-50, 99-109, 114, widespread rumors indicated that Norton's paperwork was "garbage," that he had a cozy relationship with his informants, that he performed flagrantly illegal searches, that he was connected to a gang that the RPD was investigating, that he was "flying too fast and too loose," and that, despite his problems, he might still be "salvageable." One of Norton's partners "blamed RPD management for NORTON's situation." ¶ 114. In his view, "NORTON was producing for management, *so [management] let him hang himself*." *Id*. (emphasis added). This final statement indicates that Norton's problems were well known to management, which a reasonable jury could reasonably conclude included Defendants.[2]

---

[2]     Beyond all of this, the Complaint contains additional evidence of Norton's habit of deceit, including five different lies to his supervisors between July 2012 (when the federal investigation of Norton was likely getting started) and his separation from the RPD in mid-2013. ¶¶ 35-40. All of these lies were uncovered soon after Norton told them and two of them were part of an effort to avoid appearances in court. The attempt to avoid court dates is particularly disturbing because it suggests that Norton wanted to avoid proceedings in which he would be required to testify under oath. Given that Norton left the Department in mid-2013 under a cloud

**B. The Defendants' Insufficient Response**

The Complaint shows that, in the face of the Defendants' likely knowledge of the unconstitutional harm suffered by the Plaintiffs, the Defendants failed to take reasonable steps to prevent or alleviate that harm. Most fundamentally, their insufficient response is shown by the fact that the Plaintiffs suffered continuing harm well past the time when Norton's misconduct was first discovered. Defendants' knowledge in 2010 and 2011 was sufficient to require a serious intervention, whether it be a prohibition on Norton's work with informants or, at a minimum, a prohibition on his reliance on informants in warrant applications. By late in 2012, however, the Defendants' failures were even more pronounced. In particular, while the FBI was investigating Norton, the Defendants were, as far as can be discerned, doing nothing to address the continuing harms caused by Norton.[3] The FBI's interests and the Defendants' own constitutional obligations were not well aligned and, as a result, the Plaintiffs' constitutional rights were sacrificed to an FBI investigation that was less concerned with their rights than discovering Norton's crimes.

---

of suspicion, there can be little doubt that Defendants would have been aware of these final, deceitful acts by Norton, and have further cause to doubt the legitimacy of arrests tied to him.

[3] These continuing harms included incarceration and/or limitation on liberty associated with probation. As explained in the Complaint, Norton's misconduct led to Bravette Johnson's arrested on March 11, 2010 and a jail term ending in November 2011. This jail term was followed, however, by a period of probation and then, in 2012, a subsequent jail term of four years—the length of which was a direct result of Norton's prior misconduct. Johnson was not released from prison until on or about August 27, 2015. *See* ¶¶ 70, 80-85. With regard to Curtis Williams, the Complaint establishes that Norton's misconduct led to his arrest on July 7, 2009 and that he spent approximately 2 years and four months in jail. After his release in April 2012, Williams was subject to obligations associated with probation and even arrested on August 3, 2013 for allegedly violating his probation—a probation, of course, that was unlawful given Norton's misconduct. *See* ¶¶ 86, 94-97.

In sum, the Complaint shows that the Defendants had both knowledge of harms suffered by the Plaintiffs as well as an opportunity to prevent or alleviate those harms.  As explained below, and contrary to their arguments, these allegations state a claim for relief.

## ARGUMENT

Defendants Gleason, Sipple, and Russell offer five arguments as to why they should not be held liable for the harm suffered by Plaintiffs:

(1) The Complaint does not allege that the Defendants were personally involved with the Plaintiffs' constitutional injuries, Br. at 10-12
(2) The Complaint does not allege facts sufficient to meet the standard for supervisory liability under *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). Br. at 12-14.
(3) The supervisory claim fails because the three underlying claims on which it is premised fail, Br. at 14-16.
(4) The Plaintiffs' supervisory claim based on malicious prosecution is time-barred. Br. at 16-17.
(5) The Defendants are entitled to qualified immunity. Br. at 17.

For the reasons below, these arguments are all meritless.  Before addressing the arguments, however, it will be helpful to review the nature of the Plaintiffs' claims against the Defendants.

### A.  The Plaintiffs' Theory of the Case Against Defendants

The statement of facts in the previous section evinces the heart of the Plaintiffs' grievances against Defendants, which is that Defendants likely knew that Norton lied about informants, but did nothing, despite the fact that persons in the Plaintiffs' positions would be unlawfully detained. This misconduct translates into two types of claims: (1) supervisory claims and (2) non-supervisory claims.

### 1.  The Supervisory Claims

The supervisory claims against Defendants are contained in Count IV.  In that claim, the Plaintiffs allege that Defendants failed to supervise Defendant Jason Norton with regard to his

commission of the constitutional violations in Counts I, II and III. This, in turn, requires an understanding of what is alleged in Counts I, II and III, which is as follows:

- **Count I**: **Fourth Amendment Malicious Prosecution Claim**. Under this claim, the Plaintiffs seek relief for the periods of their detentions beginning with their indictments and ending with their releases, because, as a result of Norton's lies in seeking search warrants, Plaintiffs were detained without probable cause and the criminal proceedings against them were terminated in their favor.
- **Count II**: **Knowing and Intelligent Plea Claim.** Under this claim, the Plaintiffs seek relief for the periods of their detentions beginning at their pleas and ending when the criminal proceedings against them were terminated in their favor. This claim is based on Norton's failure to disclose his lies during the plea process, thus depriving the Plaintiffs of the right to make a knowing and intelligent plea under *Brady v. United States*, 397 U.S. 742 (1970).
- **Count III**: **Liberty Claim under the Fourteenth and/or Eighth Amendment.** Under this claim, the Plaintiffs seek relief for the periods of their detentions beginning just after their pleas and ending when the criminal proceedings against them were terminated in their favor. This claim is based on Norton's failure to disclose his lies after the Plaintiffs pled guilty, thus depriving the Plaintiffs of the right to be free from unlawful detention.

Thus, in the supervisory claims alleged in Count IV, Plaintiffs allege that Defendants failed to take reasonable steps to prevent or alleviate the harms suffered by Plaintiffs, despite Defendants' actual or constructive knowledge that Norton would violate, was violating, or had violated the Plaintiffs' rights to: (1) be free from malicious prosecution, (2) make knowing and intelligent pleas, and (3) enjoy liberty under the Fourteenth and/or Eighth Amendment.

There are two additional points about the supervisory claims that are significant. First, although most supervisory claims involve an allegation that the supervisor knew that the subordinate would commit a violation *in the future*, Plaintiffs have also alleged here that Defendants failed to supervise *during or after* the violations. *See* ¶¶ 125-26, 142-45; *see also* ¶¶98-124. The reason for these "during or after" allegations is that the constitutional violations committed by Norton began at the time of the searches *and continued until Plaintiffs were released years later*. Thus, Defendants are liable to Plaintiffs not only because they failed to

supervise Norton *before* the violations occurred, but also during the period in which the violations were occurring or had occurred.[4]

Second, the supervisory claim refers back to Counts I, II and III *as a group*, rather than separately, because it is generally unimportant to Plaintiffs' case against Defendants which constitutional violation(s) Norton actually committed.[5]  If Norton committed the violation specified in Count I, but not in Counts II or III, Defendants would be just as liable to the Plaintiffs as they would have had Norton committed the violation in Count II, but not Counts I and III.  It is the Plaintiffs' position, of course, that Norton committed the violations named in all of Counts I, II and III, but because Defendants' liability does not hinge on which one of those Counts Norton violated, it was not necessary to separately allege Defendants' liability on a count-by-count basis.  Consequently, *if the Plaintiffs state a claim in <u>any of</u> Counts I, II or III against Norton, they state a claim for relief in Count IV against Defendants as long as they can*

---

[4]     There is no reason to think that a supervisory claim only extends to prospective constitutional violations, rather than ongoing constitutional violations. Indeed, it is nonsensical to think that a supervisor could be held liable for failing to interrupt a foreseeable constitutional violation, but escape liability for failing to intervene while the violation *was actually occurring*. To the extent that this understanding of supervisory liability overlaps with bystander liability, the Plaintiffs have stated a claim on that ground as well. "To succeed on a theory of bystander liability, a plaintiff must demonstrate that a law-enforcement officer (1) knew that a fellow officer was violating an individual's constitutional rights; (2) had a reasonable opportunity to prevent the harm; and (3) chose not to act." *Stevenson v. City of Seat Pleasant, Md.*, 743 F.3d 411, 417 (4th Cir. 2014) (internal quotation marks and modifications omitted). The Complaint contains numerous allegations that would allow a reasonable jury to infer that Defendant had actual knowledge that Norton had lied in his application for search warrants—especially once the federal investigation was underway.  Such lies rendered the Plaintiffs' incarceration unlawful, thus imposing on Norton a duty to come clean about his frauds.  Norton's failure to come clean amounted to a violation of the Plaintiffs' Fourteenth and/or Eighth Amendment rights—a violation of which the Defendants would have been aware as a bystander.  The Defendants had a "reasonable opportunity to prevent the harm" but "chose not to act."  As such, even if the Plaintiffs' supervisory claim is framed as a bystander claim, it still states a claim upon which relief can be granted.

[5]     The only slight difference between the claims would be the length of incarceration that would be actionable against Defendants.  As the explanation of Counts I, II, and III, above, shows, the length of unlawful incarceration differs slightly between the Counts.

*show that Defendants, in the face of sufficient knowledge of the violation, failed to respond appropriately.*

### 2. The Non-Supervisory Claims

In addition to the supervisory claims in Count IV, the Plaintiffs also allege in Count VI that Defendants deprived them of their rights to liberty under the Fourteenth and/or Eighth Amendments. These counts are similar to Count IV in that they are based on Defendants' failures to act upon their likely knowledge, but are different in an important respect: Count VI is *not* a supervisory claim. That is, Defendants' liability in this respect does not depend on their roles as supervisors, but simply on their failures to act given their knowledge that Norton's misconduct would likely have caused persons like the Plaintiffs to be unlawfully jailed.

### B. The Complaint Alleges that the Defendants Acted Personally to Deprive the Plaintiffs of Their Constitutional Rights.

The Defendants argue that the "Plaintiffs do not allege that the Officers were involved in their arrests, prosecutions or sentencings in any way," and that this lack of involvement is fatal to all claims against them. Br. at 10. This argument is meritless because it is based on the erroneous understanding of what it means, as a matter of constitutional law, to be "involved" in "arrests, prosecutions or sentencings."

The crux of the flaw in Defendants' argument can be illustrated with the following question: if a supervisor comes to know that one of his subordinate officers obtained search warrants using made-up informants, that the subordinate still has not come clean about the frauds, and that persons are very likely unlawfully in jail as a result, *and the supervisor does nothing,* is the supervisor personally involved with the unlawful detention in any way? The answer, one hopes, is obvious. When a supervisor gains knowledge of the sort alleged in the Complaint, *the* supervisor ***becomes*** personally involved. At that point, the supervisor simply

cannot wipe his hands of the knowledge and say, "well, I wasn't around for the arrest, so I have no duty to act."

This hypothetical is simply a colloquial way of stating the law supervisory liability, which imposes a duty on a supervisor to act when he has "*knowledge* that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff." *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks omitted, emphasis added). The Complaint plausibly alleges that the Defendants had such knowledge and, because the doctrine of supervisory liability imposes a constitutional duty to act upon such knowledge, the Plaintiffs have properly alleged that the Defendants acted personally to deprive the Plaintiffs of their constitutional rights.[6]

### C. The Plaintiffs State Plausible Claims Against Norton, thus Providing a Basis for Supervisory Liability.

In their memorandum in support of motion to dismiss, the Defendants argue that the "Plaintiffs spend a great deal of ink portraying Norton as a bad cop, but none of their allegations show that he posed a risk of constitutional injury." Br. at 13. This is incorrect.

As explained at length in the statement of facts, the Defendants would have reasonably known that: (1) Norton engaged in highly suspicious and deceitful activity with a confidential informant—including tipping the informant off to an likely arrest—in **April 2010,** ¶¶ 42-48, 109; (2) Norton was doubly reprimanded in **March 2011** for deceit with regard to confidential informants dating back to 2009 and 2010, ¶¶ 110-13; (3) a confidential informant was

---

[6]     Defendant Sipple's involvement in the harms suffered by Johnson are further established by the fact that he signed an N-10 form—a form associated with payment to an informant—that was facially flawed and unfit for his signature. ¶ 72. Sipple's signature on the N-10 form thus further establishes that, near the time of Johnson's arrest, and well before his plea and subsequent incarceration, Sipple had reason to doubt the accuracy—and thus constitutionality— of Norton's practices with informants.

interviewed about his relationship with Norton in **late 2011** as part of an IAD investigation of

Norton, ¶¶ 106-08, (4) the RPD's confidential informant program in **mid-2012** (and prior) lacked

basic checks on integrity that would keep an officer from lying about the identity of an

informant, ¶¶ 121-24; (5) the FBI began investigating Norton **in the summer or fall of 2012** for

lying about the identity of his informants on warrant applications filed **as early as 2009**, ¶¶ 23,

115; and (6) Norton's colleagues and other supervisors thought he played "too fast and too

loose," had encountered him lying on numerous occasions, and believed that "management" was

letting Norton "hang himself" because he was "producing." ¶ 114; *see also* ¶¶ 99-113 and 33-40.

Thus, the question before the Court is whether an officer with this track record poses a

"risk of constitutional injury." To ask the question is almost to answer it. An officer repeatedly

observed engaging in misconduct involving informants, and who was clearly on the IAD's radar

screen, is certainly someone who poses a risk of constitutional injury. And even further, once

the FBI had opened an investigation into the officer, and the investigation was focused on the

officer's systemic lying in his applications for search warrants, there can be little doubt that

constitutional injury—whether it is in process or in store—may further occur. Thus, the

Plaintiffs' supervisory claims should proceed.

**D. The Plaintiffs' Underlying Claims are Not Defeated by Proximate Causation.**

The Defendants alternatively argue that the "Plaintiffs' Fourth, Eighth and Fourteenth

Amendment claims against Norton are all premised" on the "'fruit of the poisonous tree

doctrine,'" which holds that "evidence discovered as a result of a Fourth Amendment violation is

subject to suppression under the exclusionary rule." Br. at 14. The fruit of the poisonous tree

doctrine is addressed below, but, as an initial matter, it is not true that "all" of the Plaintiffs'

underlying claims are based on the fruit of the poisonous tree doctrine. In fact, only the

Plaintiffs' malicious prosecution claim depends on that doctrine. The Plaintiffs' knowing and intelligent plea claims, as well as their liberty claims under the Eighth and/or Fourteenth Amendment, are actionable without regard to the fruit of the poisonous tree doctrine and supervisory liability therefore may be imposed regardless of the doctrine's applicability.

With regard to the doctrine's applicability in the malicious prosecution context, the Plaintiffs acknowledge that several circuits have held that the fruit of poisonous tree doctrine (which works in tandem with the exclusionary rule) does not apply in certain § 1983 cases. The prevailing logic in these cases is that "[t]he cost of applying the exclusionary rule in [the § 1983] context is significant ... [a]nd the deterrence benefits are miniscule." *Black v. Wiggington*, 811 F.3d 1259, 1268 (11th Cir. 2016); *see also Townes v. City of New York*, 176 F.3d 138, 148 (2d Cir. 1999) (explained that applying the exclusionary rule in § 1983 cases "would vastly over deter police officers and would result in a wealth transfer that is peculiar, if not perverse"); *Wren v. Towe*, 130 F.3d 1154, 1158 (5th Cir. 1997) (per curiam); *Hector v. Wyatt*, 235 F.3d 154, 159 (3rd Cir. 2000) (refusing to apply exclusionary rule because an "officer who took a frisk one modest step too far could face vast liability"); *Lingo v. City of Salem,* 832 F.3d 953 (9th Cir. 2016) (noting that the exclusionary rule should apply "only where its deterrence benefits outweigh its substantial social costs").

Crucially, however, no circuit court has confronted the circumstances presented here— namely, ***a detention arising from the intentional deceit of a magistrate by a police officer.*** In such a case, there is good reason to think that the rule's "deterrence benefits [*would*] outweigh its substantial social costs." *Lingo*, 832 F.3d at 958. The different balance of costs and benefits arises from the fact that ***the exclusionary rule has little deterrent effect on officers who are willing lie to obtain or preserve an arrest.*** This has been common knowledge for years in the

field of law enforcement—so common, in fact, that officers in New York City had their own term for it: "testilying."[7]  "Testilying" arose largely as a result of the Supreme Court's decision in *Mapp v. Ohio*, 347 U.S. 643 (1961), which extended the exclusionary rule to state criminal proceedings.  Before *Mapp*, officers were likely to admit that they found the contraband on the suspect's person or at his residence—even if the search of the person or place was unconstitutional.  Without the exclusionary rule, there was no reason to pretend otherwise.  But after *Mapp* came down, there was a "suspicious rise" in so-called "dropsy" cases—cases in which "officers alleged that the defendant dropped the contraband on the ground."[8]

The phenomenon of "testilying" did not tail off once *Mapp* was absorbed into the legal landscape.  For example, in 1994, a blue-ribbon commission charged with studying corruption in the New York City Police Department concluded that "testilying" was "probably the most common form of police corruption, particularly in connection with arrests for possession of narcotics and guns."[9]  And more recent studies confirm that the problem is still wide-spread.[10]

Thus, in contrast to the criminal setting, applying the exclusionary rule (and its component, the fruit of the poisonous tree doctrine) in the civil setting in a case where an officer has intentionally defrauded the legal system actually ***creates deterrence where little existed***

---

[7]       MILTON MOLLEN ET AL.,COMM'N TO INVESTIGATE ALLEGATIONS OF POLICE CORRUPTION AND THE ANTI-CORRUPTION PROCS. OF THE POLICE DEP'T, CITY OF N.Y., ANATOMY OF FAILURE: A PATH FOR SUCCESS 36 (1994).

[8]       Comment, *Effect of* Mapp v. Ohio *on Police Search-and-Seizure Practices in Narcotics Cases*, 4 COLUM. J.L. & SOC. PROBS. 87, 95 (1968); *see also* Irving Younger, *The Perjury Routine*, Nation, May 8, 1967, at 597 (explaining that, after *Mapp*, "police made the great discovery that if the defendant drops the narcotics on the ground, after which the police man arrests him, the search is reasonable and the evidence is admissible."

[9]       MOLLEN ET AL., at 36.

[10]      Christopher Slobogin, *Testilying: Police Perjury and What to Do About It*, 67 COLO. L. REV. 1037, 1041-48 (1996) ("Whether it is conjecture by individual observers, a survey of criminal attorneys, or a more sophisticated study, the existing literature demonstrates a widespread belief that testilying is a frequent occurrence.").

*before*.  An officer like Norton, for whom the exclusionary rule was apparently of no consequence in the criminal context because he was already willing to simply fabricate "evidence" and repeatedly lie to magistrates to "justify" searches, might not be so keen to continue to do so if he faced personal civil liability for such actions.[11]

Of course, the value of such deterrence is not sufficient on its face to justify the rule, for the rule could be outweighed by costs to law enforcement, and, thus, society as a whole.  Such costs, however, would be extraordinarily limited because they would be borne mainly by officers who insisted on willfully deceiving a magistrate.[12]  Such limitations are entirely appropriate because the vast majority of law enforcement officers are honest, diligent, and dedicated to the public good—*and are not going to intentionally deceive*.  Like all fields of work, however, a few will occasionally stray from the straight and narrow.  When that occurs in the policing context, and liberty is consequently lost, *some* amount of deterrence is needed to protect the public.  Indeed, the need for deterrence is particularly appropriate in this context because Norton has never been charged with any crime—even though he quite plainly perjured himself over and over again. Thus, applying the exclusionary rule in the civil setting will provide appropriate—and, in this case, the *only*—deterrence.

---

[11]    Indeed, the importance of deterrence through a § 1983 action is magnified here because another major tool of deterrence—criminal punishment—is apparently not in play here. Norton has not been charged with any crimes.

[12]    Society would potentially also incur the costs associated with the release of a suspect that was factually guilty (though the Plaintiffs do not concede that they are factually guilty, and further do believe that factual guilt is relevant to this case).  The cost of releasing a factually guilty suspect, however, is a routine cost associated with the exclusionary rule that, for over half century, has failed, to overcome its utility as a deterrent. *See Mapp v. Ohio*, 367 U.S. 643 (1961) (applying the exclusionary rule to state criminal adjudications).  If it the exclusionary rule does not produce unacceptably high social costs when an officer *mistakenly* violates the Constitution, it certainly will not produce such costs when an officer intentionally violates the Constitution.

The only court to apparently confront an issue like that presented here is the Northern District of Oklahoma in *Williams v. City of Tulsa*, 2016 WL 1572957 (N.D. Okla. Apr. 19, 2016). Importantly, however, the court in *Williams* did not face the argument the Plaintiffs advance here,[13] which is that, although the exclusionary rule may not be appropriate in the majority of § 1983 actions, it is entirely appropriate—***even essential***—in cases like that presented here. Given that *Williams* does not consider the need for deterrence in cases of "testilying," the case is of limited use to this Court.

In sum, this Court should apply the exclusionary rule here in cases of intentional deceit because, under the logic of the rule, its benefits outweigh its costs. No binding precedent suggests otherwise and this case presents the Court with a unique opportunity to better articulate the role of the exclusionary rule in § 1983 cases.

**E. The Plaintiffs' Claims are Not Time Barred.**

The Defendants also argue that the Plaintiffs' Fourth Amendment claims are time-barred. Br. at 16. In support of this argument, the Defendants first argue that "[a]ctions arising from an unlawful search and seizure accrue at the time of the search or seizure." *Id.* As authority for this, the Defendants cite *Smith v. McCarthy*, 349 F. App'x 851 (4th Cir. 2009), but the *Smith* court would certainly be surprised by the Defendants' characterization of its holding, because the court very clearly held there that ***"the cause of action under § 1983 accrues 'when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action.'"*** (citation and internal quotations marks omitted). It will often be the case that

---

[13] The court's opinion in *Williams* was issued as part of its ruling in a bench trial. The Court invited the parties to submit briefs before ruling and, although the defendant argued the exclusionary rule should not apply in § 1983 cases, the plaintiff did not address the issue at all. *See Williams v. Henderson*, 2016 WL 3566093 (N.D.Okla.) (defendant's brief); *Williams v. Henderson*, 2016 WL 3566057 (N.D.Okla.) (plaintiff's brief).

the plaintiff possesses sufficient facts at the time of the search or seizure, but it takes little

imagination to see why that would not always be true. Indeed, it takes no imagination at all,

because the case before the Court illustrates this point perfectly. How in the world were Bravette

Johnson and Curtis Williams supposed to know on the days of their arrests that Norton had lied

to a magistrate judge across town and out of their presence?

Luckily, the foolishness inherent in the Defendants' assertion is, contrary to their claims,

not the law in the Fourth Circuit. Rather, the law is plain that a § 1983 claim accrues "when the

plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal

his cause of action." *Nasim v. Warden, Md. House of Corr.,* 64 F.3d 951, 955 (4th Cir.1995) (en

banc). In a footnote, the Defendants seem to see the light, but, somehow, they cannot bring

themselves to walk into it. In footnote 5, the Defendants state that:

> Notwithstanding the holdings of *Smith* and *Gonzales*,[14] the Fourth Circuit has held that
> federal causes of action accrue when "the plaintiff possesses sufficient facts about the
> harm done to him that reasonable inquiry will reveal his cause of action." *Nasim*, 64 F.3d
> at 955 (4th Cir. 1995).

If the Fourth Circuit "has held" in a published opinion that "federal causes of action accrue when

the Plaintiff possesses sufficient facts about the harm done to him," then why are the Defendants

suggesting that an unpublished case **which cites the same authority and rule***,* holds otherwise?

---

[14]       Alongside *Smith*, the Defendants also point to *Gonzales v. Entress*, 133 F.3d 551, 553
(7th Cir. 1998), which they say "collect[s] cases" establishing that "claims for Fourth
Amendment violations necessarily accrue at the time of the search or seizure." Br. at 16. What
the Defendants fail to mention, however, is that (1) *Gonzales* only collects *other Seventh Circuit
cases*, (2) that those cases only address Fourth Amendment violations that would have been
known to the victim at the time of the violation itself, and (3) that Seventh Circuit law is entirely
consistent with Fourth Circuit law on the accrual of § 1983 claims. *See, e.g.*, *Logan v. Wilkins*,
644 F.3d 577, 581–82 (7th Cir. 2011) ("For § 1983 purposes, a claim accrues when the plaintiff
knows or should know that his or her constitutional rights have been violated.").

Whatever their logic or motivations, the causes of action alleged here most certainly did not accrue at the moment of Plaintiffs' arrests.

The Defendants alternatively argue that, if Plaintiffs' claims did not accrue on the days of Plaintiffs' arrests, they must have accrued when they gained knowledge of Norton's misconduct. Br. at 17. This argument, however, ignores *Heck v. Humphrey*, 512 U.S. 477, 481 (1994), which holds that, if a plaintiff's § 1983 allegations would "necessarily imply the invalidity of his conviction or sentence," the prisoner "has no cause of action under Section 1983 unless and until the conviction is . . . invalidated." The claims here would certainly imply the invalidity of Plaintiffs' sentences because the claims are all based on fact that the Plaintiffs should not have been incarcerated. The Plaintiffs' convictions were invalidated on August 27, 2015 (for Johnson) and April 12, 2016 (for Williams). Because the Plaintiffs filed suit on August 8, 2017, which is within two years of the invalidation of their convictions, their claims are not time barred.

**F. The Defendants Are Not Entitled to Qualified Immunity.**

Defendants finally argue that they are entitled to qualified immunity. This argument is without merit.

With regard to the supervisory claim based on malicious prosecution (Count IV), the Defendants are not entitled to qualified immunity. In this context, as with all qualified immunity issues, the question before the Court is whether the Defendants made "bad guesses in gray areas," *Wilson v. Kittoe,* 337 F.3d 392, 403 (4th Cir. 2003). If, as the Complaint plausibly alleges, Defendants had actual or constructive knowledge that Norton was playing "too fast and too loose" with his search warrants near the time of the Plaintiffs' arrests, then the Defendants hardly faced a difficult decision in a "gray area." Rather, they faced an obvious duty in a black-

and-white context: the duty to speak up.  But the Defendants did not do that.  They therefore may not take refuge in the defense of qualified immunity.

Next, with regard to the supervisory claim for the Plaintiffs' deprivation of the right to make a knowing and intelligent plea (Count IV), the Defendants also were not acting in a "gray area."  If the Complaint's plausible allegations are taken as true, as they must be here, it is clear that the Defendants failed to act despite having actual or constructive knowledge of Norton's misconduct.  The failure to act in this context was not a close call, it was a duty established by *Brady v. United States*, 397 U.S. 742 (1970), which plainly holds that an officer's misrepresentation can render a guilty plea invalid.  *Fisher v. United States*, 711 F.3d 460 (4th Cir. 2013) did not establish new law in this regard, but simply applied the plain holding of *Brady*: which is that, by withholding lies underlying a search warrant, an officer engages in misrepresentation under *Brady*. Given this, the Defendants are not entitled to qualified immunity.

Finally, with regard to the supervisory claim for the deprivation of the Plaintiffs' liberty (Count IV), and the direct claim for the deprivation of the Plaintiffs' liberty (Count VI), the Defendants also may not claim refuge in the doctrine of qualified immunity.  *Golson v. Department of Corrections*, 914 F.2d 1491 (4th Cir. 1990) (unpublished) demonstrates that clear law existed on this issue at the time of the Defendants' violations. The court in *Golson* stated as clearly as possible that, when a person has reason to believe that someone is in jail but ought not to be, that person has a duty to act.  To the extent that Defendants might contend that *Golson* is not sufficiently similar to the case at hand, it is important to note that "'the nonexistence of a case holding the defendant's identical conduct to be unlawful does not prevent denial of qualified immunity.'" *Id*. at 403 (internal quotation marks omitted). This is because the goal of qualified immunity is to "ensure that before they are subjected to suit, officers are on *notice* their conduct

is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (emphasis added) (quoting *Saucier v. Katz,* 533 U.S., at 206); *see also Ridpath v. Bd. of Governors Marshall Univ.,* 447 F.3d 292, 313 (4th Cir.2006) ("the lodestar for whether a right was clearly established is whether the law 'gave the officials 'fair warning' that their conduct was unconstitutional'") (quoting *Hope*, 536 U.S. at 741); see also *Wilson*, 337 F.3d at 403 (quoting *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001) (Michael, J., concurring)). ("[Q]ualified immunity was never intended to relieve government officials from the responsibility of applying familiar legal principles to new situations."). It is a certainly a "familiar legal principle[]" that, where a police officer lies and persons are detained as a result of those lies, the Constitution has been violated, and persons aware of these lies would hardly find themselves in uncharted terrain as to whether to speak up or stay quiet. No reasonable officer could think that the Constitution permitted him to stay quiet under such circumstances.

## **CONCLUSION**

For the reasons stated above, the Plaintiffs respectfully request that the Court deny Defendants' Motion to Dismiss in its entirety.

Respectfully submitted,

BRAVETTE JOHNSON
CURTIS WILLIAMS

By: _____/s/ Mark J. Krudys_____
Counsel

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
919 E. Main Street, Suite 2020
Richmond, VA 23219
Phone: (804) 774-7950
Email: mkrudys@krudys.com

John Frederick Preis (VSB# 45764)
7719 Rock Creek Road
Henrico, VA 23229
Phone: (804) 289-8682
Email: jpreis@richmond.edu

Amy L. Austin (VSB# 46579)
THE LAW OFFICE OF AMY L. AUSTIN, P.L.L.C.
101 Shockoe Slip, Suite M
Richmond, VA  23219
Phone: (804) 343-1900
Email: amyaustinlawyer@gmail.com

*Counsel for Plaintiffs Bravette Johnson and Curtis Williams*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 3, 2017, I electronically filed the foregoing document with the

Clerk of Court using the CM/ECF system, which will send notification of such filing to all

registered users.

By:  /s/ Mark J. Krudys

Mark J. Krudys (VSB# 30718)
THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 E. Main Street, Suite 2020
Richmond, VA  23219
Phone: (804) 774-7950
Fax: (804) 381-4458
Email: mkrudys@krudys.com
Web: www.krudys.com