UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

BRAVETTE JOHNSON

and

CURTIS WILLIAMS,

    Plaintiffs,

v.                                                         Civil Action No. 3:17CV553

CITY OF RICHMOND, VIRGINIA, *et al.*,

    Defendants.

## **DEFENDANTS GLEASON, SIPPLE, AND RUSSELL'S REBUTTAL BRIEF**

Defendants Christopher Gleason ("Gleason"), Charles Sipple ("Sipple"), and Roger Russell ("Russell") (collectively the "Officers"), by counsel, submit this Rebuttal Brief in further support of their Rule 12(b)(6) Motion to Dismiss.

## I. INTRODUCTION

Plaintiffs' Opposition to Defendants Gleason, Sipple, and Russell's Rule 12(b)(6) Motion to Dismiss ("Plaintiffs' Opposition Brief") only confirms what the Officers have already established – that Plaintiffs' Complaint fails to show that the Officers possessed the requisite knowledge to be held liable for Officer Norton's misuse of search warrant applications.

Plaintiffs contend that the Officers were actively involved in their constitutional deprivations because they failed to recognize and correct Norton's bad acts. This argument effectively concedes that the Officers had no active role in the Plaintiffs' arrests or prosecutions and reaffirms that Plaintiffs' case against the Officers can only survive if Plaintiffs can show that the Officers are legally responsible for Norton's misconduct.

Plaintiffs devote pages of text to reorganizing and repeating the allegations contained in their Complaint, which allege, at most, that Norton was a poor employee, who performed shoddy police work and disregarded the Richmond Police Department's procedures on occasion. However, two threshold requirements for imputing liability to the Officers – (1) that Norton's prior misconduct posed a *pervasive* and *unreasonable* risk of *constitutional injury* and (2) that the Officers knew, or had reason to know, of such misconduct – are supported only by the Plaintiffs' own self-serving conclusions, not by the facts alleged.

Plaintiffs cite limited authority in their Opposition Brief and rely, instead, on rhetorical questions and purported "reasonable inferences" to defend their claims. They insist that as supervisors, the Officers are equally responsible for remedying the prior misconduct of their subordinates as they are for preventing future misconduct. Plaintiffs overlook, however, the established principle that imposing liability for an officer's failure to act is disfavored and only permitted in certain limited circumstances. Plaintiffs defend their theory of bystander liability only in a footnote and present a selective reading of the *Shaw v. Stroud* standard in support of their supervisory liability claim. Indeed, Plaintiffs ignore language in the *Shaw* opinion explaining what constitutes a pervasive and unreasonable risk of constitutional harm, and they fail to address the additional elements of deliberate indifference and causation required to establish supervisory liability.

Furthermore, Plaintiffs gloss over their non-supervisory claim against the Officers and acknowledge that this count is based on the same flawed theory of liability as their supervisory claim. Finally, as the Officers have already explained and Plaintiffs fail to rebut, the underlying claims against Norton fail because Plaintiffs cannot establish proximate cause; and, moreover, Plaintiffs' Fourth Amendment claim is barred by the two-year statute of limitations.

## II. PLAINTIFFS RELY ON UNFOUNDED CONCLUSIONS REGARDING THE OFFICERS' KNOWLEDGE

Plaintiffs claim that six events alleged in their Complaint put the Officers on notice that Norton was likely to falsify search warrant applications – (1) "Norton's Tip Off and the RAVE Report – April 2010," (2) "Norton's Reprimands for Misconduct with Informants – March 2011," (3) "IAD's Investigation of Norton – Probably in the Last Quarter of 2011," (4) "Reforms to the Informant Program – Mid-2012," (5) "The Initiation of the Federal Investigation – Mid-2012 or Fall 2012," and (6) "Knowledge Gained Informally – Probably between Mid-2010 and Mid-2012." Pls.' Opp'n Br. 2-7. While it is not necessary to summarize Plaintiffs' allegations again at this time, it is important to note that the purported significance of these events is based entirely on the Plaintiffs' conjecture.

Plaintiffs first argue that it is reasonable to infer that Norton tipped off an informant known as R.A. because "he was scared that R.A., when arrested, would say something that he wasn't supposed to . . . [which] 'something' might have been R.A.'s lack of involvement in warrant applications that Norton had previously sworn to a magistrate that R.A. was involved in." *Id.* at 3. Plaintiffs suggest that the Officers should have reached the same conclusion and, therefore, anticipated that Norton would manufacture search warrant affidavits at some point in the future. However, the Complaint is devoid of any factual allegations that could prove that Norton tipped off R.A. for this reason.

Secondly, Plaintiffs assert that Norton received formal reprimands for "his attempt to use informants who had not yet been established as reliable – the exact behavior that underlies the wrongful detentions in this case." *Id.* at 3-4. This contention misconstrues Plaintiffs' own allegations. The Complaint, in fact, alleges that Norton was reprimanded because he confiscated narcotics from a suspect, without making an arrest, and because of apparent inconsistencies in

3

some of his N-10 forms, used to document payments to informants. *See* Compl. ¶¶ 32, 34, 110-12. Plaintiffs conclude that the Officers would have seen both reprimands in Norton's personnel file and, therefore, "would have had knowledge sufficient to believe . . . that Norton regularly lied about his relationship with informants, thus creating the substantial risk [that] persons like Plaintiffs could have been wrongfully imprisoned." Pls.' Opp'n Br. 4. Considering that neither reprimand pertains to Norton's search warrant applications, this conclusion requires multiples leaps in logic that are unsupported by the factual allegations in the Complaint.

With respect to the alleged IAD investigation, Plaintiffs claim that R.A. was interviewed by a Richmond police officer "as well as, in all likelihood, a member of the IAD" at some time during 2011. The allegations contained in the Complaint state nothing about the content of this interview, except that it "concerned R.A.'s relationship with Norton." Compl. ¶ 106 (internal quotation marks omitted). Plaintiffs nevertheless argue that "Norton was on RPD's disciplinary radar in 2011 and, given the seriousness of the investigations into his conduct, persons in supervisory roles like the [Officers] would have very likely been privy to the serious problems surrounding Norton." Pls.' Opp'n Br. 4. Again, Plaintiffs' conclusion skips a few steps in reasoning.

The connection between reforms in the department's informant program and Plaintiffs' claims against the Officers is perhaps the most attenuated. Plaintiffs allege that prior to these reforms, officers routinely signed N-10 forms without actually witnessing the payments made to informants. *Id.* at 5. They then argue that this practice is significant because witnessing payments "prevents officers from lying about the existence of informants to begin with." *Id.* Plaintiffs further allege that the department failed to maintain informant resume sheets and conclude that "if an informant program is not using resume sheets it lacks any serious

4

commitment to accuracy and preventing fraud." *Id.* Neither of these alleged problems directly relates to search warrants, nor any police procedure that could infringe on a suspect's constitutional protections. These self-interested conclusions provide no support for Plaintiffs' case.

Plaintiffs argue that the FBI's 2012 investigation of "Norton's misconduct with informants" is "one of the most important events of this case." *Id.* at 6. Even though both Bravette Johnson ("Johnson") and Curtis Williams ("Williams") were arrested years prior to this investigation and there is no indication that any of the Officers were personally involved in their cases, Plaintiffs insist that the FBI's involvement should have prompted the Officers to suddenly realize that the Plaintiffs were wrongfully convicted and take action. Plaintiffs do not identify what action the Officers should have taken until page twenty-one of their Opposition Brief, where they allege that the Officers had "the duty to speak up."

Plaintiffs ignore that the Commonwealth's Attorney's Office, the body responsible for convicting and sentencing them, also took the initiative to reverse their convictions. It is not clear what the Plaintiffs believe the "duty to speak up" entails, but their arguments suggest that the Officers should have circumvented the FBI's and the Commonwealth's Attorney's efforts and somehow procured earlier reversals. Even if this were legally feasible, applicable case law provides no basis for such a duty in the Section 1983 context.

Finally, Plaintiffs' reliance on inter-department gossip is too speculative to warrant a further response. The conclusive allegations discussed above are precisely the kind of baseless accusations that the federal pleading standard prohibits. Plaintiffs' claims against the Officers should be dismissed because the Complaint does not allege facts sufficient to establish liability under any recognized theory.

5

## III. ALL CLAIMS AGAINST THE OFFICERS FAIL AS A MATTER OF LAW

It is settled law that bystander liability and supervisory liability are the only recognized exceptions to the general rule that an officer may only incur Section 1983 liability through his own affirmative misconduct. *See Ruttenberg v. Jones*, 603 F. Supp. 2d 844, 870-71 (E.D. Va. 2009) (citations omitted). Plaintiffs do not explicitly plead bystander liability, and the Officers' Brief in Support thoroughly explains why the Plaintiffs' failure to allege actual knowledge forecloses any prospect of recovery under this theory. As their Opposition Brief demonstrates, Plaintiffs rely primarily on a theory of supervisory liability. They reference *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) repeatedly in their brief, but ignore nearly every element of the well-known standard provided by this decision[1].

As reiterated below, the Officers' motion provides several grounds to dismiss Plaintiffs' claims. First and foremost, the facts alleged do not satisfy the *Shaw* standard. Plaintiffs also fail to state a plausible claim that the Officers violated their constitutional rights directly. And Plaintiffs' underlying claims against Norton are defeated by proximate cause and time restrictions.

   A.   **Plaintiffs cannot satisfy the requirements of the *Shaw* standard.**

   1.   **Norton's conduct did not pose a pervasive and unreasonable risk of constitutional injury.**

To establish the first element of the *Shaw* test, Plaintiffs must allege conduct that "is widespread, or at least has been used on several different occasions[,] and that the conduct

---

[1] Under *Shaw*, the plaintiff must show that – (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff, (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practice, and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. 13 F.3d at 799.

engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." 13 F.3d 791, 799 (4th Cir. 1994) (citing *Slakan v. Porter*, 737 F.2d 368, 373-74 (4th Cir. 1984))[2]. The *Shaw* and *Slakan* opinions provide instructive examples of what constitutes widespread conduct.

In *Shaw*, which concerned a wrongful death claim arising from an arresting officer's use of excessive force, the evidence showed that the defendant supervisor had received and blatantly disregarded several prior complaints of excessive force against the officer. 13 F.3d at 795-96. In *Slakan*, another excessive force case, the defendant prison warden admitted that he knew of and approved the use of a high-pressure water hose to punish inmates, and a non-party witness testified that this practice was widely used at the facility and rarely questioned by supervisors. 737 F.2d at 373-74. In both cases, the conduct at issue clearly violated constitutional standards and was strikingly similar to prior reported offenses by the same officers.

Conversely, the Eastern District of Virginia has repeatedly dismissed supervisory liability claims based on isolated and unrelated incidents of alleged misconduct. *E.g., November v. Chesterfield County*, Civil Action No. 3:17-cv-113-JAG, 2017 U.S. Dist. LEXIS 180631, *13-14 (E.D. Va. Oct. 31, 2017); *Willis v. Blevins*, 966 F. Supp. 2d 646, 663 (E.D. Va. 2013). The plaintiff in *November* sustained significant injuries after an arresting officer fired a Taser and ignited gasoline covering his person. 2017 U.S. Dist. LEXIS 180631 at *4. The plaintiff alleged that the officer had used a Taser on three prior occasions, without incident, and had received two prior infractions for engaging in a verbal altercation with another officer and failing to leash his police dog, which resulted in injuries to another officer. *Id.* at *6-7. The Court held that these

---

[2] Although the *Shaw* Court reviewed a district court's decision to grant summary judgment, the Court's holding also applies when assessing the sufficiency of a complaint at the motion to dismiss stage. *See Alfaro-Garcia v. Henrico County*, Civil Action No. 3:15cv349, 2016 U.S. Dist. LEXIS 132274, *31-34 (E.D. Va. Sept. 26, 2016).

7

facts could not establish that the defendant supervisor knew that the arresting officer posed a pervasive and unreasonable risk to the public. *Id.* at *13.

Similarly, the plaintiff in *Willis* alleged that the defendant police chief was responsible for numerous constitutional violations committed by a subordinate officer, including fabricating evidence and arresting the plaintiff without probable cause. 966 F. Supp. 2d at 651. The Court granted the chief's motion to dismiss, holding that the plaintiff's allegation of a single prior incident of unrelated misconduct by the investigating officer was insufficient. *Id.* at 652. The Court further held that the plaintiff's allegations of misconduct by other officers in the department were irrelevant under the *Shaw* standard[3]. *Id.*

In light of these decisions, the facts alleged in Plaintiffs' Complaint do not establish that Norton's prior conduct posed a pervasive and unreasonable risk of constitutional injury. First, Plaintiffs do not allege any prior reported incidents in which Norton altered or falsified search warrant applications. Second, while Norton did receive two reprimands, these disciplinary actions represent isolated incidents, having nothing to do with search warrant applications. Third, while failing to arrest a suspect, following the seizure of contraband, and falsifying N-10 forms may violate standard police practice, they do not constitute constitutional violations. And lastly, as held in *Willis*, reforms to the informant program, based on alleged widespread misconduct by other officers, are irrelevant under *Shaw*.

---

[3] The plaintiff in *Willis* attached a report to his opposition brief that documented numerous problems in the police department's training program. The Court did not consider the report because it was not referenced in the plaintiff's complaint, but also noted that the report was irrelevant because it contained no specific allegations of misconduct by the subordinate officer. 966 F. Supp. 2d at 652 n.6.

## 2. The Officers did not have actual or constructive knowledge of Norton's misconduct.

While the nature of Norton's prior misconduct and the Officers' knowledge are intertwined under the *Shaw* standard, it is important to note separately that the Complaint does not contain any allegation showing that the Officers had actual or constructive knowledge that Norton engaged in any misconduct relating to the department's search warrant procedure. A plain reading of the Complaint shows the lack of actual knowledge, and this alone is enough to defeat any claim for bystander liability.

Furthermore, because Plaintiffs do not allege that the Officers were required to review or approve Norton's warrant applications, there is no reasonable basis to show constructive knowledge either. Plaintiffs do not address this deficiency in their Brief in Opposition, but claim that constructive knowledge can be inferred from the six enumerated events. This argument falls flat, however, as all six events are wholly unrelated to the search warrant process.

Plaintiffs emphasize the FBI's investigation throughout their Opposition Brief. The Complaint alleges that the FBI looked into numerous incidents involving Norton and interviewed several of Norton's co-workers and informants, including the informants identified on the search warrant applications at issue. But, while it may be reasonable to infer that the Officers knew that the FBI investigation was underway, there is no basis to conclude that they were aware of the details of the investigation. The investigation was conducted by federal agents, not the police department. Moreover, there is no allegation that the FBI interviewed the Officers or, more importantly, that they advised the Officers, or any other ranking member of the department, of their findings. Plaintiffs' assertion that the Officers had a "strong reason on doubt the veracity of Norton's affidavits" simply because they knew that an FBI investigation was taking place is just another of Plaintiffs' baseless conclusion.

### 3. There is no basis to establish deliberate indifference.

Plaintiffs argue that "in the face of [their] likely knowledge of the unconstitutional harm suffered by the Plaintiffs, the [Officers] failed to take reasonable steps to prevent or alleviate that harm." Pls. Opp'n Br. 8. However, this is not the correct standard. The second prong of the *Shaw* test requires that the Officers' response be so inadequate as to show "deliberate indifference" or "tacit authorization" of Norton's behavior. 13 F.3d at 799. "A plaintiff must establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses." *Id.* (internal quotation marks and citations omitted). Further, a plaintiff cannot rely on a single incident or isolated incidents to prove deliberate indifference because "a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence within the area of his responsibilities . . . or to guard against the deliberate criminal acts of his properly trained employees when he has no basis . . . to anticipate the misconduct." *Id.* (citing *Slakan*, 737 F.2d at 373).

Plaintiffs' Complaint contains no allegations of documented, widespread abuses of the department's search warrant procedure by Norton or any other member of the department. At most, Plaintiffs allege isolated incidents of misconduct, unrelated to the search warrant process. And even if the Officers were aware of this behavior, which the Complaint assumes, *Shaw* clearly establishes that the Officers were not then required to anticipate and uncover every conceivable act of misconduct committed by Norton in the future.

### 4. Plaintiffs also fail to establish causation.

A supervisory liability claim requires proof that the supervisor's conduct was both the cause in fact and the proximate cause of the Plaintiffs' injuries. *Id.* Similar to the deliberate indifference element, without facts supporting that the Officers knew or should have known that

Norton falsified the search warrant applications that led to their arrests, Plaintiffs have no basis to show that their injuries were the natural consequence of any act or omission by the Officers.

### B. Plaintiffs' non-supervisory claim also fails because Plaintiffs cannot establish knowledge.

Plaintiffs offer a brief defense of their non-supervisory claim, which is based on the theory that the Officers violated their Eighth and Fourteenth Amendment rights directly because they knew of Norton's misconduct, but failed to remediate it. This claim is simply a rewording of Plaintiffs' supervisory claim and provides no independent basis for relief.

In response to the Officers' qualified immunity defense, Plaintiffs cite the unpublished opinion, *Golson v. Dep't of Corr.*, Nos. 90-7344, 90-7345, 1990 U.S. App. LEXIS 17452 (4th Cir. Aug. 30 1990) (per curiam), for the proposition that "when a person has reason to believe that someone is in jail but ought not to be, that person has a duty to act." Pls.' Opp'n Br. 21. However, the *Golson* opinion contains no such holding. Rather, the *Golson* Court reasoned that while incarceration beyond the termination of one's sentence *may* state a claim under the Eighth and Fourteenth Amendments, a Fourteenth Amendment claim requires proof that the defendant acted with *more* than mere negligence, and an Eighth Amendment claim requires proof of deliberate indifference. 1990 U.S. App. LEXIS 17452 at *2-3 (citations omitted)[4]. The Fourth Circuit held that the plaintiff failed to allege a viable claim under either theory because he could not establish that the Department of Corrections knew he was incarcerated past the expiration of

---

[4] The Officers stand by their qualified immunity defense as an alternative basis for dismissal. Plaintiffs cannot provide any authority to support their position that a supervisor has an affirmative duty to unearth all constitutional misconduct committed by their subordinates. Thus, the jury would have no basis to conclude that the Officers violated a clearly established constitutional right. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (noting that a plaintiff must establish that a constitutional right was clearly established at the time of the alleged violation to defeat qualified immunity) (citations omitted).

11

his sentence. *Id.* at *3-5 ("The Department did all that it could have been expected to do, given the information in its possession . . .").

Again, Plaintiffs insist that the Officers have a duty to investigate and uncover all potential constitutional violations committed by their subordinates, when this is not the law of the Fourth Circuit. The Complaint does not provide a plausible basis to conclude that the Officers knew Norton doctored his search warrant applications, let alone, that they knew the Plaintiffs were wrongfully incarcerated years after their arrests. And without such knowledge, Plaintiffs cannot show that the Officers acted with any culpable state of mind. Plaintiffs' non-supervisory claim is without merit.

### C. Plaintiffs' argument that the fruit of the poisonous tree doctrine should apply is unsubstantiated and should be disregarded.

Without any authority to support their position, Plaintiffs urge the Court to ignore the substantial body of case law holding that the fruit of the poisonous tree doctrine is inapplicable in the Section 1983 context because applying the doctrine in this case would deter Norton and other officers from intentionally defrauding the legal system. Pls.' Opp'n Br. 15-18.

Plaintiffs misinterpret decisions, such as *Ware v. James City County*, 652 F. Supp. 2d 693, 705 (E.D. Va. 2009) and *Townes v. City of New York*, 176 F.3d 138, 148-49 (2d Cir. 1999), as fact-specific. In both of these cases, the Court unequivocally stated that "the fruit of the poisonous tree doctrine is not available to assist a § 1983 claimant." *Ware*, 652 F. Supp. 2d at 705 (quoting *Townes*, 176 F.3d at 148-49) (internal quotation marks omitted). As Plaintiffs point out, *Williams v. City of Tulsa*, Case No. 11-CV-469-TCK-FHM, 2016 U.S. Dist. LEXIS 52066, *20-22 (N.D. Okla. Apr. 19, 2016) provides further support for the Officers' position. But, the Officers need not rely on this decision to show that the Plaintiffs cannot establish proximate cause.

Plaintiffs offer no argument in opposition to the Officers' point that the facts pled show that probable cause existed at the time of the Plaintiffs' arrests. Nor do Plaintiffs dispute that intervening events can break the causal chain between an officer's misconduct and a claimant's injuries. Because Plaintiffs concede these points, their argument that only their malicious prosecution claim depends on the fruit of the poisonous tree doctrine rings hollow. There is no question that Plaintiffs were arrested because the investigating officers found contraband in their possession, not because Norton obtained a search warrant under false pretenses. The Commonwealth's Attorney's Office then decided to pursue criminal charges against the Plaintiffs; and, regardless of their reasons for doing so, the Plaintiffs decided to plead guilty to their crimes. Finally, the Circuit Court for the City of Richmond exercised its discretion in imposing Plaintiffs' sentences. All of these subsequent events defeat Plaintiffs' claim that their imprisonment was the proximate result of Norton's misconduct.

### D. The Officers' statute of limitations defense is valid.

Plaintiffs spend considerable effort attacking the Officers' argument that some of their underlying claims against Norton are time-barred. Nevertheless, they ignore the main point of this small portion of the Officers' Brief in Support – that Plaintiff Johnson knew or should have known of his potential claim against Norton before the Commonwealth's Attorney's Office moved to vacate his conviction in July 2015, as his own letter to the prosecutor's office initiated this process. *See* Compl. ¶¶ 84-85. Because the Plaintiffs did not file this suit until August 2017, Johnson's claim is undoubtedly prohibited by the two-year statute of limitations. *See Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995) (holding that a federal cause of action accrues when the plaintiff possesses sufficient facts to realize his cause of action following a reasonable inquiry).

13

Plaintiffs argue that regardless of when they acquired knowledge of Norton's misconduct, *Heck v. Humphrey*, 512 U.S. 477, 487 (1994) prohibited them from bringing a claim that implies the invalidity of their convictions or sentences until after their convictions were overturned. Pls.' Opp'n Br. 20. This argument disregards the caveat provided on the same page of the *Heck* opinion that "a suit for damages attributable to an allegedly unreasonable search may lie even if the challenged search produced evidence that was introduced in a . . . trial resulting in the . . . plaintiff's still-outstanding conviction." 512 U.S. at 487 n.7.

Plaintiffs' Fourth Amendment claim against Norton is premised on the allegation that the initial searches and arrests were not supported by probable cause. *Heck* is inapplicable, as neither claim suggests that Plaintiffs' subsequent convictions were invalid. In fact, Plaintiffs challenge their convictions on other grounds – that they were denied the right to make a knowing and intelligent plea. Plaintiffs should have raised their Fourth Amendment claims when they first had reason to suspect that Norton fabricated their search warrant applications. Johnson, and likely Williams as well, have now lost that opportunity.

### E. Qualified Immunity Applies

As stated in the Officers' Brief in Support and for the reasons set forth above, the Complaint fails to show that the Officers deprived the Plaintiffs of a constitutional right and, certainly, fails to show that the Officers violated a clearly established constitutional right. As such, the Officers are entitled to qualified immunity as a matter of law.

### VI. CONCLUSION

For the reasons stated herein and those stated in the Officers' previously submitted Brief in Support, the Officers' motion should be granted and Plaintiffs' claims against Gleason, Sipple, and Russell should be dismissed with prejudice.

CHRISTOPHER GLEASON, CHARLES SIPPLE, and ROGER RUSSELL

_/s/_
D. Cameron Beck, Jr. (VSB No. 39195)
Walker Terry (VSB No. 84532)
*Attorneys for Defendants Gleason, Sipple, and Russell*
MCCANDLISH HOLTON
P.O. Box 796
1111 E. Main St., Suite 2100
Richmond, VA 23218
(804) 775-3100 Telephone
(804) 775-3800 Facsimile
cbeck@lawmh.com
wterry@lawmh.com

# CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of November, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such Filing (NEF) to the following counsel of record:

Mark J. Krudys
The Krudys Law Firm, PLC
Suntrust Center
919 E. Main Street, Suite 2020
Richmond, VA 23219
(804) 774-7950 Telephone
(804) 381-4458 Facsimile
mkrudys@krudys.com
*Counsel for Plaintiffs*

John Frederick Preis
7719 Rock Creek Road
Henrico, VA 23229
(804) 289-8682 Telephone
jpreis@richmond.edu
*Counsel for Plaintiffs*

Amy L. Austin
The Law Office of Amy L. Austin, PLLC
101 Shockoe Slip, Suite M
Richmond, VA 23219
(804) 343-1900 Telephone
(804) 343-1901 Facsimile
amyaustinlawyer@gmail.com
*Counsel for Plaintiffs*

Stephen M. Hall
Richard E. Hill, Jr.
Office of the City Attorney
900 E. Broad Street
Richmond, VA 23219
(804) 646-7953 Telephone
(804) 646-7939 Facsimile
Stephen.Hall@richmondgov.com
Richard.HillJr@richmondgov.com
*Counsel for Defendant City of Richmond*

David P. Corrigan
Jeremy D. Capps
M. Scott Fisher, Jr.
Harman Claytor Corrigan & Wellman
4951 Lake Brook Drive, Suite 100
Glen Allen, VA 23060-9272
(804) 747-5200 Telephone
(804) 747-6085 Facsimile
dcorrigan@hccw.com
jcapps@hccw.com
sfisher@hccw.com
*Counsel for Defendant Norton*

Jonathan P. Harmon
Brian D. Schmalzbach
McGuireWoods LLP
Gateway Plaza
800 E. Canal Street
(804) 775-1000 Telephone
(804) 698-2304 Facsimile
jharmon@mcguirewoods.com
bschmalzbach@mcguirewoods.com
*Counsel for Defendant Norwood*

> Ashley L. Taylor, Jr.
> Stephen C. Piepgrass
> Brooke K. Conkle
> Troutman Sanders LLP
> 1001 Haxall Point
> Richmond, VA 23219
> (804) 697-1286 Telephone
> (804) 697-1339 Facsimile
> ashley.taylor@troutmansanders.com
> stephen.piepgrass@troutmansanders.com
> brooke.conkle@troutmansanders.com
> *Counsel for Defendants Alston, Corrigan, Harrison, and Blackwell*

And I hereby certify that I will mail a copy of the foregoing by U.S. mail, postage prepaid, to the following non-filing user(s): none.

> */s/*
> D. Cameron Beck, Jr. (VSB No. 39195)
> Walker Terry (VSB No. 84532)
> *Attorneys for Defendants Gleason, Sipple, and Russell*
> MCCANDLISH HOLTON
> P.O. Box 796
> 1111 E. Main St., Suite 2100
> Richmond, VA 23218
> (804) 775-3100 Telephone
> (804) 775-3800 Facsimile
> cbeck@lawmh.com
> wterry@lawmh.com